1    SHANNON ERNSTER (SBN 264940)
     sernster@grsm.com
2    HELA VAKNIN (SBN 342083)
     hvaknin@grsm.com
3    GORDON REES SCULLY MANSUKHANI, LLP
     633 West Fifth Street, 52nd Floor
4    Los Angeles, California 90071
     Telephone: (213) 576-5000
5    Facsimile: (213) 680-4470

6    Attorneys for Defendants
     FIRST HEALTH GROUP CORP.
7    and COVENTRY HEALTH CARE
     NATIONAL NETWORK, INC.

8

9                    UNITED STATES DISTRICT COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11

12   UNIVERSITY OF SOUTHERN              CASE NO. 2:25-cv-3364
     CALIFORNIA on behalf of its KECK    *Judge:*
13   HOSPITAL OF USC and on behalf of
     its USC VERDUGO HILLS               *Los Angeles County Superior Court*
14   HOSPITAL,                           *Case No. 25STCV05606*

15                      Plaintiff,       **DECLARATION OF SHANNON
                                         L. ERNSTER IN SUPPORT OF
16          v.                           DEFENDANTS' NOTICE OF
                                         REMOVAL**
17   COVENTRY HEALTH CARE
     NATIONAL NETWORK, INC.; FIRST       State Court Complaint Filed:
18   CONTINENTAL LIFE & ACCIDENT         February 27, 2025
     INSURANCE CO.; FIRST HEALTH
19   GROUP CORP.; and DOES 1 through
     25, inclusive,                      Accompanying Document:
20                                       Notice of Removal
                       Defendants.
21

22

23

24

25

26

27

28

DECLARATION OF SHANNON L. ERNSTER IN SUPPORT OF DEFENDANTS' NOTICE OF REMOVAL

GORDON REES SCULLY MANSUKHANI, LLP
633 West Fifth Street, 52nd Floor
Los Angeles, CA 90071

**GORDON REES SCULLY MANSUKHANI, LLP**
633 West Fifth Street, 52nd Floor
Los Angeles, CA 90071

## DECLARATION OF SHANNON L. ERNSTER

I, Shannon L. Ernster, declare as follows:

1.      I am an attorney duly licensed to practice law before all courts of the State of California and the United States District Court for the Central District of California, and am a partner at Gordon Rees Scully Mansukhani, LLP, attorneys for Defendants First Health Group Corp. ("First Health") and Coventry Health Care National Network, Inc. ("Coventry") in this matter.  I am a member in good standing with the State Bar of California.  I have personal knowledge of the following facts, except for those based on information and belief, which I believe to be true, and if called upon to testify, I could and would competently testify to their truth and accuracy.

2.      This declaration is submitted in support of Defendants' Notice of Removal under 28 U.S.C. §§ 1332, 1441, and 1446.

3.      Plaintiff University of Southern California on behalf of its Keck Hospital of USC and on behalf of its USC Verdugo Hills Hospital ("Plaintiff") filed the instant action against Coventry, First Health, and First Continental Life & Accident Insurance Company in the Superior Court of the State of California for the County of Los Angeles, entitled *University of Southern California on behalf of its Keck Hospital of USC and on behalf of its USC Verdugo Hills Hospital v. Coventry Health Care National Network, Inc., et al.*, Case No. 25STCV18272.  A true and correct copy of the Complaint is attached hereto as **Exhibit A**.

4.      Plaintiff served First Health with the Summons and Complaint on March 17, 2025.  A true and correct copy of the Service of Process Transmittal Summary is attached hereto as **Exhibit B.**

5.      Plaintiff served Coventry with the Summons and Complaint on March 18, 2025.  A true and correct copy of the Service of Process Transmittal Summary is attached hereto as **Exhibit C.**

6.    **Exhibit D** is a complete copy of all of the documents Plaintiff served on First Health on March 17, 2025.

7.    **Exhibit E** is a complete copy of all of the documents Plaintiff served on Coventry on March 18, 2025.

8.    I am advised by counsel for Defendant First Continental Life & Accident Insurance Company that it consents to the removal of the case and will join in Defendants' Notice of Removal.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and if called as a witness I could and would so testify.

Executed this 16th day of April, 2025, in Nashville, Tennessee.


/s/ *Shannon L. Ernster*
Shannon L. Ernster

**GORDON REES SCULLY MANSUKHANI, LLP**
633 West Fifth Street, 52nd Floor
Los Angeles, CA 90071

# EXHIBIT A

**HELTON LAW GROUP**
A PROFESSIONAL CORPORATION
CARRIE MCLAIN (State Bar No. 181674)
MIKAELA COX (State Bar No. 316886)
THOMAS YAU (State Bar No. 339222)
ATTORNEY AT LAW
1590 Corporate Drive
Costa Mesa, CA 92626
TELEPHONE: (562) 901-4499
FACSIMILE: (562) 901-4488

ATTORNEYS FOR PLAINTIFF

Electronically FILED by
Superior Court of California,
County of Los Angeles
2/27/2025 7:25 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its KECK HOSPITAL OF USC and on behalf of its USC VERDUGO HILLS HOSPITAL,<br><br>Plaintiff,<br><br>vs.<br><br>COVENTRY HEALTH CARE NATIONAL NETWORK, INC.; FIRST CONTINENTAL LIFE & ACCIDENT INSURANCE CO.; FIRST HEALTH GROUP CORP.; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.: 25STCV05606<br><br>ASSIGNED TO:<br>DEPT.:<br><br>UNLIMITED - DAMAGES IN EXCESS OF $35,000<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>1. **NEGLIGENT MISREPRESENTATION**<br>2. **DECEIT**<br>3. **BREACH OF IMPLIED-IN-FACT CONTRACT**<br>4. **QUANTUM MERUIT**<br>5. **PROMISSORY ESTOPPEL**<br>6. **UNFAIR BUSINESS PRACTICES (CAL. BUS. & PROF. CODE § 17200 et seq.)**<br>7. **BREACH OF WRITTEN CONTRACT**<br>8. **BREACH OF WRITTEN CONTRACT** |

TO ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:

1.      Plaintiff UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its KECK HOSPITAL OF USC and on behalf of its USC VERDUGO HILLS HOSPITAL, (collectively "Plaintiff" or "Hospitals") bring this action against Defendants COVENTRY HEALTH CARE NATIONAL NETWORK, INC., FIRST CONTINENTAL LIFE & ACCIDENT INSURANCE CO., FIRST HEALTH GROUP CORP. and Does 1 through 25 for failure to pay $545,328.90 for hospital services provided to the Patient, who allegedly had health care insurance through Defendants.

**THE PARTIES**

2.     Plaintiff UNIVERSITY OF SOUTHERN CALIFORNIA ("USC") on behalf of its KECK HOSPITAL OF USC ("Keck") and on behalf of its USC VERDUGO HILLS HOSPITAL ("VHH") is a nonprofit public benefit corporation licensed to do business in the State of California, with its principal place of business in the City of Los Angeles, County of Los Angeles. USC owns and operates Keck Hospital of USC and USC Verdugo Hills Hospital, which at all relevant times discussed herein are and have been licensed as acute-care hospitals by the California Department of Public Health ("CDPH").

3.     USC, Keck and Verdugo are referred to herein collectively as "Plaintiff" or "Hospitals."

4.     Plaintiff is informed and believes and, on this basis alleges the following: Defendant COVENTRY HEALTH CARE NATIONAL NETWORK, INC. ("Coventry") is a corporation domiciled, organized and existing under the laws of the State of Delaware.

5.     Plaintiff is informed and believes and, on this basis alleges the following: Defendant FIRST CONTINENTAL LIFE & ACCIDENT INSURANCE CO. ("FCL" or "FIRST CONTINENTAL") is a corporation domiciled, organized and existing under the laws of the State of Utah and licensed to transact insurance in several states and territories. Commencing on or before October 15, 2019, FIRST CONTINENTAL unlawfully acted as an insurance company in California and has, in that capacity unlawfully transacted the business of insurance in California without the requisite certificate of authority.

6.     Plaintiff is informed and believes and, on this basis alleges the following: Defendant FIRST HEALTH GROUP CORP. ("First Health") is a corporation domiciled, organized and existing under the laws of the State of Delaware.

7.     As explained further below, Coventry Health Care National Network, Inc., and its affiliates, including but not limited to First Health Network, (collectively, "Coventry Companies" or "Coventry Company") breached the Coventry Health Care National Network, Inc. Participating Hospital Agreement, effective February 1, 2008, with Keck USC ("Keck USC Agreement") and the Coventry Agreement, effective November 1, 2011, with Verdugo Hills ("Verdugo Hills Agreement").

8.   Plaintiff is unaware of the true names, identities, and capacities of the Defendants sued as Does 1 through 25, inclusive, and each of them as based thereon, sue said defendants by such fictitious names. When their true names and capacities are ascertained, Plaintiff will amend this complaint by inserting their true names and capacities. Plaintiff is informed and believes and alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged herein, and that the Plaintiff's damages as alleged herein were proximately caused by those Defendants.

9.   Plaintiff is informed and believes and alleges that at all times mentioned, each of the Defendants, including all Defendants sued under fictitious names, were the agent and/or employee of each of the remaining Defendants, and in so doing the things alleged, were acting within the scope of his, her or its agency and employment, and with the permission and consent of the other defendants.

10.   Plaintiff is withholding the full name of the patient addressed in this complaint to preserve the patient's protected rights to privacy concerning health care information. Plaintiff will refer to the patient individually as patient. The Patient's name and claims information have been, and/or will be made available to Defendants upon request consistent with HIPAA and the minimum necessary requirement.

11.   FCL, COVENTRY, FIRST HEALTH, and Does 1 through 25 are collectively referred to herein as "Defendants."

## AGENCY

12.   The Hospitals are informed and believe and thereon allege that at all times mentioned herein, each of the Defendants, including all Defendants sued under fictitious names, were the agent and/or employee of each of the remaining Defendants, including specifically but not limited to FCL and FIRST HEALTH, and in so doing the things alleged herein, were acting within the scope of his or her agency and employment and with the permission and consent of each of the other Defendants.

13.   The Hospitals are informed and believe and thereon alleges that Defendants have entered into an administrative service agreement or other contracts with Administrative Concepts Inc. ("ACI") and Zelis to act as agents for Defendants, and have provided ACI and Zelis actual or ostensible authority to act on Defendants' behalf for: communicating with policyholders and medical

1  providers, such as the Hospitals; creating agreements with medical providers so that Defendant's
2  policy holders may receive medical services; verifying member policy information and eligibility to
3  medical providers, such as the Hospitals, interpreting plan terms and provisions; authorizing services
4  to be provided by the Hospitals to FCL policyholders; determining medical necessity and coverage of
5  services; receiving the Hospitals' claims; processing and administering the Hospitals' claims and
6  appeals; approving or denying the Hospitals' claims and appeals; interpreting policy documents;
7  determining whether and how to pay the Hospitals' claims; issuing payment advices, claim status
8  reports and explanation of benefits ("EOBs") and making and administering payments.

9      14.    With respect to the claims at issue in this case, the Hospitals dealt directly with FCL,
10  ACI, and/or Zelis in obtaining agreements to pay for services, seeking authorization for the services,
11  obtaining eligibility and coverage information, submitting claims for reimbursement, communicating
12  about the claims, appealing the denial or underpayment of the claim, submitting additional information
13  concerning the claim, and receiving explanation of benefits ("EOB").

14                              **BACKGROUND**

15  **A.    VERDUGO HILLS HOSPITAL CLAIM**

16      15.    In early 2023, Patient was admitted to the Emergency Department at VHH to receive
17  emergency medical services.  Patient presented with a fever, productive cough, chills, nausea,
18  shortness of breath and headache for more than seven days.  While in the ED, the Patient was febrile,
19  tachypneic, tachycardic and hypoxic.

20      16.    The Patient identified to VHH that he was a California resident.  The Patient presented
21  an insurance identification card identifying "Evolve Health" sponsored by the Service Industry Trade
22  Alliance.  The card claims the plan offers "Limited medical benefits underwritten by: First Continental
23  Life and Accident Insurance Company."   The card further identifies First Health as the applicable
24  network and directed providers to submit claims to Administrative Concepts, Inc. ("ACI").

25      17.    On the Patient was admitted, a VHH employee called ACI and verified the Patient's
26  eligibility under the plan.  The following day, the VHH employee phoned ACI again and verified the
27  Patient's insurance type as "PPO." ACI's employee Joyce Robert provided tracking number
28  EV2022458 and verified the Patient's insurance benefits and coverage as 100% with zero copy and

1  deductible. Ms. Robert further instructed that the hospital fax clinicals to ACI and represented no
2  precertification was required.

3      18. The Patient was diagnosed with sepsis, Legionnaires' disease, toxic encephalopathy,
4  acute respiratory distress syndrome, and severe sepsis with septic shock. During the stay, the Patient
5  was placed on mechanical ventilation. During the Patient's inpatient stay, VHH provided hospital
6  services with charges totaling $190,521.35.

7      19. Five (5) days after the Patient was admitted, the Patient's physicians determined the
8  Patient required transfer to a higher level of care for extracorporeal membrane oxygenation (ECMO),
9  which is a method of providing cardiac and respiratory support to a person whose heart and lungs are
10  unable to provide enough oxygen to sustain life. VHH contacted the Transfer Center at Keck to
11  request transfer for a higher level of care.

12      20. FCL, ACI, and its other co-conspirators (collectively referred to as the "Payors") and/or
13  its agents improperly denied payment for the emergency and post-stabilization hospital services the
14  Hospitals provided.

15      21. Meanwhile, unbeknownst to Plaintiff, on February 2, 2022, the California Department
16  of Insurance ("CDI") issued a Cease-and-Desist Order that FCL stop operating an insurance plan in
17  California. The Order finds that FCL unlawfully acted as an insurance company in California without
18  the requisite certificate of authority.

19      22. It is the Plaintiff's understanding this Patient was a California resident during the dates
20  of services at issue. Thus, each of the Payors continued to operate in California in violation of the
21  Cease-and-Desist Order.

22      23. The Cease-and-Desist Order also instructed First Health Network, its officers, directors,
23  employees, agents, affiliates, and representatives, ordering it to end its business practices aiding and
24  abetting First Continental's unlawful transaction of insurance in California.

25      24. The Cease-and-Desist Order concludes First Health Network aided and abetted First
26  Continental in violation of California Insurance Code section 703, which makes it a misdemeanor
27  offense to in any manner aid a non-admitted insurer to transact insurance business in California.

28

25.     As reflected in the attached exhibits, Defendants' unlawful activities in aiding and abetting FCL's illegal business of insurance in California continued.  Specifically, Coventry Company permitted FCL to continue to identify Coventry Company on insurance identification cards in February 2023.

26.     Coventry Company also improperly and illegally granted FCL access to rates in the Hospitals' Agreements for one or more of the Hospitals' claims for services provided. In doing so, Coventry Company breached the Keck Agreement and Verdugo Agreement.

27.     Additionally, FCL and/or its Agents further engaged in intentional fraud and/or negligent misrepresentation by informing VHH that authorizations were not required pursuant to an alleged insurance policy issued to a California resident in violation of the Cease-and-Desist Order.

28.     FCL and/or its Agents have improperly denied VHH's claim citing conflicting reasons for such denial, when the Hospital provided lifesaving emergency services to the Patient while at VHH.

29.     Pursuant to the federal Emergency Medical Treatment and Active Labor Act (EMTALA) at 42 USC §1385dd, hospitals are required to provide services to any patient regardless of the patient's ability to pay as long as the services are necessary to stabilize the patient.  However, once a patient has been stabilized, a hospital may determine whether to continue to provide services or transfer the Patient to an alternative facility (such as a County Hospital), depending on whether the patient has coverage pursuant to a health care plan or otherwise has the ability to pay.

30.     When the Patient was stable, VHH verified the Patient's eligibility with   Defendants and notified Defendants of the Patient's admission to the Hospital.  VHH requested authorization of the services the Hospital would be providing the Patient and, in so doing, specifically informed that Defendants what type of care and illness the Patient was receiving care for from the Hospital.

31.     On more than one occasion after VHH provided the Defendants information regarding the Plaintiff's medical status and clinical care and before the Patient's transfer from VHH to Keck for a higher level of care. The Defendants provided the Hospitals information regarding the Patient's insurance benefits and lack of authorization requirement.  The information Defendants provided to the

1  Hospitals did not disclose that the Patient's plan through FCL did not cover charges for the care
2  Patient was and would be receiving.

3      32.    Unbeknownst to the Hospitals, the information the Hospitals provided to the
4  Defendants was sufficient for the Defendants to make a determination that the Hospitals' services
5  were not covered based on information that the Defendants exclusively possessed about the terms of
6  the Patient's insurance plan through FCL.

7      33.    However, at no time before the Patient's discharge from VHH and admission to Keck
8  did the Hospitals know or have any reasonable way of knowing that the Patient's injuries were not
9  covered under the Patient's insurance plan through FCL.

10     34.    Despite these facts, before the Hospitals provided all acute care hospital services to the
11 Patient, Defendants: (1) provided to the Hospitals oral verification of the Patient's eligibility,
12 coverage, and benefits under the Patient's plan through FCL; (2) repeatedly informed VHH that
13 authorization was not required; and (3) requested that the Hospitals provide clinical information
14 regarding the Patient's medical condition.  In making such communications and taking such actions,
15 Defendants expressly and/or impliedly communicated, and the Hospitals reasonably understood
16 Defendants' communications and actions to communicate, that the services the Hospitals provided to
17 the Patient were covered under the Patient's plan through FCL, and thus that Defendants were legally
18 obligated to pay for such services.

19     35.    The Hospitals are informed and believe that in engaging in such communications and
20 taking such actions the Defendants and/or its Agents, were acting within the scope of its agency and
21 employment and with the permission and consent of each of the other Defendants, including
22 specifically, but not limited to, FCL and Coventry Company.

23     36.    The Hospitals would not have provided all of the acute care hospital services that they
24 provided to the Patient without such assurances of payment by Defendants.

25     37.    Additionally, the Defendants caused the Hospitals to reasonably believe that each of the
26 other Defendants were their actual and/or ostensible agents.  Specifically, the Defendants caused the
27 Patient and their family to present member identification cards to the Hospitals identifying each of the
28 Defendants as the entities to contact for information from the Defendants regarding the Patient's

1  eligibility and benefits, and for authorization of services.  Additionally, each of the Defendants

2  provided the other Defendants confidential, private, and protected health information regarding the

3  Patient, which the other Defendants then communicated to Verdugo; the other Defendants would not

4  be entitled to have access to said confidential, private, and protected health information if they were

5  not authorized agents of the Defendants.

6       38.    Ultimately, Verdugo provided acute care hospital services to the Patient with total

7  charges of $190,521.35, with the expected reimbursement of $34,651.66 based on the VHH

8  Agreement rate.

9       39.    Hospitals sent a claim for reimbursement to the Defendants and/or its Agents.  On

10  August 18, 2023, months after the Patient's discharge, Defendants for the first time communicated that

11  the services VHH provided were not covered by the Patient's plan through FCL because of the

12  "exclusion of the alcohol related diagnoses."

13       40.    The Defendants chose to ignore the majority of the Patient's diagnosis such as

14  Legionnaires' disease and acute respiratory distress syndrome and denied the claim in its entirety.

15       41.    To date, Defendants have paid nothing to VHH for such services. Thus, Verdugo has

16  sustained damages in the amount of $34,651.66, plus interest.

17  **B.**    **KECK HOSPITAL OF USC CLAIM**

18       42.    When the Patient's physicians at VHH determined the Patient required transfer to a

19  higher level of care for extracorporeal membrane oxygenation (ECMO), which is a method of

20  providing cardiac and respiratory support to a person whose heart and lungs are unable to provide

21  enough oxygen to sustain life, VHH contacted the Transfer Center at Keck to request transfer for a

22  higher level of care.

23       43.    Because the Patient was an inpatient at VHH, Keck did financial clearance for the

24  Patient prior to accepting the transfer.  Specifically, Keck called FCL and/or its agents and was

25  informed that Patient had active coverage and no authorization was required.

26       44.    FCL and/or its agents verified the Patient's coverage and benefits.  Keck relied upon

27  such verifications and the plan's participation in the First Health Network/Coventry Company to

28  "financially clear" the Patient prior to accepting the Patient for lateral transfer that same day for non-

EMTALA services. Keck registered the Patient under "First Health" coverage and expected reimbursement from the plan at the Coventry Company Network rates under the Keck and Verdugo Agreement with Coventry Companies.

45. Prior to admission, the following health insurance identification card identifying the plan as participating in the Coventry Company network (See Exhibit A - Insurance card attached).

46. Defendants verified the Patient's coverage and benefits with ACI once again in March 2023, and Keck was told once again that no authorization was required. Keck relied upon such verifications and the plan's participation in the Coventry Company Network to "financially clear" the Patient prior to accepting the Patient for transfer for higher level of care. Keck registered the Patient under "First Health" coverage and expected reimbursement from the plan at the Coventry Company rates under the Keck and Verdugo Agreement.

47. The Hospitals' records indicate at no time prior to or concurrent with the Hospitals' provision of services to the Patient did Payors inform Hospitals that February 14, 2023, was the last day the Patient had insurance coverage. The Hospitals' records indicate Payors further failed to inform Hospitals of any policy exclusions or benefits limitations until months after the Patient discharged from the Hospitals.

48. The Patient was admitted to Keck for emergency services related to multifocal pneumonia and bacteremia. The Patient was treated at Keck from February into March 2023.

49. On March 6, 2023, Keck faxed Patient's clinical notes to ACI.

50. Keck received correspondence from ACI dated April 24, 2023, asking for the toxicology report, admission summary, and discharge summary.

51. Again, on May 5, 2023, Keck spoke with ACI and was told that Patient was active on the dates of service and was still active.

52. At no time before the Patient's discharge from Keck did Hospitals know or have any reasonable way of knowing that the Patient's coverage had terminated on February 14, 2023.

53. Despite these facts, before Keck provided all acute care hospital services to the Patient, Defendants: (1) provided to the Hospitals oral verification of the Patient's eligibility, coverage, and benefits under the Patient's plan through FCL; (2) repeatedly informed Keck that authorization was

not required; and (3) requested that the Hospitals provide clinical information regarding the Patient's medical condition. In making such communications and taking such actions, Defendants expressly and/or impliedly communicated, and the Hospitals reasonably understood Defendants' communications and actions to communicate, that the Patient had active coverage and the services Keck provided to the Patient were covered under the Patient's plan through FCL, and thus that Defendants were legally obligated to pay for such services.

54.     FCL initially denied payment for both Keck and VHH claims for reimbursement on the basis of an unspecified exclusion for a particular diagnosis. The explanations of benefits, dated May 30, 2023 and September 26, 2023, denying the claims expressly state that the payor accessed the Coventry Company contract rates.

55.     On the EOB dated September 26, 2023, FCL changed the denial reason from denial based on an exclusion to denial based on the termination of Patient's coverage starting on February 14, 2023.

56.     Months after the Patient's discharge, the Plan Defendants for the first time communicated that the services Keck provided were not covered by the Patient's plan through FCL because the Patient's services were rendered after the Patient insurance had terminated on February 14, 2023.

57.     In all previous communications, Defendants had communicated to Keck that the Patient had active coverage and no authorization was required before Patient's transfer occurred and requested clinical information regarding the Patient. In engaging in such communications and taking such actions, Defendants expressly and/or impliedly communicated, and the Hospitals reasonably understood Defendants' communications and actions to communicate, that the services Keck provided to the Patient were covered under the Patient's plan through FCL.

58.     Keck would not have accepted the transfer of the Patient to its acute rehabilitation hospital, nor would it have provided the acute rehabilitation hospital services that it provided to the Patient without such assurances of payment by Defendants.

59.     Additionally, the Defendants caused Keck to reasonably believe that each of the other Defendants were their actual and/or ostensible agents. Specifically, the Defendants caused the Patient

and their family to present member identification cards to the Hospitals identifying each of the Defendants as the entities to contact for information from the Defendants regarding the Patient's eligibility and benefits, and for authorization of services.    Additionally, each of the Defendants provided the other Defendants confidential, private, and protected health information regarding the Patient, which the other Defendants then communicated to the Hospitals; the other Defendants would not be entitled to have access to said confidential, private, and protected health information if they were not authorized agents of the Defendants.

60.    FCL, ACI, and its other co-conspirators (collectively referred to as the "Payors") and/or its agents improperly denied payment for the emergency and post-stabilization hospital services the Hospitals provided.

61.    Meanwhile, unbeknownst to Hospitals, on February 2, 2022, the California Department Insurance issued a Cease-and-Desist Order that FCL stop operating an insurance plan in California. The Order finds that FCL unlawfully acted as an insurance company in California without the requisite certificate of authority.

62.    It is the Hospitals' understanding this Patient was a California resident during the dates of services at issue.    Thus, each of the Payors continued to operate in California in violation of the Cease-and-Desist Order.

63.    The Cease-and-Desist Order also instructed Coventry Companies, First Health Network, its officers, directors, employees, agents, affiliates, and representatives, ordering it to end its business practices aiding and abetting First Continental's unlawful transaction of insurance in California.

64.    The Cease-and-Desist Order concludes First Health Network aided and abetted First Continental in violation of California Insurance Code section 703, which makes it a misdemeanor offense to in any manner aid a non-admitted insurer to transact insurance business in California.

65.    As reflected in the attached exhibits, Coventry Company's unlawful activities in aiding and abetting FCL's illegal business of insurance in California continued.    Specifically, Coventry Company permitted FCL to continue to identify Coventry Company on insurance identification cards in February 2023.

66.     Coventry Company also improperly and illegally granted FCL access to rates in the Hospitals' Agreements for one or more of the Hospitals' claims for services provided in February 2023. In doing so, Coventry Company breached the Keck Agreement and Verdugo Agreement.

67.     Ultimately, Keck provided acute rehabilitation hospital services to the Patient with total charges of $785,657.29, with the expected reimbursement of $510,677.24 from the plan at the Coventry Company rates under the Keck and Verdugo Hills Agreement.

68.     To date, Defendants have paid nothing to the Hospital for such services. Thus, the Hospital has sustained damages in the amount of $510,677.24, plus interest.

## FIRST CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

## (AS TO ALL DEFENDANTS)

69.     The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

70.     Prior to the Hospitals agreeing to accept the admission of the Patient and/or providing post-stabilization care to the Patient in their hospitals, Defendants expressly and/or impliedly represented that no pre-authorization was required, and the hospital services the Hospitals would be providing the Patient were covered under the Patient's PPO medical insurance plan through FCL, and thus that Defendants were legally obligated to pay for such services.

71.     The Patient identified to Hospitals that he was a California resident.  The Patient presented an insurance identification card identifying "Evolve Health" sponsored by the Service Industry Trade Alliance.  The card claims the plan offers "Limited medical benefits underwritten by: First Continental Life and Accident Insurance Company."  The card further identifies First Health as the applicable network and directed providers to submit claims to Administrative Concepts, Inc. (See Exhibit A - Insurance card attached).

72.     The Hospitals would not have admitted the Patient for post-stabilization services at VHH, and Keck would not have accepted transfer of the Patient to its hospital for higher level of care or provided acute care hospital services to the Patient without such assurances by Defendants.

73.    Prior to each of Defendants' representations, the Hospitals had informed Defendants that the Patient was being treated for sepsis, Legionnaires' disease, toxic encephalopathy, acute respiratory distress syndrome, and severe sepsis with septic shock.

74.    Thus, at the time Defendants made their representations, they were not true, and Defendants had no reasonable grounds for believing the representations to be true when they made them because the Patient's plan through ACI did either not cover charges due to the plan exclusions and/or being rendered after the Patient's coverage had been terminated.

75.    The Hospitals are informed and believe that in engaging in such communications and taking such actions each of the Defendants was the agent and/or employee of each of the remaining Defendants, including specifically but not limited to FCL and Coventry Companies and/or their agents, and in engaging in such communications and taking such actions, were acting within the scope of its agency and employment and with the permission and consent of each of the other Defendants, including specifically, but not limited to, FCL and Coventry Company.

76.    Additionally, Defendants are also liable to the Hospitals in failing to maintain license and certification in compliance with California law, and wrongful denial of coverage. FCL, ACI and its other co-conspirators (collectively referred to as the "Payors") engaged in a series of communications and conduct that constitute intentional fraud and/or negligent misrepresentation, including but not limited to: 1) engaging in the business of insurance without a license or certification under California law; 2) issuing to a California resident an insurance policy that fails to not comply with California law;  3) verifying the Patient's coverage and benefits in February 2023, (prior to admission at VHH), and again in February 2023, (prior to admission at Keck) without disclosing the Patient's policy ended that very day, the policy exclusions, and the benefits limitations;  and 4) engaging in communications and conduct on and after February 14, 2023, causing Keck to believe the Patient's coverage remained active.

77.    Defendants failed to inform Hospitals of any policy exclusions or benefits limitations until months after the Patient discharged from the Hospitals.

78.    Defendants also failed to inform Hospitals that, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist Order to FCL ordering it to end its unlawful

1   transaction of insurance in California.    The Order further orders ACI, Coventry Company, and
2   coconspirators to stop aiding and abetting FCL's unlawful practices. (See Exhibit B - Cease and Desist
3   Order). The Order finds that FCL unlawfully acted as an insurance company in California without the
4   requisite certificate of authority.    The Order identifies multiple violations by FCL, including
5   misrepresentation of fixed-benefit indemnity insurance as "health insurance" in violation of Insurance
6   Code sections 106(b)(2), 780(a), 781 and 790.03(b). CDI cited, as grounds for finding that First Health
7   aided and abetted FCL's illegal conduct, the appearance of the First Health Network logo on health
8   insurance identification cards virtually identical to the ones the Patient presented to the Hospitals.
9   (See, e.g., id., p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11).    The Order concludes ACI and
10  First Health Network aided and abetted FCL in violation of California Insurance Code section 703,
11  which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact
12  insurance business in California. (Id. at 21, lines 4-7). The Order commanded ACI., First Health and
13  other coconspirators to cease and desist their unlawful activities.

14          79.    Payors' unlawful activities in aiding and abetting FCL's illegal business of insurance in
15  California continued.    Specifically, FCL and/or ACI verified to the Hospitals on multiple occasions
16  that the Patient had active health insurance coverage through FCL. Payors continued to identify
17  Coventry Company on the Patient's insurance identification cards in February 2023. Coventry
18  Company also improperly and illegally granted FCL access to rates in the Hospitals' Agreements for
19  one or more of the Hospitals' claims for services provided in February 2023. Such conduct constitutes
20  unfair and deceptive acts or practices in the business of insurance, in violation of California Insurance
21  Code sections 790.02 and 790.03(b).

22          80.    Additionally, the fixed-benefit indemnity insurance FCL issued to the California-
23  resident Patient fails to comply with California essential benefit requirements, and in and of itself
24  constitutes a breach of the Coventry Company's Agreement with Keck and VHH. Under California
25  law, "where a contract confers on one party a discretionary power affecting the rights of the other, a
26  duty is imposed to exercise that discretion in good faith and in accordance with fair dealing."
27  California Lettuce Growers v. Union Sugar Co. (1955) 45 Cal.2d 474, 484. "[I]nsurance coverage is
28  interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary

1 | clauses are interpreted narrowly against the insurer." *MacKinnon v. Truck Ins. Exchange* (2003) 31

2 | Cal.4th 635, 648, 3 Cal.Rptr.3d 228 (internal quotations and alterations omitted).

81.    Defendants intended that the Hospitals rely upon Defendants' representations.

82.    The Hospitals reasonably relied on Defendants' representations by continuing to care for the Patient rather than seeking the Patient's transfer to another hospital facility.

83.    The Hospitals were harmed. Specifically, the Hospitals provided the Patient medically necessary and physician-ordered acute care hospital services with total charges of $976,178.64. The Hospitals expected reimbursement at the Coventry Company contract rate of $545,328.90. The Hospitals have received no payment from the Defendants for the lifesaving and medically necessary care provided to the Patient. Thus, the Hospitals have been damaged in an amount not less than $545,328.90, plus interest.

84.    The Hospitals' reliance on Defendants' representations was a substantial factor in causing the Hospital's harm.

## SECOND CAUSE OF ACTION

### DECEIT

### (AS TO ALL DEFENDANTS)

85.    The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

86.    Defendants provided to the Hospitals written and oral verification of the Patient's eligibility, coverage, and benefits under the Patient's plan through FCL, repeatedly informed Hospitals that no authorization was required for the Hospitals' provision of services to the Patient, participated in decisions regarding the Patient's medical care and requested that the Hospitals provide clinical information regarding the Patient's medical condition. In engaging in such communications and taking such actions, Defendants expressly and/or impliedly communicated, and the Hospitals reasonably understood Defendants' communications and actions to communicate, that the services the Hospitals would be providing to the Patient were covered under the Patient's plan through FCL, and thus that FCL and Coventry Company were legally obligated to pay for such services.

87.    The Hospitals would not have provided all of the acute care hospital services they provided to the Patient without such assurances by Defendants.

88.    Defendants did not communicate that the Patient's plan through FCL either did not cover charges or were incurred while Patient's plan had terminated. Thus, the disclosures Defendants made were deceptive.

89.    Defendants intentionally failed to disclose the fact that the Patient's plan through FCL did not cover the Patient's care and, thus, that FCL and Coventry Company would not pay the Hospitals for the services provided to the Patient.  Such facts were known only to Defendants and Hospitals could not have discovered them.

90.    Additionally, Defendants are also liable to the Hospitals in failing to maintain license and certification in compliance with California law, and wrongful denial of coverage.  FCL, ACI and its other co-conspirators (collectively referred to as the "Payors") engaged in a series of communications and conduct that constitute intentional fraud and/or negligent misrepresentation, including but not limited to: 1) engaging in the business of insurance without a license or certification under California law; 2) issuing to a California resident an insurance policy that fails to not comply with California law;  3) verifying the Patient's coverage and benefits in February 2023, (prior to admission at VHH), and again in February 2023, (prior to admission at Keck) without disclosing the Patient's policy ended that very day, the policy exclusions, and the benefits limitations; and 4) engaging in communications and conduct on and after February 14, 2023, causing Keck to believe the Patient's coverage remained active.

91.    Defendants failed to inform Hospitals of any policy exclusions or benefits limitations until months after the Patient discharged from the Hospitals.

92.    Defendants also failed to inform Hospitals that, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist Order to FCL ordering it to end its unlawful transaction of insurance in California.  The Order further orders ACI, Coventry Companies, and coconspirators to stop aiding and abetting FCL's unlawful practices. The Order finds that FCL unlawfully acted as an insurance company in California without the requisite certificate of authority. The Order identifies multiple violations by FCL, including misrepresentation of fixed-benefit

indemnity insurance as "health insurance" in violation of Insurance Code sections 106(b)(2), 780(a), 781 and 790.03(b). CDI cited, as grounds for finding that Coventry Company aided and abetted FCL's illegal conduct, the appearance of the First Health Network logo on health insurance identification cards virtually identical to the ones the Patient presented to the Hospitals. (*See,* e.g., id., p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11). The Order concludes ACI and First Health Network aided and abetted FCL in violation of California Insurance Code section 703, which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact insurance business in California. (Id. at 21, lines 4-7). The Order commanded ACI., First Health and other coconspirators to cease and desist their unlawful activities.

93.    Payors' unlawful activities in aiding and abetting FCL's illegal business of insurance in California continued. Specifically, FCL and/or ACI verified to the Hospitals on multiple occasions that the Patient had active health insurance coverage through FCL. Payors continued to identify First Health Network on the Patient's insurance identification cards in February 2023. Coventry Company also improperly and illegally granted FCL access to rates in the Hospitals' Agreement with Coventry Company. Such conduct constitutes unfair and deceptive acts or practices in the business of insurance, in violation of California Insurance Code sections 790.02 and 790.03(b).

94.    The fixed-benefit indemnity insurance FCL issued to the California-resident Patient fails to comply with California essential benefit requirements, and in and of itself constitutes a breach of the Coventry Company Agreement with Hospitals. Under California law, "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *California Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 484. "[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted narrowly against the insurer." *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648, 3 Cal.Rptr.3d 228 (internal quotations and alterations omitted).

95.    The Hospitals are informed and believe that in engaging in such communications and taking such actions each of the Defendants was the agent and/or employee of each of the remaining Defendants, including specifically but not limited to FCL and Coventry Company, and in engaging in

1    such communications and taking such actions, were acting within the scope of its agency and
2    employment and with the permission and consent of each of the other Defendants, including
3    specifically, but not limited to, FCL and Coventry Company.

4        96.    The Hospitals did not know of the concealed facts at any time before the Patient was
5    discharged from the Hospitals.

6        97.    Defendants intended to deceive the Hospitals by concealing these facts.

7        98.    The Hospitals reasonably relied on Defendants' deception by continuing to care for the
8    Patient rather than seeking the Patient's transfer to another hospital facility.

9        99.    The Hospitals were harmed. Specifically, the Hospitals provided the Patient medically
10   necessary and physician-ordered acute care hospital services with total charges of $976,178.64. The
11   Hospitals expected reimbursement at the Coventry Company contract rate of $545,328.90. The
12   Hospitals have received no payment from the Defendants for the lifesaving and medically necessary
13   care provided to the Patient. Thus, the Hospitals have been damaged in an amount not less than
14   $545,328.90, plus interest.

15       100.   Defendants' concealment was a substantial factor in causing the Hospitals' harm.

16                          **THIRD CAUSE OF ACTION**

17                     **BREACH OF IMPLIED-IN-FACT CONTRACT**

18                          **(AS TO ALL DEFENDANTS)**

19       101.   The Hospitals re-allege and incorporate by reference each and every allegation set forth
20   above.

21       102.   The Patient identified to Hospitals that he was a California resident. The Patient
22   presented an insurance identification card identifying "Evolve Health" sponsored by the Service
23   Industry Trade Alliance. The card claims the plan offers "Limited medical benefits underwritten by:
24   First Continental Life and Accident Insurance Company." The card further identifies First Health as
25   the applicable network and directed providers to submit claims to Administrative Concepts, Inc.

26       103.   Prior to providing acute care hospital services to the Patient, the Hospitals notified the
27   Defendants of the Patient's inpatient admission and verified the Patient's eligibility, coverage, and
28   benefits with the Defendants and or their agents.

104.    Defendants provided to the Hospitals written and oral verification of the Patient's eligibility, coverage, and benefits under the Patient's plan through FCL, repeatedly informed Hospitals that no authorization was required for the Hospital's provision of services to the Patient

105.    On numerous occasions, Defendants requested from the Hospitals clinical information regarding the Patient's medical condition.  In engaging in such communications and taking such actions, Defendants expressly and/or impliedly communicated, and the Hospitals reasonably understood Defendants' communications and actions to communicate, that the services the Hospitals would be providing to the Patient were covered under the Patient's plan through FCL, and thus that FCL and Coventry Company were legally obligated to pay for such services.

106.    The Hospitals reasonably understood the actions and communications by Defendants to constitute an express and/or implied request by Defendants that the Hospitals provide services to the Patient and an agreement by Defendants to pay the Hospitals for such requested services.

107.    The Hospitals are informed and believe that in engaging in such communications and taking such actions each of the Defendants was the agent and/or employee of each of the remaining Defendants, including specifically but not limited to FCL and Coventry Company, and in engaging in such communications and taking such actions, were acting within the scope of its agency and employment and with the permission and consent of each of the other Defendants, including specifically, but not limited to, FCL and Coventry Company.

108.    Additionally, the Cease-and-Desist Order concludes Coventry Company aided and abetted FCL in violation of California Insurance Code Section 703, which makes it a misdemeanor offense to in any manner aid a non-admitted insurer to transact insurance business in California.

109.    As reflected in the attached exhibits, Coventry Company's unlawful activities in aiding and abetting FCL's illegal business of insurance in California continued.   Specifically, Coventry Company permitted FCL to continue to identify Coventry Company on insurance identification cards in February 2023.

110.    Coventry Company improperly and illegally granted FCL access to rates in the Hospitals' Agreements for one or more of the Hospitals' claims for services provided. In doing so, Coventry Company breached the Keck Agreement and Verdugo Agreement.

111.    The conduct of Defendants gave rise to an implied-in-fact contract between the Hospitals and Defendants to pay for the care and treatment rendered by the Hospitals to the Patient.

112.    The Hospitals performed all of its obligations under its implied contract with Defendants. Specifically, the Hospitals provided medically necessary and physician-ordered acute care hospital services to the Patient with total charges of $976,178.64.

113.    The Hospitals submitted complete claims to Defendants for payment. Defendants failed to pay the Hospitals for the services rendered to the Patient.

114.    Defendants have paid nothing to the Hospitals for these services.

115.    Defendants have breached the implied-in-fact contract by failing to pay the Hospitals the full amounts owed to the Hospitals for the medically necessary services provided to the Patient.

116.    The Hospitals expected reimbursement at the Coventry Company contract rate of $545,328.90. As a result of this breach, the Hospitals have received no payment from the Defendants for the lifesaving and medically necessary care provided to the Patient. Thus, the Hospitals have been damaged in an amount not less than $545,328.90, plus interest.

### FOURTH CAUSE OF ACTION

### QUANTUM MERUIT

### (AS TO ALL DEFENDANTS)

117.    The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

118.    As alleged herein, the Hospitals believe they are entitled to full and complete payment from the Defendants in accordance with the written and implied-in-fact contracts. However, to the extent the written or implied-in-fact contracts alleged do not apply and/or are deemed unenforceable against the Defendants for any of the services at issue, the Hospitals allege in the alternative that the Defendants owe the Hospitals for these services based on *quantum meruit.*

119.    Defendants expressly and/or impliedly requested that the Hospitals provide emergent and acute care hospital services to the Patient in circumstances that gave rise to the Hospitals' reasonable belief that Defendants would pay for such services.

120.    Thereafter, the Hospitals provided such services to the Patient pursuant to such Requests and communications.

121.    The Hospitals' provision of said medical services to the Patient was intended to and, in fact, benefited Defendants.

122.    The reasonable value of the services the Hospitals provided to the Patient at the express and/or implied requests of the Defendants is $976,178.64.

123.    Defendants have paid nothing to the Hospitals for these services.

124.    Thus, the Hospitals are entitled to *quantum meruit* recovery in the amount of $545,328.90, plus statutory interest.

## FIFTH CAUSE OF ACTION

### PROMISSORY ESTOPPEL

### (AS TO ALL DEFENDANTS)

125.    The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

126.    Prior to the Hospitals' providing hospital services to the Patient, the Defendants informed Hospitals that the Patient had active coverage and no preauthorization was required for the services the Hospitals would provide the Patient.

127.    In so doing, Defendants knew and/or should have known that Hospitals would be reasonably induced to rely on their representations by providing hospital services to the Patient, and refraining from taking other action, such as seeking to transfer the Patient to another facility.

128.    Hospitals reasonably relied on the communications and conduct of Defendants by providing lifesaving and medically necessary hospital services to the Patient with total charges of $976,178.64, and refraining from taking other action, such as seeking to transfer the Patient to another facility.

129.    Defendants have paid nothing to the Hospitals for the services provided to the Patient.

130.    As a proximate result of the failure of Defendants to perform according to the representations that they made to the Hospitals, the Hospitals have been damaged in the amount of $545,328.90 (pursuant to the Coventry Company contract rates), plus interest.

131.    Justice requires that the promises of Defendants be enforced.

## SIXTH CAUSE OF ACTION

### UNFAIR BUSINESS PRACTICES

### (CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200)

### (AS TO ALL DEFENDANTS)

132.    The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

133.    California Business & Professions Code §17200 provides that "unfair competition shall mean and include any unlawful, unfair, or fraudulent business act or practice."

134.    Defendants have utilized unfair business acts and practices that are designed to preclude Plaintiff from obtaining proper reimbursement for the services that they provided to the Patient, a member of Defendants' health service plans.

135.    These unfair acts and practices are in violation of the Knox-Keene Act, the regulations promulgated thereunder, and the Unfair Business Practices Act.

136.    California Business & Professions Code §17200 provides that "unfair competition shall mean and include any unlawful, unfair, or fraudulent business act or practice."

137.    The Knox-Keene Act requires health plans to pay health care providers on a timely, reasonable and fair basis, and not to engage in unfair payment patterns.

138.    Based on information and belief, beginning on an exact date unknown to the Hospitals, but within two years preceding the filing of this complaint, Defendants engaged in the following unlawful, unfair and/or fraudulent conduct:

   a.  Failing to timely and fully reimburse the claim, including accrued interest, for the Patient in violation of 28 Cal. Code Reg. § 1300.71;

   b.  Failing to issue payment to Hospitals for emergency medical services pursuant to Health and Safety Code section 1371.4(b);

   c.  Deliberately misleading the Hospitals in believing that the patient had insurance coverage, the services were covered, and no authorization was required;

    d.  Routinely and systematically using methodologies designed to deny claims based on coverage exclusions for Defendants' own financial benefit;

    e.  Failing to reimburse claims citing nothing more than an unknown and arbitrary Standards;

    f.  Intentionally failing to disclose the fact that the Patient's plan through FCL did not cover the Patient's care and, thus, that Payors would not pay the Hospitals for the services provided to the Patient. Such facts were known only to Defendants and the Hospitals could not have discovered them;

    g.  Failing to maintain license and certification in compliance with California law;

    h.  Engaging in the business of insurance without a license or certification under California law;

    i.  Issuing to a California resident an insurance policy that fails to comply with California law;

    j.  Verifying the Patient's coverage and benefits in February 2023, (prior to admission at VHH), and again in February 2023, (prior to admission at Keck) without disclosing the Patient's policy ended that very day, the policy exclusions, and the benefits limitations;

    k.  Engaging in communications and conduct on and after February 14, 2023, causing Keck to believe the Patient's coverage remained active;

    l.  Failing to inform Hospitals of any policy exclusions or benefits limitations until months after the Patient discharged from the Hospitals;

    m.  Failing to inform Hospitals that, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist Order to FCL ordering it to end its unlawful transaction of insurance in California. The Order further orders ACI, First Health, and coconspirators to stop aiding and abetting FCL's unlawful practices[1].

---

[1] The Order finds that FCL unlawfully acted as an insurance company in California without the requisite certificate of authority. The Order identifies multiple violations by FCL, including misrepresentation of fixed-benefit indemnity insurance as "health insurance" in violation of Insurance Code sections 106(b)(2), 780(a), 781 and 790.03(b). CDI cited, as grounds for finding that First Health aided and abetted FCL's illegal conduct, the appearance of the First Health Network

n. Coventry Company's unlawful activities in aiding and abetting FCL's illegal business of insurance in California. Specifically, FCL and/or ACI verified to the Hospitals on multiple occasions that the Patient had active health insurance coverage through FCL. Payors continued to identify First Health Network on the Patient's insurance identification cards in February 2023;

o. Coventry Company improperly and illegally granting FCL access to rates in the Hospitals' Agreements. Such conduct constitutes unfair and deceptive acts or practices in the business of insurance, in violation of California Insurance Code sections 790.02 and 790.03(b); and is breach of the Agreement between Coventry Company and Hospitals; and

p. FCL improperly issued a fixed-benefit indemnity insurance to the California - resident Patient failing to comply with California essential benefit requirements, and in and of itself constitutes a breach of the Coventry Company Agreement with Hospitals[2].

139. Defendants' conduct constitutes unlawful, unfair, and fraudulent business practices under California Business & Professions Code sections 17200, et seq.

140. The Hospitals suffered injury-in-fact when Defendants failed to properly and timely pay the Hospitals' claims for the medically necessary and physician-ordered services provided to the Patient.

141. Plaintiff has standing to bring this claim pursuant to California Business & Professions Code §17204 on the grounds stated herein, because Plaintiff has suffered injury-in-fact and lost money

---

logo on health insurance identification cards virtually identical to the ones the Patient presented to the Hospitals. (See Ex. B., p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11). The Order concludes ACI and First Health Network aided and abetted FCL in violation of California Insurance Code section 703, which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact insurance business in California. (Id. at 21, lines 4-7). The Order commanded ACI., First Health and other coconspirators to cease and desist their unlawful activities.

[2] Under California law, "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *California Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 484. "[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted narrowly against the insurer." *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648, 3 Cal.Rptr.3d 228 (internal quotations and alterations omitted).

1  and/or property as the result of Defendants' refusal to pay for medical services the Hospitals provided

2  to the Patient, a member of FCL's health plan.

3      142.   As a direct and proximate result of Defendants' wrongful acts, the Hospitals have

4  suffered and will continue to suffer substantial pecuniary losses and irreparable injury-in-fact.

5      143.   Plaintiff is informed and believes that Defendants will continue their ongoing unfair

6  business practices toward Plaintiffs if not enjoined from doing so.

7      144.   The equitable remedies under California Business & Professions Code §17200, are

8  subject to the broad discretion of the Court (*Hambrick v. Healthcare Partners Medical Group, Inc.*,

9  (2015) 238 Cal. App. 4th). As a direct and proximate result of the Plan's wrongful, misleading, and

10  illegal acts, Hospitals have suffered substantial pecuniary losses and irreparable injury-in-fact. Under

11  California Business & Professions Code §17200, said violations render Defendants liable to Hospitals

12  for restitution and injunctive relief to restore Hospitals' money which the Plan acquired by means of

13  such unfair business practices, plus statutory interest.

14      145.   Plaintiff also seeks restitution and disgorgement of an amount to be proven at trial,

15  which is the amount that Defendants improperly received and retained that they were obligated to pay

16  the Hospitals for the services provided, plus any statutory penalties and/or attorneys' fees as available

17                    **SEVENTH CAUSE OF ACTION**

18                    **BREACH OF WRITTEN CONTRACT**

19                       **(AS TO ALL DEFENDANTS)**

20      146.   The Hospitals re-allege and incorporate by reference each and every allegation set forth

21  above.

22      147.   Prior to providing hospital services to the Patient, the Hospitals notified the Defendants

23  of the Patient's inpatient admission and verified the Patient's eligibility, coverage, and benefits with

24  the Defendants and/or their agents.

25      148.   The Patient's insurance card lists entities Evolve Health, First Health Network, First

26  Continental Life and Accident Insurance Company, and Administrative Concepts Inc. (See Ex. A).

27      149.   The Patient's insurance card is almost identical to the insurance card identified in the

28  Cease-and-Desist order (See Ex. B). Evolve Health is an unlicensed entity, First Heath Network is an

1  unlicensed entity[3], First Continental Life & Accidental Insurance is a non-admitted insurer, and

2  Administrative Concepts, Inc. is a non-resident Registered Administrator.

3      150.    Keck relied upon the plan's participation in Coventry Company to "financially clear"

4  the Patient in February 2023, prior to accepting the Patient for lateral transfer that same day for non-

5  EMTALA services. Keck registered the Patient under "First Health" coverage and expected

6  reimbursement from Defendants at the Coventry Company network rates under the Keck Agreement.

7      151.    Defendants provided to Keck written and oral verification of the Patient's eligibility,

8  coverage, and benefits under the Patient's plan through FCL, and repeatedly informed Keck that no

9  authorization was required for the Hospital's provision of services to the Patient

10     152.    On numerous occasions, Defendants requested from Keck clinical Information

11 regarding the Patient's medical condition.  In engaging in such communications and taking such

12 actions, Defendants expressly and/or impliedly communicated, and Keck reasonably understood

13 Defendants' communications and actions to communicate, that the services Keck would be providing

14 to the Patient were covered under the Patient's plan through FCL, and thus that Defendants were

15 legally obligated to pay for such services.

16     153.    Defendants' unlawful activities in aiding and abetting FCL's illegal business of

17 insurance in California continued.  Specifically, Defendants permitted FCL to continue to identify

18 First Health Network on insurance identification cards in February 2023.  (See Ex. A).  Defendants

19 also improperly and illegally granted First Continental access to rates in the Keck Agreement for the

20 Hospital's claims for reimbursement for services provided to the Patient.

21     154.    Defendants breached the Keck Agreement.  Specifically, Section 3.3 of the Keck

22 Agreement provides, in pertinent part:

23

24 [3] Unbeknownst to the Hospitals, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist
   Order to First Health Network, its officers, directors, employees, agents, affiliates, and representatives, ordering it to end its
25 business practices aiding and abetting First Continental's unlawful transaction of insurance in California.  Ex. B.  The
   Order finds that First Continental unlawfully acted as an insurance company in California without the requisite certificate of
26 authority.  *Id.*, p. 4, lines 10-15. CDI cited, as grounds for finding that First Health aided and abetted First Continental's
   illegal conduct, the appearance of the First Health Network logo on health insurance identification cards virtually identical
27 to the ones the Patient presented to the Hospitals.  *See, e.g., id.*, p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11.  The
   Order concludes First Health Network aided and abetted First Continental in violation of California Insurance Code section
28 703, which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact insurance business in
   California.  *Id.* at 21, lines 4-7.  The Order commanded First Health to cease and desist its unlawful activities.

**Non-Coventry Payors.** When a Coventry Company is not the Payor, the Payor, not Coventry or a Coventry Company, shall have the obligation and liability to Hospital with respect to any claim or fee for health care services relating to or arising under the Agreement. *Coventry shall, however, require each Payors to comply with applicable state and federal laws and regulations and the relevant terms and conditions of this Agreement.*

155.    Coventry Company breached Section 3.3 by failing to require FCL to comply with California Insurance law.

156.    Per Section 6.11 of the Keck Agreement, the Agreement shall be governed by the laws of the State of California. Furthermore, Section 3.4 of the Keck Agreement provides, in pertinent part:

**Compliance with Law.** Coventry and Coventry Companies agree to comply with all applicable ... state ... laws and the directives of applicable agencies, and regulations of CMS, any other oversight agencies and in the state(s) in which Coventry Company operates, including, without limitation, requirements that shall cause or require Coventry Company Coventry [sic] to amend the terms and conditions of the Agreement. Coventry Companies understand and agree that CMS and the appropriate State agencies may change or add to such requirements, laws, rules, and regulations from time to time.

Defendants breached the Keck Agreement by aiding and abetting First Continental insurer to transact insurance business in California in violation of California Insurance Code section 703. Defendants further breached the Keck Agreement by failing to comply with CDI's Cease-and-Desist Order.

157.    Defendants also breached Section 3.5 of the Keck Agreement by failing to require FCL maintain the necessary licenses and certifications to transact insurance business in California. Defendants further breached Section 3.5 by failing to notify Hospitals of CDI's Cease-and- Desist Order.

158.    Keck submitted a complete claim to Defendants for payment. Defendants failed to pay Keck for the services rendered to the Patient.

159.    Defendants have paid nothing to the Hospital for these services.

160.    Defendants' breaches of contract damaged Keck by denying it full reimbursement for the claims at issue at the rates under the Keck Agreement. Keck is entitled to recover from Defendants $510,677.24, the expected reimbursement under the Keck Agreement, plus statutory interest.

///

///

## EIGHTH CAUSE OF ACTION

## BREACH OF WRITTEN CONTRACT

## (AS TO COVENTRY COMPANY AND DOES 1-25)

161.    The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

162.    Prior to providing hospital services to the Patient, VHH notified the Defendants of the Patient's inpatient admission and verified the Patient's eligibility, coverage, and benefits with the Defendants and or their agents.

163.    The Patient's insurance card lists entities Evolve Health, First Health Network, First Continental Life and Accident Insurance Company, and Administrative Concepts Inc. (See Ex. A).

164.    Patient's insurance card is almost identical to the insurance card identified in the Cease-and-Desist order (See Ex. B). Evolve Health is an unlicensed entity, First Heath Network is an unlicensed entity[4], First Continental Life and Accidental Insurance is a non-admitted insurer, and Administrative Concepts, Inc. is a non-resident Registered Administrator.

165.    VHH registered the Patient under "First Health" coverage and expected reimbursement from the plan at the Coventry Company network rates under the Verdugo Agreement.

166.    FCL and/or its agents provided to VHH written and oral verification of the Patient's eligibility, coverage, and benefits under the Patient's plan through FCL, and repeatedly informed VHH that no authorization was required for the Hospital's provision of services to the Patient

167.    On numerous occasions, FCL and/or its agents requested from VHH clinical Information regarding the Patient's medical condition.  In engaging in such communications and taking such actions, Defendants expressly and/or impliedly communicated, and VHH reasonably

---

[4] Unbeknownst to the Hospitals, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist Order to First Health Network, its officers, directors, employees, agents, affiliates, and representatives, ordering it to end its business practices aiding and abetting First Continental's unlawful transaction of insurance in California. Ex. B. The Order finds that First Continental unlawfully acted as an insurance company in California without the requisite certificate of authority. *Id.*, p. 4, lines 10-15. CDI cited, as grounds for finding that First Health aided and abetted First Continental's illegal conduct, the appearance of the First Health Network logo on health insurance identification cards virtually identical to the ones the Patient presented to the Hospitals. *See, e.g., id.*, p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11. The Order concludes First Health Network aided and abetted First Continental in violation of California Insurance Code section 703, which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact insurance business in California. *Id.* at 21, lines 4-7. The Order commanded First Health to cease and desist its unlawful activities.

1    understood Defendants' communications and actions to communicate, that the services VHH would be
2    providing to the Patient were covered under the Patient's plan through FCL, and thus that Defendants
3    were legally obligated to pay for such services.

4        168.    Defendants' unlawful activities in aiding and abetting FCL's illegal business of
5    insurance in California continued.  Specifically, Defendants permitted FCL to continue to identify
6    First Health Network on insurance identification cards in February 2023. (See Ex. A).  Defendants
7    also improperly and illegally granted First Continental access to rates in the VHH Agreement for
8    VHH's claim for reimbursement for services provided to the Patient.

9        169.    Defendants breached the Verdugo Agreement by failing to require FCL maintain the
10   necessary licenses and certifications to transact insurance business in California.  Defendants further
11   breached Section 3.5 by failing to notify Hospitals of CDI's Cease-and- Desist Order.

12       170.    VHH submitted complete claims to Defendants for payment.  Defendants failed to pay
13   VHH for the services rendered to the Patient.

14       171.    Defendants have paid nothing to VHH for these services.

15       172.    Defendants' breaches of contract damaged VHH by denying it reimbursement for the
16   claims at issue at the rates under the Verdugo Agreement.  VHH is entitled to recover from Defendants
17   $34,651.66, the expected reimbursement under the VHH Agreement, plus statutory interest.

18   **PRAYER FOR RELIEF**

19   WHEREFORE, Plaintiff prays for relief as set forth below:

20       1.    For damages and payment in amounts according to proof at trial;

21       2.    For *quantum meruit* in the amount according to proof at trial;

22       3.    For injunctive relief from unfair business practices;

23       4.    For pre-judgment interest as provided by law;

24   ///
25   ///
26   ///
27   ///
28   ///

5.    For attorneys' fees according to statute; and

6.    For costs of suit herein incurred, and for such other and further relief as the Court deems just and proper.


DATED:  February 27, 2025                    HELTON LAW GROUP, APC

                                             By: _____
                                                 CARRIE MCLAIN
                                                 MIKAELA COX
                                                 THOMAS YAU
                                                 Attorney for Plaintiff

30
COMPLAINT

# Exhibit A



## MEMBER SERVICES

For all billing, membership and non-claims related questions.

Call: 855-577-1610
Monday to Friday
9am to 7pm EST.

## CLAIMS SUBMISSION

EDI Payor ID: ▮▮▮▮

Mail: Administrative Concepts Inc.
994 Old Eagle School Rd., Ste. 1005
Wayne PA 19087

Web: www.visit-aci.com

Call: (800) 565-6052

## ADDITIONAL BENEFITS

Access the Member Portal site to download additional membership materials, instruction guides, temporary ID cards, benefits and much more by visiting www.MyMemberInfo.com

**ASSOCIATION MEMBER BENEFITS**
www.serviceindustrytradealliance.org
Access Code: SITA18

**SITA**

## ELIGIBILITY

To confirm eligibility and/or obtain benefit determinations, please call: (800) 565-6052

By using this card, member agrees with all terms and conditions of the plan. This card does not guarantee coverage.

Limited medical benefits underwritten by: First Continental Life and Accident Insurance Company.

Exhibit B

1  TYLER MCKINNEY, SBN 263717
   CHRISTINA CARROLL, SBN 263713
2  CALIFORNIA DEPARTMENT OF INSURANCE
3  300 Capitol Mall, 17th Floor
   Sacramento, California 95814
4  Telephone: 916 492-3283
   E-mail: christina.carroll@insurance.ca.gov
5
   *Attorneys for the California Department of Insurance*
6

7

8                    **STATE OF CALIFORNIA**

9              **DEPARTMENT OF INSURANCE**

10

11  In the Matter of:                              File No. LA202100084

12

13  ADMINISTRATIVE CONCEPTS, INC.,                 ORDER TO CEASE AND DESIST (Ins.
    [Lic. No. 0C38805]                             Code § 12921.8)
14

15  ASSOCIATION FOR BETTER HEALTH,

16  ASSOCIATION HEALTH CARE                        ORDER TO SHOW CAUSE WHY AN
    MANAGEMENT, INC.,                              ORDER IMPOSING A MONETARY
17  DBA FAMILY CARE                                PENALTY SHOULD NOT ISSUE (Ins.
                                                   Code § 12921.8)
18
    MATTHEW DEPREY,                                NOTICE OF RIGHT TO HEARING
19  [Lic. No. 0M50797]

20
    EVOLVE HEALTH,
21

22  FIRST CONTINENTAL LIFE & ACCIDENT
    INSURANCE COMPANY,
23
    FIRST HEALTH NETWORK,
24

25  CURTIS GARCEAU,
    [Lic. No. 4026934]
26

27  GET ME CARE,
    AKA GETMECARE,
28

---

1  SAMANTHA MABIE,
   [Lic. No. 0L30001]

2

3  NATIONAL ASSOCIATION OF PREFERRED
   PROVIDERS,

4  SCOTT RUSSELL,

5  [Lic. No. 0N03621]

6  SERVICE INDUSTRY TRADE ALLIANCE,

7  FABIAN VERGARA,

8  [Lic. No. 0M31165]

9                    Respondents.

10

11

12    . TO: ADMINISTRATIVE CONCEPTS, INC. ("ACI"), 400 CAMPUS DRIVE, SUITE

13  300, COLLEGEVILLE, PENNSYLVANIA, 19426, its officers, directors, employees, trustees,

14  agents, brokers, affiliates, successors, and service representatives; and,

15        ASSOCIATION HEALTH CARE MANAGEMENT, INC., DBA FAMILY CARE, 11111

16  RICHMOND AVENUE, SUITE 200, HOUSTON, TEXAS, 77082, its officers, directors,

17  employees, trustees, agents, brokers, affiliates, successors, and service representatives;

18  and,

19        ASSOCIATION FOR BETTER HEALTH, 1630 DES PERES ROAD, SUITE 140, ST.

20  LOUIS, MISSOURI, 63131, its officers, directors, employees, trustees, agents, brokers,

21  affiliates, successors, and service representatives; and,

22        MATTHEW DEPREY, 141 NW 20TH STREET, SUITE G6, BOCA RATON, FLORIDA,

23  33431; and,

24        EVOLVE HEALTH, 994 OLD EAGLE SCHOOL ROAD, SUITE 1005, WAYNE,

25  PENNSYLVANIA, 19087, its officers, directors, employees, trustees, agents, brokers,

26  affiliates, successors, and service representatives; and,

27

28

1  FIRST CONTINENTAL LIFE & ACCIDENT INSURANCE COMPANY, 101

2  PARKLANE BOULEVARD, SUITE 301, SUGAR LAND, TEXAS 77478, its officers,

3  directors, employees, trustees, agents, brokers, affiliates, successors, and service

4  representatives; and

5  FIRST HEALTH NETWORK, 7400 WEST CAMPUS ROAD, SUITE F510, NEW

6  ALBANY, OHIO, 43054, its officers, directors, employees, trustees, agents, brokers,

7  affiliates, successors, and service representatives; and,

8  CURTIS GARCEAU, 123 NW 13TH STREET, BOCA RATON, FLORIDA, 33432; and,

9  GET ME CARE, AKA GETMECARE, 123 NW 13TH STREET, SUITE 101, BOCA

10 RATON, FLORIDA, 33432, its officers, directors, employees, trustees, agents, brokers,

11 affiliates, successors, and service representatives; and,

12 SAMANTHA MABIE, 1000 NW 65TH STREET, SUITE 110, FORT LAUDERDALE,

13 FLORIDA, 33309; and,

14

15 NATIONAL ASSOCIATION OF PREFERRED PROVIDERS, 11111 RICHMOND

16 AVENUE, SUITE 250, HOUSTON, TEXAS, 77082, its officers, directors, employees,

17 trustees, agents, brokers, affiliates, successors, and service representatives; and,

18 SCOTT RUSSELL, PO BOX 1619, POMPANO BEACH, FLORIDA, 33061; and,

19 SERVICE INDUSTRY TRADE ALLIANCE, 16476 Wild Horse Creek Road,

20 Chesterfield, Missouri, 63017, its officers, directors, employees, trustees, agents, brokers,

21 affiliates, successors, and service representatives; and,

22 FABIAN VERGARA, 8700 WEST FLAGLER STREET, SUITE 405, MIAMI,

23 FLORIDA, 33174; and,

24 WHEREAS, California Insurance Code Section 12921.8(a)(1) authorizes the

25 Commissioner to issue a cease and desist order to a person who has acted in a capacity for

26 which a license, registration, or certificate of authority from the Commissioner was required

27 but not possessed; and,

28

1   WHEREAS, California Insurance Code Section 12921.8(a)(2) authorizes the

2   Commissioner to issue a cease and desist order to a person who has aided or abetted a

3   person described in Section 12921.8(a)(1); and,

4   WHEREAS, California Insurance Code Section 12921.8(a)(3) authorizes the

5   Commissioner to issue an order to show cause for imposition of a monetary penalty against

6   a person described in 12921.8(a)(1) or 12921.8(a)(2); and,

7   WHEREAS, California Insurance Code Section 12921.8(c) authorizes the

8   Commissioner to issue said order to show cause without holding a hearing prior to issuance

9   of the order; and,

10  WHEREAS, commencing on or before October 15, 2019, Respondent FIRST

11  CONTINENTAL LIFE & ACCIDENT INSURANCE COMPANY ("FIRST CONTINENTAL"),

12  has in this State unlawfully acted as an insurance company in California, and has in that

13  capacity unlawfully transacted the business of insurance in this State without the requisite

14  certificate of authority; and,

15

16  WHEREAS, FIRST CONTINENTAL is a nonadmitted insurer not authorized to

17  transact insurance in California.[1] FIRST CONTINENTAL is domiciled in Texas and licensed

18  to transact insurance in several states and territories.[2] FIRST CONTINENTAL was

19  previously authorized to transact Life and Disability insurance in California on March 31,

20  1980. On or about July 3, 2002, the California Department of Insurance ("Department")

21  issued a Cease and Desist Order against FIRST CONTINENTAL due to its failure to meet

22  the mandatory minimum policyholder surplus requirement. As a result, FIRST

23  CONTINENTAL stopped writing business in California. On or about June 26, 2012, the

24  Department accepted FIRST CONTINENTAL's request to officially withdraw from the State

25

26  [1] California Insurance Code §25.

27  [2] Arkansas, Arizona, Colorado, District of Columbia, Delaware, Florida, Georgia, Hawaii, Indiana, Kansas, Louisiana, Maryland, Maine, Missouri, Mississippi, Montana, North Dakota, Nebraska, New Mexico,

28  Oklahoma, South Dakota, Tennessee, Texas, Utah, the U.S. Virgin Islands, Vermont, and Wisconsin.

1  of California.  FIRST CONTINENTAL does not currently hold a certificate of authority to

2  transact business in the State of California, and has not held a certificate of authority during

3  any time period relevant to the matter at issue; and,

4      WHEREAS, FIRST CONTINENTAL has acted in a capacity for which a certificate of

5  authority is required but not possessed by insuring at least 12 Californians[3] as set forth

6  below; and,

7      WHEREAS, all other Respondents have aided and abetted FIRST CONTINENTAL in

8  the unlawful transaction of insurance in this State as outlined below.

9      WHEREAS, additional violations include, but are not limited to:

10   (a)   Misrepresentation of fixed-benefit indemnity insurance as "health insurance,"

11       in violation of sections 106(b)(2), 780(a), 781, and 790.03(b) of the California

12       Insurance Code.

13   (b)   Issuance of fixed-benefit indemnity insurance to Californians who did not have

14       comprehensive health insurance, in violation of section 10198.61(b) of the

15       California Insurance Code.

16

17   (c)   Failure to comply with sections 10198.61(a) and 10198.8 of the California

18       Insurance Code, which require insurers to certify annually to the

19       Commissioner that they do not market their indemnity insurance as a

20       substitute for Affordable Care Act health insurance, "regardless of the situs of

21       the contract or group master policyholder."

22      WHEREAS, the complainants below were California residents during all relevant time

23  periods.

24  //

25  //

26

27  _____

28  [3] More than 12 Californians have filed complaints with the Department of Insurance alleging misrepresentation and other misconduct.  It is unknown how many other Californians have actually been insured by FIRST CONTINENTAL.

1    **1. COMPLAINANT B.S.**

2    WHEREAS, on or about February 19, 2020, Respondent MATTHEW DEPREY

3    ("DEPREY"), sold B.S.[4] "health insurance" for $369.90 down and $269.95 per month.

4    According to B.S.:

5

6    I contacted [Matthew] in Feb 2020 about an insurance coverage.
     He set me up with a policy and he stated it has zero deductible and
7    covers everything except being pregnant. On Friday 06/26/2020 i
     had to go to the ER and then had heart surgery on Saturday
8    because my main artery was 99.9% blocked. Today i get a call from
9    the hospital billing department. Saying my insurance only covers
     only $350 per day. My balance now is $100,000 for the hospital bill
10   plus the doctors as they are bill separately and that could be
     another $40,000. I call [Matthew] and pretended that a friend of
11   mine was looking for ins and wanted to confirm my coverage. I
12   asked about the zero deductible and he said yes. Then I asked if a
     heart attack and the need to go to the ER and have heart surgery.
13   He said all of that is covered. Which is a total lie and he told me in
     those exact words in February. Please follow up and call him and
14   ask about the coverage and she [sic] if he tells you the same thing.
15   This is fraud.

16

17   WHEREAS, the policy was sold circuitously - DEPREY enrolled B.S. in Respondent

18   SERVICE INDUSTRY TRADE ALLIANCE's ("SITA's") Membership Plan. SITA was the

19   policyholder on FIRST CONTINENTAL group policy number FCL-GLI-001-002-AZ, which

20   stated "all [SITA] members between the ages of 18 and 64" were eligible for coverage. Due

21   to the SITA membership, B.S. was covered on the group policy for limited benefit indemnity

22   insurance with FIRST CONTINENTAL. The situation was so confusing that B.S. did not

23

24

25   _____

26   [4] All identifying and privileged information regarding consumers has been removed for purposes of publication
     on the Department's public website pursuant to the provisions of Insurance Code Section 12938. Accordingly,
     consumers, victims and other non-parties may be identified by fictitious names or initials. The actual identities
27   of these individuals are provided in Exhibit A, attached hereto and incorporated herein by this reference, for
     purposes of this Accusation only. Exhibit A will not appear on the Department's public website.
28

1  know who the insurer was – on the Department's Request for Assistance form, B.S. stated

2  that the insurer was FIRST HEALTH NETWORK; and,

3       WHEREAS, SITA, FIRST CONTINENTAL, and FIRST HEALTH NETWORK are

4  unlicensed.[5]  Since 2018, DEPREY has been licensed with the Department as a non-

5  resident Accident and Health Agent, license number 0M50797.[6]

6

7                    **2.  COMPLAINANT Y.B.**

8       WHEREAS, Respondent EVOLVE HEALTH, an unlicensed entity, issued a medical

9  plan insurance card to Y.B. effective October 15, 2019.  The insurance card contains a

10  confusing litany of names and contact information:

11

12
13
14   
15
16
17

18

19       WHEREAS, EVOLVE HEALTH is the name at the top of the card, and the policy

20  number is FCL-GLI-001-AZ. The Medical Plan is through unlicensed Respondent FIRST

21  HEALTH NETWORK, www.firsthealthlbp.com, with "[i]nsurance benefits underwritten by

22  FIRST CONTINENTAL," a nonadmitted insurer as discussed above. Claims handling is

23  through Respondent ADMINISTRATIVE CONCEPTS, INC. ("ACI"), 800-565-6052,

24  www.visit-aci.com.  ACI has been licensed with the Department since 1998 as a non-

25

26

27  _____

28  [5] Any reference to "unlicensed" means unlicensed with the California Department of Insurance.

[6] The Department has issued an Accusation against DEPREY.

1    resident Registered Administrator, license number 0C38805.[7] The policyholder is instructed

2    to call 855-577-1610 for "all billing, customer service and non-claims related questions,"

3    800-565-6052 to verify eligibility and/or obtain benefits, and go to

4    www.associationforbetterhealth.org to access member benefits. The information was so

5    confusing that Y.B. did not know who the insurer was – on the Department's Request for

6    Assistance form, Y.B. stated that the insurer was EVOLVE; and,

7        WHEREAS, according to Y.B., she paid about $300 per month for the insurance.

8    Subsequently, Y.B. said she received a letter from ACI and FIRST CONTINENTAL claiming

9    that she owed five thousand, two hundred and twelve dollars ($5,212.00) for a hospital visit

10   on January 8, 2020.  Y.B. claims she never visited any hospital on that date.

11

12

13                        **3. COMPLAINANT T.A.**

14       WHEREAS, on or about August 28, 2020, T.A. found health insurance online, and

15   purchased the coverage over the phone with an EVOLVE HEALTH agent for $297.90 down

16   and $197.95 per month. All payments were made to EVOLVE HEALTH.  According to T.A.:

17           I was told I had broad coverage for a healthcare plan I purchased. I
18           recently found out that this plan I was sold has no out-of-pocket
             maximum, and only pays 80% of the costs up to $2,500. This is
19           extremely low for a healthcare plan. I even told the agent that I had
             just been denied after an accident, in another policy I had with
20           another insurer, and that I wanted to make sure I was covered.

21

22   In actuality, T.A. was sold a "membership" in SITA that included limited indemnity benefits.

23   SITA was the policyholder on FIRST CONTINENTAL group policy number FCL-GLI-001-

24   002-AZ; and,

25       WHEREAS, EVOLVE HEALTH issued a medical plan insurance card to T.A.

26   According to the insurance card, the Medical Plan is through FIRST HEALTH NETWORK.

27

28   _____

     [7] The Department has issued an Accusation against ACI.

1  with "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The policy number on

2  T.A.'s insurance card is identical to the policy number above for Y.B., but does not match

3  the policy number on T.A.'s actual policy, which is FCL-GLI-001-002-AZ. The insurance

4  card states that SITA association member benefits can be accessed at

5  www.serviceindustrytradealliance.org. All other information appears identical to the

6  information on the insurance card for Y.B.



15  The situation was so confusing that T.A. did not know who the insurer was – on the

16  Department's Request for Assistance form, T.A. stated that the insurer was EVOLVE

17  HEALTH.  After T.A. discovered that the policy was "essentially worthless," he cancelled the

18  coverage and is requesting a full refund.

20  **4. COMPLAINANTS M.A. AND J.M.**

21  WHEREAS, on or about February 7, 2020, M.A. and his wife J.M. obtained "health

22  insurance" with FIRST CONTINENTAL. Their intent was to obtain coverage for regular

23  doctor visits. Instead, they were sold a membership in ABH for $539.90 down and $439.95

24  per month, which included limited indemnity coverage. ABH was the policyholder on FIRST

25  CONTINENTAL group policy number FCL-GLI-001-AZ, which stated "all [ABH] members

26  between the ages of 18 and 64" were eligible for limited indemnity coverage; and,

27  WHEREAS, EVOLVE HEALTH issued a medical plan insurance card to M.A. and

28  J.M., showing the Medical Plan through FIRST HEALTH NETWORK, with "[i]nsurance

1  benefits underwritten by FIRST CONTINENTAL."Strangely, the insurance card indicates

2  that the membership association is SITA, not ABH. The other information on the insurance

3  card is similar to the information on the insurance card for Y.B.



12  The information was so confusing that J.M. did not know who the insurer was – on the

13  Department's Request for Assistance form, J.M. stated that the insurer was EVOLVE

14  HEALTH; and,

15      WHEREAS, on or about April 16, 2020, J.M. had COVID-19 symptoms and went to a

16  clinic to get a COVID-19 test.  FIRST CONTINENTAL paid $65, leaving J.M. with a $185.81

17  balance; and,

18      WHEREAS, in November 2020, J.M. went to the doctor and, for unknown reasons,

19  FIRST CONTINENTAL refused to pay any portion of the bill, leaving J.M. with a balance of

20  $243.64; and,

21      WHEREAS, on March 9, 2021, EVOLVE HEALTH sent M.A. a verification letter

22  confirming that he "purchased a brand of membership in the SERVICE INDUSTRY TRADE

23  ALLIANCE called EVOLVE HEALTH with an effective date of 2/7/2020."  The letter makes

24  no mention of FIRST CONTINENTAL or insurance coverage.

25  //

26  //

27  //

28

## 5. COMPLAINANT M.F.

WHEREAS, Respondent GETMECARE, an unlicensed entity, issued a medical plan insurance card in M.F.'s name effective August 20, 2020. The insurance card includes a confusing array of names and contact information. GETMECARE is the name at the top of the card. The policy number is FCL-GLI-001-AZ. The Medical Plan is through FIRST HEALTH NETWORK, with "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The number 855-648-6927 is for "all billing, customer service and non-claims related questions." SITA association member benefits can be accessed at www.serviceindustrytradealliance.org. Most of the other contact information appears similar to the information on the insurance card for Y.B.



The information was so confusing that M.F. did not know who the insurer was – on the Department's Request for Assistance form, M.F. stated that the insurers were GETMECARE and HealthFirst.

WHEREAS, according to M.F., health insurance representatives misrepresented coverage to attract policyholders. M.F. was told, and the medical plan insurance card indicates, that there was only a $10 co-pay for doctor visits. Subsequently, M.F. discovered that the insurance only paid about 10 percent of the amount of the doctor visits.

//

//

## 6. COMPLAINANT J.G.

WHEREAS, J.G. lost his job on January 8, 2021 and attempted to purchase health insurance under COBRA. The person J.G. spoke with on a recorded line assured him that he was signing him up for health insurance coverage; and,

WHEREAS, instead of issuing J.G. a health insurance policy, J.G. was issued a "SecureCare Mini" limited benefit policy and an Accidental Death and Dismemberment ("AD&D") policy for $320.40 down and $221.40 per month. The SecureCare Mini policy stated: "Insurance benefits are underwritten by FIRST CONTINENTAL LIFE AND ACCIDENT INSURANCE COMPANY for members of the ASSOCIATION FOR BETTER HEALTH"; and,

WHEREAS, Respondent NATIONAL ASSOCIATION OF PREFERRED PROVIDERS ("NAPP"), an unlicensed entity, issued a claims identification card in J.G.'s name effective February 2, 2021, which appears to be for the AD&D policy.[8]  The claims card includes the following information:

- Member eligibility: 1-866-910-6173.  Submit claims on HFCA 1500 or UB92 to: Claims, 11111 Richmond Ave., Ste. 200, Houston, TX 77082,[9] or Fax to: 713-270-1391.

- VOLUNTARY ACCIDENT INSURANCE PROGRAM, ISSUED TO NAPP ASSOCIATION.

WHEREAS, it would appear from the documents submitted by J.G. that he was required to purchase memberships in both ABH and NAPP to obtain the "SecureCare Mini" and the AD&D policies; and,

WHEREAS, when J.G. attempted to make a doctor's appointment, he was informed that the doctor did not take the insurance, even though the doctor's name was on his

---

[8] The AD&D insurer is unknown.

[9] This address belongs to Respondent ASSOCIATION HEALTH CARE MANAGEMENT, INC.

1  insurance card. When J.G. attempted to contact the person he initially spoke with, he stated

2  every phone number was disconnected or out of service, so he was unable to reach

3  anyone. Soon after, J.G. was rushed to emergency with an infected gallbladder and had to

4  have it removed immediately.  J.G. believes that the applicable Respondents should be

5  responsible for the costs of his surgery and recovery, due to their misinformation and

6  fraudulent actions, which prevented J.G. from acquiring proper health insurance before he

7  fell ill.

8

9                          **7.  COMPLAINANT V.C.**

10         WHEREAS, V.C. had health insurance through her employer until she was laid off.

11  According to V.C., she conducted an Internet search for "ObamaCare," which led her to

12  EVOLVE HEALTH.  V.C. stated she told the agent, Respondent FABIAN VERGARA

13  ("VERGARA"), that she mainly needed coverage for her new baby's visits and checkups.

14  VERGARA assured her the plan she was getting would be the best fit. VERGARA sold V.C.

15  "health insurance" for $567.90 down and $467.95 per month. Since 2018, VERGARA has

16  been licensed with the Department as a non-resident Accident and Health Agent, license

17  number 0M31165;[10] and,

18

19         WHEREAS, EVOLVE HEALTH issued a medical plan insurance card to V.C. and her

20  baby, L.C., effective August 1, 2020, showing the Medical Plan through FIRST HEALTH

21  NETWORK with "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The other

22  contact information on the insurance card is similar to the information on the insurance card

23  for Y.B. The information was so confusing that V.C. did not know who the insurer was – on

24  the Department's Request for Assistance form, V.C. stated that the insurer was EVOLVE

25  HEALTH; and,

26

27

28  _____

   [10] The Department has issued an Accusation against VERGARA.

WHEREAS, after a few doctor visits, V.C. started to receive bills from Children's Health Orange County ("CHOC") showing that she owed money for her baby's wellness checkups and vaccinations because they were not covered by insurance. V.C. attempted to call her insurance company but was transferred from one department to another with no resolution. As a result, V.C. cancelled her policy on January 20, 2021 and enrolled her baby in MediCal, but still has an outstanding balance from CHOC for three thousand, six hundred dollars ($3,600.00). V.C. does not believe she should be responsible for this amount since VERGARA assured her that the plan he sold her was a regular health plan that would cover her baby's wellness checkups. Had V.C. been told up front that she was being sold a limited policy, she stated she would never have purchased it; and,

WHEREAS, on June 2, 2021, EVOLVE HEALTH sent V.C. a verification letter confirming she "purchased a brand of membership in the SERVICE INDUSTRY TRADE ALLIANCE called EVOLVE HEALTH with an effective date of August 1, 2020." The letter made no mention of FIRST CONTINENTAL or insurance coverage.

## 8. COMPLAINANT A.U.

WHEREAS, in or about September 2020, Respondent CURTIS GARCEAU ("GARCEAU") sold A.U. "health insurance" for $260.90 down and $160.95 per month. According to A.U., "I signed up for FIRST HEALTH and United Business Association ["UBA"] for supplemental insurance through GETMECARE …" A.U. was told that between FIRST HEALTH and UBA she would have full health coverage. According to A.U., GARCEAU told her there was a $10 copay for doctor visits, $250 for ambulance, and $350 for emergency treatment, with the remaining balance covered by UBA, subject to an annual limit of two million dollars. GARCEAU never told A.U. that she had a limited plan. Since 2019,

1   GARCEAU has been licensed with the Department as a non-resident Life, Accident and

2   Health Agent, license number 4026934;[11] and

3       WHEREAS, GETMECARE issued a medical plan insurance card in A.U.'s name

4   effective September 5, 2020. The Medical Plan is through FIRST HEALTH NETWORK; with

5   "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The number 855-648-6927 is

6   for "all billing, customer service and non-claims related questions." Association member

7   benefits are through SITA, and all other contact information appears identical to the

8   information on the insurance card for Y.B.

9       WHEREAS, A.U. learned she had a limited plan when she saw a cardiologist and

10   had an echocardiogram, and neither FIRST HEALTH nor UBA would provide any coverage.

11   A.U. had to pay for the cardiologist and the echocardiogram herself.

12

13

14                    **9.  COMPLAINANT D.M.**

15       WHEREAS, on or about March 24, 2020, Respondent SAMANTHA MABIE

16   ("MABIE"), sold D.M. "health insurance" for $369.90 down and $269.95 per month.

17   According to D.M., she found the insurance on www.healthcare.gov and:

18

19           [A]gent made the policy sound like a full coverage plan. What I

20           signed was never supplied to me, policy and cards never sent to me. Paid almost $400.00 a month for a year asked for a policy

21           more than once never received. Finally received a portal sign in that had a confirmation clause to see policy that stated I didn't have

22           medical coverage at all. When I called I was told that is what I signed the first day that I never received a copy of in my instant

23           messages. I would never have paid 400 for a sub par policy I have a pneumonia background I cancelled a Blue Shield policy for this

24           plan.

25

26

27

28

---

[11] The Department has issued an Accusation against GARCEAU.

WHEREAS, MABIE had enrolled D.M. in SITA's Membership Plan, which included limited benefit "health insurance." The health insurer is not explicitly stated on the receipt, but is believed to be FIRST CONTINENTAL. The situation was so confusing that D.M. believed her health insurer was EVOLVE HEALTH. Since 2016, MABIE has been licensed with the Department as a non-resident Accident and Health Agent, license number 0L30001.[12] D.M. is requesting a full refund.

## 10. COMPLAINANT D.W.

WHEREAS, D.W. states:

> I was sold this insurance policy after filling out an online questionnaire that I thought was with the Covered California Website. Unfortunately, it was a pop-up site belonging to a private broker. I was sold a policy that I was told was Aetna, and paid $743.95 with my debit card for a policy covering me and my family, with a PPO health and dental plan. Within 24 hours, I realized this was not through Covered California and is indeed not an Aetna plan, and called back to cancel. I also called Covered California, and signed up with a new policy with them. I have made numerous phone calls to the previous insurer and have followed the exact protocol told to me: to send an email, along with proof of my existing insurance, requesting immediate cancellation. I sent this email on Monday, July 19, 2021. I have yet to hear from them, have not been refunded, and am unable to reach them by phone.

WHEREAS, D.W. received a temporary medical plan insurance card. SecureCare Preferred Starter is the name at the top of the card. No policy number is listed. Other information on the card includes the following: MDLIVE Doctor Visit Fee: $0; Unlimited # of Visits; 866-976-0802; www.mdlive.com/myewellness. The Medical Plan is through FIRST HEALTH, with "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The number 866-910-6173 or benefitsportal.net is for "member services." ABH association member

---

[12] The Department has issued an Accusation against MABIE.

benefits can be accessed at www.associationforbetterhealth.org. Claims submission: ACI, 994 Old Eagle School Road, Ste. 1005, Wayne, PA 19087. www.visit-aci.com or 800-565-6053. To confirm eligibility and obtain benefit determinations, please call 800-565-6053. At some point, D.W. apparently dealt with Prosperity Health Group. The information was so confusing that D.W. believed her insurer was Prosperity Health Group.

## 11. COMPLAINANT M.S.

WHEREAS, on or about June 10, 2021, M.S. purchased what she believed to be full coverage health insurance through FIRST CONTINENTAL, policy number FCL-GLI-001-AZ. M.S. was never informed that the coverage was a limited benefit plan. M.S. states:

> When purchasing this health insurance I was told there was a $10 copay for doctor visits. After visiting the doctor in July [2021] I received a bill for $857.25 instead of the $10 copay as initially outlined in my call with the company. I have since cancelled my insurance with them however at the time I called to cancel it was again confirmed I [*sic*] this insurance had a $10 copay. This isn't really insurance as I paid almost $800 per month for a $10 copay. It would have been less expensive to forgo the insurance and pay the doctor directly for the appointment.

WHEREAS, M.S.'s bank statement shows that Respondent FAMILY CARE of Texas, 800-323-4057, took the initial payment of $848.45 and the first installment of $738.45 from her bank account. FAMILY CARE is the DBA of Respondent ASSOCIATION HEALTH CARE MANAGEMENT, INC.

## 12. COMPLAINANTS E.P. AND N.P.

WHEREAS, on or about December 4, 2020, E.P. and N.P. received a call from insurance agent and Respondent SCOTT RUSSELL ("RUSSELL"), who told them he could give them better health coverage with lower premiums than E.P. had through his previous insurer, Blue Cross; and,

WHEREAS, from June 18, 2019 until his license expired for failure to renew on June 30, 2021, RUSSELL was licensed with the Department as a non-resident Accident and Health Agent, license number 0N03621;[13] and,

WHEREAS, E.P. and N.P. talked extensively about the coverage with RUSSELL, and it sounded good, so they purchased the "health insurance" through FIRST CONTINENTAL, with ACI as the administrator. The medical plan was called "SecureCare Enterprise," and policy documents indicate that E.P. and N.P. were enrolled as members of ABH to obtain the coverage for $593.40 down and $468.40 per month; and,

WHEREAS, RUSSELL told E.P. and N.P. they would be receiving medical identification cards and a booklet with all the information about medical and dental coverage within a few weeks. Although the medical cards arrived, the booklet never came. E.P. and N.P. forgot about the booklet until March 2021, and when they called member services, they were informed that the insurer does not have medical coverage booklets but there is a website. When N.P. accessed the website, she discovered that RUSSELL had included a life insurance policy at $105.45 per month, which they had not requested. At N.P.'s request, the life insurance was removed; and,

WHEREAS, on or about March 27, 2021, E.P. had to go to the emergency room for about two hours. On or about April 29, 2021, ACI sent E.P. an explanation of benefits form stating that the coverage was a limited benefit plan and did not provide any emergency room coverage, contrary to what they had been told by RUSSELL. E.P. and N.P. were understandably upset, as RUSSELL told them they had the best policy. The emergency room bill was $8,287.49, and FIRST CONTINENTAL refused to pay any portion of it; and,

WHEREAS, N.P. tried diligently to obtain a refund by contacting the various numbers provided, but was constantly put on hold for excessive amounts of time, transferred,

---

[13] The Department has issued an Accusation against RUSSELL.

disconnected, and told she needed to call a different number. When N.P. tried to go to the website to see if there was a refund, it showed the following message:

**Access Request**

This account cannot be accessed due to an unresolved issue. Please contact a services leader to assist in resolving this matter.

Member Services | (866) 910-6173 | memberservices@ahcminc.com

AHCM Inc. is Respondent ASSOCIATION HEALTH CARE MANAGEMENT INC., DBA FAMILY CARE; and,

The phone game is a common theme among complainants, and appears to be a scheme by which FIRST CONTINENTAL, ACI and possibly other Respondents attempt to evade policyholder requests for refunds and payments, probably hoping the policyholders will just go away - and many probably do - leaving Respondents with a handsome profit.

## ILLEGAL INSURANCE

WHEREAS, the fixed-benefit policies at issue in this case work in the opposite manner of standard health insurance policies. Typical health policies often require the policyholder to pay a deductible or co-pay, then the insurer pays the remainder of the charges. But with the fixed-benefit policies, the insurer pays fixed amounts (analogous to a deductible or co-pay), and the policyholder pays the remainder of the charges. The policyholder is essentially self-insured, since the fixed amounts paid by the insurer are fairly low and only cover a small fraction of the actual costs. This type of supplementary insurance might be acceptable to fill in the gaps for someone who has existing health insurance with high deductibles, but it is not intended to be a primary health insurance policy, although Respondents sold it as such. As stated above, this type of coverage is illegal in California when sold as a primary health insurance policy, notwithstanding the fact that it was backed by a nonadmitted, illegal insurer, and sold by misrepresentation.

## VIOLATIONS

### *Unlawful Activities*

WHEREAS, FIRST CONTINENTAL has acted in a capacity for which a certificate of authority is required but not possessed, in violation of California Insurance Code section 700; has misrepresented fixed-benefit indemnity insurance as "health insurance," in violation of sections 106(b)(2), 780(a), 781, and 790.03(b); has issued fixed-benefit indemnity insurance to Californians who did not have comprehensive health insurance, in violation of section 10198.61(b); and failed to comply with sections 10198.61(a) and 10198.8, which require insurers to certify annually to the Commissioner that they do not market their indemnity insurance as a substitute for Affordable Care Act health insurance, "regardless of the situs of the contract or group master policyholder."

WHEREAS, ADMINISTRATIVE CONCEPTS, INC. ("ACI") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, the ASSOCIATION FOR BETTER HEALTH ("ABH") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, ASSOCIATION HEALTH CARE MANAGEMENT, INC., DBA FAMILY CARE ("AHCM") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, MATTHEW DEPREY has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, EVOLVE HEALTH has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, FIRST HEALTH NETWORK has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, CURTIS GARCEAU has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, GET ME CARE, AKA GETMECARE, has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, SAMANTHA MABIE has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, the NATIONAL ASSOCIATION OF PREFERRED PROVIDERS ("NAPP") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, SCOTT RUSSELL has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, the SERVICE INDUSTRY TRADE ALLIANCE ("SITA") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance

1  in California, to transact insurance with California residents, in violation of California

2  Insurance Code section 703; and,

3      WHEREAS, FABIAN VERGARA has aided and abetted FIRST CONTINENTAL, an

4  entity not licensed to transact the business of insurance in California, to transact insurance

5  with California residents, in violation of California Insurance Code section 703; and,

6

7                          ***Dates of Unlawful Activities***

8      (WHEREAS, FIRST CONTINENTAL is not licensed by the Commissioner to transact

9  insurance business as an insurer, and began engaging in the unlawful activity set forth

10  herein on or before October 15, 2019).

11      (WHEREAS, ACI) ABH, EVOLVE HEALTH, and(FIRST HEALTH NETWORK began)

12  engaging in the unlawful activity set forth herein on or before October 15, 2019; and,

13      WHEREAS, AHCM and NAPP began engaging in the unlawful activity set forth

14  herein on or before February 2, 2021; and,

15      WHEREAS, MATTHEW DEPREY and SITA began engaging in the unlawful activity

16  set forth herein on or before February 19, 2020; and,

17      WHEREAS, GET ME CARE began engaging in the unlawful activity set forth herein

18  on or before August 20, 2020; and,

19      WHEREAS, CURTIS GARCEAU began engaging in the unlawful activity set forth

20  herein on or before September 5, 2020; and,

21      WHEREAS, SAMANTHA MABIE began engaging in the unlawful activity set forth

22  herein on or before March 24, 2020; and,

23      WHEREAS, SCOTT RUSSELL began engaging in the unlawful activity set forth

24  herein on or before December 4, 2020; and,

25      WHEREAS, FABIAN VERGARA began engaging in the unlawful activity set forth

26  herein on or before August 1, 2020; and,

27

28

1

## **ORDER TO CEASE AND DESIST**

2

WHEREAS, all Respondents are ordered to CEASE and DESIST the unlawful

3

activities set forth herein.

4

5

## **ORDER TO SHOW CAUSE**

6

NOW THEREFORE, FIRST CONTINENTAL IS HEREBY ORDERED to SHOW

7

CAUSE why the facts recited above do not establish grounds for the Commissioner to

8

impose a monetary penalty pursuant to Insurance Code section 12921.8 of five times the

9

amount of money received by FIRST CONTINENTAL while acting in the capacity for which

10

a license, registration or certificate of authority was required but not possessed, or five

11

thousand dollars ($5,000) for each day FIRST CONTINENTAL has acted in the capacity for

12

which a license, registration or certificate of authority was required but not possessed,

13

14

whichever is greater. In the absence of contrary evidence, it shall be presumed that a

15

person continuously acted in a capacity for which a license, registration, or certificate of

16

authority was required on each day from the date of the earliest such act until the date those

17

acts were discontinued, as proven by the person at a hearing; and,

18

NOW THEREFORE, ABH; AHCM; EVOLVE HEALTH; FIRST HEALTH NETWORK;

19

GET ME CARE; NAPP and SITA ARE HEREBY ORDERED to SHOW CAUSE why the

20

facts recited above do not establish grounds for the Commissioner to impose a monetary

21

penalty pursuant to Insurance Code section 12921.8 of five times the amount of money

22

received by any of said Respondents while aiding and abetting FIRST CONTINENTAL to

23

act in a capacity for which a license, registration or certificate of authority was required but

24

not possessed, or five thousand dollars ($5,000) for each day any of said Respondents

25

have aided or abetted FIRST CONTINENTAL to act in a capacity for which a license,

26

registration or certificate of authority was required but not possessed, whichever is greater.

27

//

28

## **NOTICE OF RIGHT TO HEARING**

Insurance Code § 12921.8(c), a copy of which is attached to this Order as Exhibit B, provides in part, as follows:

> "A person to whom a cease and desist order...has been issued, may, within <u>seven days</u> after service of the order...request a hearing by filing a request for the hearing with the commissioner."

If you desire a hearing in this matter, your written request for a hearing must be received within seven days after you are personally served with this Order. The seven-day period begins on the day after you are served with this Order, and if the seventh day falls on a weekend or holiday, the deadline is extended to the next business day. Your written request for a hearing must be directed to Christina Carroll, attorney for the California Department of Insurance, at the address at the top of the first page of this order.

IN WITNESS WHEREOF, I have set my hand and affixed my official seal this 2nd day of February, 2022.

RICARDO LARA
Insurance Commissioner

By:

Digitally signed by Tyler P. McKinney
Date: 2022.02.02 12:31:27 -08'00'

TYLER MCKINNEY
Assistant Chief Counsel

# EXHIBIT B

Wolters Kluwer

**CT Corporation**
**Service of Process Notification**
03/17/2025
CT Log Number 548652638

## Service of Process Transmittal Summary

**TO:**  David Scott, Paralegal Consumer Litigation Team
Aetna Inc
151 Farmington Ave
Hartford, CT 06156-0002

**RE:**  **Process Served in California**

**FOR:**  FIRST HEALTH GROUP CORP.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its KECK HOSPITAL OF USC and on behalf of its USC VERDUGO HILLS HOSPITAL, vs. COVENTRY HEALTH CARE NATIONAL NETWORK, INC. |
| **CASE #:** | 25STCV05606 |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 03/17/2025 at 12:51 |
| **JURISDICTION SERVED:** | California |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 03/17/2025, Expected Purge Date: 03/22/2025 |
| | Image SOP |
| | Email Notification,  Desiree Beatty  beattyd@aetna.com |
| | Email Notification,  David Scott  ScottD4@aetna.com |
| | Email Notification,  Kim Lees  kimberly.lees@cvshealth.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System
330 N BRAND BLVD
STE 700
GLENDALE, CA 91203
877-564-7529
MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

# EXHIBIT C

 **Wolters Kluwer**

**CT Corporation**
**Service of Process Notification**
03/18/2025
CT Log Number 548670536

## Service of Process Transmittal Summary

**TO:**   David Scott, Paralegal Consumer Litigation Team
Aetna Inc
151 Farmington Ave
Hartford, CT 06156-0002

**RE:**   **Process Served in Delaware**

**FOR:**   COVENTRY HEALTH CARE NATIONAL NETWORK, INC.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its KECK HOSPITAL OF USC and on behalf of its USC VERDUGO HILLS HOSPITAL vs. COVENTRY HEALTH CARE NATIONAL NETWORK, INC. |
| **CASE #:** | 25STCV05606 |
| **PROCESS SERVED ON:** | The Corporation Trust Company, Wilmington, DE |
| **DATE/METHOD OF SERVICE:** | By Process Server on 03/18/2025 at 16:08 |
| **JURISDICTION SERVED:** | Delaware |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 03/19/2025, Expected Purge Date: 03/24/2025 |
| | Image SOP |
| | Email Notification,  Desiree Beatty  beattyd@aetna.com |
| | Email Notification,  David Scott  ScottD4@aetna.com |
| | Email Notification,  Kim Lees  kimberly.lees@cvshealth.com |
| **REGISTERED AGENT CONTACT:** | The Corporation Trust Company |
| | 1209 Orange Street |
| | Wilmington, DE 19801 |
| | 877-564-7529 |
| | MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

# EXHIBIT D

**Wolters Kluwer**

## Service of Process Transmittal Summary

**TO:**      David Scott, Paralegal Consumer Litigation Team
             Aetna Inc
             151 Farmington Ave
             Hartford, CT 06156-0002

**RE:**      **Process Served in California**

**FOR:**     FIRST HEALTH GROUP CORP.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its KECK HOSPITAL OF USC and on behalf of its USC VERDUGO HILLS HOSPITAL, vs. COVENTRY HEALTH CARE NATIONAL NETWORK, INC. |
| **CASE #:** | 25STCV05606 |
| **PROCESS SERVED ON:** | C T Corporation System, GLENDALE, CA |
| **DATE/METHOD OF SERVICE:** | By Process Server on 03/17/2025 at 12:51 |
| **JURISDICTION SERVED:** | California |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 03/17/2025, Expected Purge Date: 03/22/2025 |
| | Image SOP |
| | Email Notification,  Desiree Beatty  beattyd@aetna.com |
| | Email Notification,  David Scott  ScottD4@aetna.com |
| | Email Notification,  Kim Lees  kimberly.lees@cvshealth.com |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 330 N BRAND BLVD |
| | STE 700 |
| | GLENDALE, CA 91203 |
| | 877-564-7529 |
| | MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**                                    Mon, Mar 17, 2025
**Server Name:**                      Jimmy Lizama

| Entity Served | FIRST HEALTH GROUP CORP. |
|---|---|
| Case Number | 25STCV05606 |
| Jurisdiction | CA |

| Inserts | | |
|---|---|---|
| | | |



**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

<table>
<tr>
<td>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
COVENTRY HEALTH CARE NATIONAL NETWORK, INC.; FIRST
CONTINENTAL LIFE & ACCIDENT INSURANCE CO.; FIRST HEALTH GROUP
CORP.; and DOES 1 through 25, inclusive
**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its KECK HOSPITAL OF
USC and on behalf of its USC VERDUGO HILLS HOSPITAL

</td>
<td>

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**Electronically FILED by**
**Superior Court of California,**
**County of Los Angeles**
2/27/2025 7:25 PM
**David W. Slayton,**
**Executive Officer/Clerk of Court,**
**By S. Ruiz, Deputy Clerk**

</td>
</tr>
</table>

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

<table>
<tr>
<td>

The name and address of the court is:
*(El nombre y dirección de la corte es):*
LOS ANGELES COUNTY SUPERIOR COURT
111 N. Hill St., Los Angeles, CA 90012

</td>
<td>

CASE NUMBER:
*(Número del Caso):*
**25STCV05606**

</td>
</tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Carrie McLain (SBN 181674) / Mikaela Cox (SBN 316886) / Thomas Yau (SBN 339222)    Fax No.: (562) 901-4488
HELTON LAW GROUP, APC - 1590 Corporate Dr., Costa Mesa, CA 92626    Phone No.: (562) 901-4499

<table>
<tr>
<td>DATE:<br>*(Fecha)*    02/27/2025</td>
<td>Clerk, by    David W. Slayton, Executive Officer/Clerk of Court    Deputy<br>*(Secretario)*    S. Ruiz    *(Adjunto)*</td>
</tr>
</table>

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

<table>
<tr>
<td>

[SEAL]

</td>
<td>

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):* FIRST HEALTH GROUP CORP.

under: ☒ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)

☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

</td>
</tr>
</table>

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
*LexisNexis® Automated California Judicial Council Forms*

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Carrie McLain (SBN 181674) / Mikaela Cox (SBN 316886) / Thomas Yau (SBN 339222)<br>HELTON LAW GROUP, APC - 1590 Corporate Dr., Costa Mesa, CA  92626 | *FOR COURT USE ONLY* |
|---|---|
| TELEPHONE NO.: (562) 901-4499          FAX NO.:  (562) 901-4488<br>EMAIL ADDRESS:  cmclain@helton.law / mcox@helton.law / tyau@helton.law<br>ATTORNEY FOR *(Name):* Plaintiffs | **Electronically FILED by<br>Superior Court of California,<br>County of Los Angeles<br>2/27/2025 7:25 PM<br>David W. Slayton,<br>Executive Officer/Clerk of Court,<br>By S. Ruiz, Deputy Clerk** |
| SUPERIOR COURT OF CALIFORNIA, COUNTY OF  LOS ANGELES<br>STREET ADDRESS: 111 N. Hill Street<br>MAILING ADDRESS:<br>CITY AND ZIP CODE: Los Angeles, CA  90012<br>BRANCH NAME: Stanley Mosk Courthouse | |

| CASE NAME:<br>University of Southern California, et al. v. Coventry, et al. | |
|---|---|

| **CIVIL CASE COVER SHEET**<br>[x] Unlimited      [ ] Limited<br>(Amount            (Amount<br>demanded          demanded is<br>exceeds $35,000)  $35,000 or less) | **Complex Case Designation**<br>[ ] Counter    [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | CASE NUMBER:<br>25STCV05606 |
|---|---|---|
| | | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation<br>(Cal. Rules of Court, rules 3.400–3.403) |
|---|---|---|
| [ ] Auto (22) | [x] Breach of contract/warranty (06) | [ ] Antitrust/Trade regulation (03) |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Construction defect (10) |
| **Other PI/PD/WD (Personal Injury/Property** | [ ] Other collections (09) | [ ] Mass tort (40) |
| **Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Securities litigation (28) |
| [ ] Asbestos (04) | [ ] Other contract (37) | [ ] Environmental/Toxic tort (30) |
| [ ] Product liability (24) | **Real Property** | [ ] Insurance coverage claims arising from the |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse | above listed provisionally complex case |
| [ ] Other PI/PD/WD (23) | condemnation (14) | types (41) |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | **Enforcement of Judgment** |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | [ ] Enforcement of judgment (20) |
| [ ] Civil rights (08) | **Unlawful Detainer** | **Miscellaneous Civil Complaint** |
| [ ] Defamation (13) | [ ] Commercial (31) | [ ] RICO (27) |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | **Miscellaneous Civil Petition** |
| [ ] Professional negligence (25) | **Judicial Review** | [ ] Partnership and corporate governance (21) |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Other petition *(not specified above)* (43) |
| **Employment** | [ ] Petition re: arbitration award (11) | |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [ ] is  [x] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the
factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties          d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel    e. [ ] Coordination with related actions pending in one or more
          issues that will be time-consuming to resolve               courts in other counties, states, or countries, or in a federal
   c. [ ] Substantial amount of documentary evidence                  court
                                                                  f. [ ] Substantial postjudgment judicial supervision
3. Remedies sought *(check all that apply):* a. [x] monetary  b. [x] nonmonetary; declaratory or injunctive relief  c. [ ] punitive
4. Number of causes of action *(specify):* EIGHT (8)
5. This case [ ] is  [x] is not  a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: February 27, 2025
Mikaela Cox
_____                    ►_____
              (TYPE OR PRINT NAME)                              (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed
  under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to
  the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.       Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. January 1, 2024] | **CIVIL CASE COVER SHEET** | Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10<br>*www.courts.ca.gov* |
|---|---|---|

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**    CM-010

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
    Asbestos Property Damage
    Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
    Medical Malpractice– Physicians & Surgeons
    Other Professional Health Care Malpractice
Other PI/PD/WD (23)
    Premises Liability (e.g., slip and fall)
    Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
    Intentional Infliction of Emotional Distress
    Negligent Infliction of Emotional Distress
    Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
    Legal Malpractice
    Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
    Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
    Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
    Negligent Breach of Contract/ Warranty
    Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
    Collection Case–Seller Plaintiff
    Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
    Auto Subrogation
    Other Coverage
Other Contract (37)
    Contractual Fraud
    Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
    Writ of Possession of Real Property
    Mortgage Foreclosure
    Quiet Title
    Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
    Writ–Administrative Mandamus
    Writ–Mandamus on Limited Court Case Matter
    Writ–Other Limited Court Case Review
Other Judicial Review (39)
    Review of Health Officer Order
    Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
    Abstract of Judgment (Out of County)
    Confession of Judgment *(non-domestic relations)*
    Sister State Judgment
    Administrative Agency Award *(not unpaid taxes)*
    Petition/Certification of Entry of Judgment on Unpaid Taxes
    Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
    Declaratory Relief Only
    Injunctive Relief Only *(non-harassment)*
    Mechanics Lien
    Other Commercial Complaint Case *(non-tort/non-complex)*
    Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
    Civil Harassment
    Workplace Violence
    Elder/Dependent Adult Abuse
    Election Contest
    Petition for Name Change
    Petition for Relief From Late Claim
    Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| University of Southern California, et al. v. Coventry, et al. | 25STCV05606 |

# CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

> **This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

| Applicable Reasons for Choosing Courthouse Location (Column C) | |
|---|---|
| 1. Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. Location where petitioner resides. |
| 2. Permissive filing in Central District. | 8. Location wherein defendant/respondent functions wholly. |
| 3. Location where cause of action arose. | 9. Location where one or more of the parties reside. |
| 4. Location where bodily injury, death or damage occurred. | 10. Location of Labor Commissioner Office. |
| 5. Location where performance required, or defendant resides. | 11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6. Location of property or permanently garaged vehicle. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| University of Southern California, et al. v. Coventry, et al. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Other Personal Injury/ Property Damage/ Wrongful Death** | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☑ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1,②⑤ |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| University of Southern California, et al. v. Coventry, et al. | |

| | A<br>Civil Case Cover<br>Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable<br>Reasons (see<br>Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br>                    Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

LASC CIV 109 Rev. 10/22
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| University of Southern California, et al. v. Coventry, et al. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation (Continued)** | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2003 Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4304 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

LASC CIV 109 Rev. 10/22
For Mandatory Use

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| University of Southern California, et al. v. Coventry, et al. | |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON:<br>☐ 1. ☑ 2. ☐ 3. ☐ 4. ☑ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | ADDRESS:<br>1500 San Pablo St. |
|---|---|
| CITY:<br>LOS ANGELES | STATE:<br>CA | ZIP CODE:<br>90033 | |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: 02/27/2025

(SIGNATURE OF ATTORNEY/FILING PARTY

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (10/22).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

**HELTON LAW GROUP**
**A PROFESSIONAL CORPORATION**
CARRIE MCLAIN (State Bar No. 181674)
MIKAELA COX (State Bar No. 316886)
THOMAS YAU (State Bar No. 339222)
ATTORNEY AT LAW
1590 Corporate Drive
Costa Mesa, CA 92626
TELEPHONE: (562) 901-4499
FACSIMILE: (562) 901-4488

ATTORNEYS FOR PLAINTIFF

Electronically FILED by
Superior Court of California,
County of Los Angeles
2/27/2025 7:25 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its KECK HOSPITAL OF USC and on behalf of its USC VERDUGO HILLS HOSPITAL,<br><br>Plaintiff,<br><br>vs.<br><br>COVENTRY HEALTH CARE NATIONAL NETWORK, INC.; FIRST CONTINENTAL LIFE & ACCIDENT INSURANCE CO.; FIRST HEALTH GROUP CORP.; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.:  25STCV05606<br><br>ASSIGNED TO:<br>DEPT.:<br><br>UNLIMITED - DAMAGES IN EXCESS OF $35,000<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>1. **NEGLIGENT MISREPRESENTATION**<br>2. **DECEIT**<br>3. **BREACH OF IMPLIED-IN-FACT CONTRACT**<br>4. **QUANTUM MERUIT**<br>5. **PROMISSORY ESTOPPEL**<br>6. **UNFAIR BUSINESS PRACTICES (CAL. BUS. & PROF. CODE § 17200 et seq.)**<br>7. **BREACH OF WRITTEN CONTRACT**<br>8. **BREACH OF WRITTEN CONTRACT** |

TO ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:

1.    Plaintiff UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its KECK HOSPITAL OF USC and on behalf of its USC VERDUGO HILLS HOSPITAL, (collectively "Plaintiff" or "Hospitals") bring this action against Defendants COVENTRY HEALTH CARE NATIONAL NETWORK, INC., FIRST CONTINENTAL LIFE & ACCIDENT INSURANCE CO., FIRST HEALTH GROUP CORP. and Does 1 through 25 for failure to pay $545,328.90 for hospital services provided to the Patient, who allegedly had health care insurance through Defendants.

**THE PARTIES**

2.      Plaintiff UNIVERSITY OF SOUTHERN CALIFORNIA ("USC") on behalf of its KECK HOSPITAL OF USC ("Keck") and on behalf of its USC VERDUGO HILLS HOSPITAL ("VHH") is a nonprofit public benefit corporation licensed to do business in the State of California, with its principal place of business in the City of Los Angeles, County of Los Angeles. USC owns and operates Keck Hospital of USC and USC Verdugo Hills Hospital, which at all relevant times discussed herein are and have been licensed as acute-care hospitals by the California Department of Public Health ("CDPH").

3.      USC, Keck and Verdugo are referred to herein collectively as "Plaintiff" or "Hospitals."

4.      Plaintiff is informed and believes and, on this basis alleges the following: Defendant COVENTRY HEALTH CARE NATIONAL NETWORK, INC. ("Coventry") is a corporation domiciled, organized and existing under the laws of the State of Delaware.

5.      Plaintiff is informed and believes and, on this basis alleges the following: Defendant FIRST CONTINENTAL LIFE & ACCIDENT INSURANCE CO. ("FCL" or "FIRST CONTINENTAL") is a corporation domiciled, organized and existing under the laws of the State of Utah and licensed to transact insurance in several states and territories. Commencing on or before October 15, 2019, FIRST CONTINENTAL unlawfully acted as an insurance company in California and has, in that capacity unlawfully transacted the business of insurance in California without the requisite certificate of authority.

6.      Plaintiff is informed and believes and, on this basis alleges the following: Defendant FIRST HEALTH GROUP CORP. ("First Health") is a corporation domiciled, organized and existing under the laws of the State of Delaware.

7.      As explained further below, Coventry Health Care National Network, Inc., and its affiliates, including but not limited to First Health Network, (collectively, "Coventry Companies" or "Coventry Company") breached the Coventry Health Care National Network, Inc. Participating Hospital Agreement, effective February 1, 2008, with Keck USC ("Keck USC Agreement") and the Coventry Agreement, effective November 1, 2011, with Verdugo Hills ("Verdugo Hills Agreement").

8.      Plaintiff is unaware of the true names, identities, and capacities of the Defendants sued as Does 1 through 25, inclusive, and each of them as based thereon, sue said defendants by such fictitious names. When their true names and capacities are ascertained, Plaintiff will amend this complaint by inserting their true names and capacities. Plaintiff is informed and believes and alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged herein, and that the Plaintiff's damages as alleged herein were proximately caused by those Defendants.

9.      Plaintiff is informed and believes and alleges that at all times mentioned, each of the Defendants, including all Defendants sued under fictitious names, were the agent and/or employee of each of the remaining Defendants, and in so doing the things alleged, were acting within the scope of his, her or its agency and employment, and with the permission and consent of the other defendants.

10.     Plaintiff is withholding the full name of the patient addressed in this complaint to preserve the patient's protected rights to privacy concerning health care information. Plaintiff will refer to the patient individually as patient. The Patient's name and claims information have been, and/or will be made available to Defendants upon request consistent with HIPAA and the minimum necessary requirement.

11.     FCL, COVENTRY, FIRST HEALTH, and Does 1 through 25 are collectively referred to herein as "Defendants."

## AGENCY

12.     The Hospitals are informed and believe and thereon allege that at all times mentioned herein, each of the Defendants, including all Defendants sued under fictitious names, were the agent and/or employee of each of the remaining Defendants, including specifically but not limited to FCL and FIRST HEALTH, and in so doing the things alleged herein, were acting within the scope of his or her agency and employment and with the permission and consent of each of the other Defendants.

13.     The Hospitals are informed and believe and thereon alleges that Defendants have entered into an administrative service agreement or other contracts with Administrative Concepts Inc. ("ACI") and Zelis to act as agents for Defendants, and have provided ACI and Zelis actual or ostensible authority to act on Defendants' behalf for: communicating with policyholders and medical

1  providers, such as the Hospitals; creating agreements with medical providers so that Defendant's
2  policy holders may receive medical services; verifying member policy information and eligibility to
3  medical providers, such as the Hospitals, interpreting plan terms and provisions; authorizing services
4  to be provided by the Hospitals to FCL policyholders; determining medical necessity and coverage of
5  services; receiving the Hospitals' claims; processing and administering the Hospitals' claims and
6  appeals; approving or denying the Hospitals' claims and appeals; interpreting policy documents;
7  determining whether and how to pay the Hospitals' claims; issuing payment advices, claim status
8  reports and explanation of benefits ("EOBs") and making and administering payments.

9       14.    With respect to the claims at issue in this case, the Hospitals dealt directly with FCL,
10  ACI, and/or Zelis in obtaining agreements to pay for services, seeking authorization for the services,
11  obtaining eligibility and coverage information, submitting claims for reimbursement, communicating
12  about the claims, appealing the denial or underpayment of the claim, submitting additional information
13  concerning the claim, and receiving explanation of benefits ("EOB").

14  **BACKGROUND**

15  **A.    VERDUGO HILLS HOSPITAL CLAIM**

16       15.    In early 2023, Patient was admitted to the Emergency Department at VHH to receive
17  emergency medical services.  Patient presented with a fever, productive cough, chills, nausea,
18  shortness of breath and headache for more than seven days.  While in the ED, the Patient was febrile,
19  tachypneic, tachycardic and hypoxic.

20       16.    The Patient identified to VHH that he was a California resident.  The Patient presented
21  an insurance identification card identifying "Evolve Health" sponsored by the Service Industry Trade
22  Alliance. The card claims the plan offers "Limited medical benefits underwritten by: First Continental
23  Life and Accident Insurance Company."  The card further identifies First Health as the applicable
24  network and directed providers to submit claims to Administrative Concepts, Inc. ("ACI").

25       17.    On the Patient was admitted, a VHH employee called ACI and verified the Patient's
26  eligibility under the plan.  The following day, the VHH employee phoned ACI again and verified the
27  Patient's insurance type as "PPO." ACI's employee Joyce Robert provided tracking number
28  EV2022458 and verified the Patient's insurance benefits and coverage as 100% with zero copy and

1    deductible.  Ms. Robert further instructed that the hospital fax clinicals to ACI and represented no
2    precertification was required.

3         18.    The Patient was diagnosed with sepsis, Legionnaires' disease, toxic encephalopathy,
4    acute respiratory distress syndrome, and severe sepsis with septic shock. During the stay, the Patient
5    was placed on mechanical ventilation.  During the Patient's inpatient stay, VHH provided hospital
6    services with charges totaling $190,521.35.

7         19.    Five (5) days after the Patient was admitted, the Patient's physicians determined the
8    Patient required transfer to a higher level of care for extracorporeal membrane oxygenation (ECMO),
9    which is a method of providing cardiac and respiratory support to a person whose heart and lungs are
10   unable to provide enough oxygen to sustain life. VHH contacted the Transfer Center at Keck to
11   request transfer for a higher level of care.

12        20.    FCL, ACI, and its other co-conspirators (collectively referred to as the "Payors") and/or
13   its agents improperly denied payment for the emergency and post-stabilization hospital services the
14   Hospitals provided.

15        21.    Meanwhile, unbeknownst to Plaintiff, on February 2, 2022, the California Department
16   of Insurance ("CDI") issued a Cease-and-Desist Order that FCL stop operating an insurance plan in
17   California. The Order finds that FCL unlawfully acted as an insurance company in California without
18   the requisite certificate of authority.

19        22.    It is the Plaintiff's understanding this Patient was a California resident during the dates
20   of services at issue.  Thus, each of the Payors continued to operate in California in violation of the
21   Cease-and-Desist Order.

22        23.    The Cease-and-Desist Order also instructed First Health Network, its officers, directors,
23   employees, agents, affiliates, and representatives, ordering it to end its business practices aiding and
24   abetting First Continental's unlawful transaction of insurance in California.

25        24.    The Cease-and-Desist Order concludes First Health Network aided and abetted First
26   Continental in violation of California Insurance Code section 703, which makes it a misdemeanor
27   offense to in any manner aid a non-admitted insurer to transact insurance business in California.

28

25. As reflected in the attached exhibits, Defendants' unlawful activities in aiding and abetting FCL's illegal business of insurance in California continued. Specifically, Coventry Company permitted FCL to continue to identify Coventry Company on insurance identification cards in February 2023.

26. Coventry Company also improperly and illegally granted FCL access to rates in the Hospitals' Agreements for one or more of the Hospitals' claims for services provided. In doing so, Coventry Company breached the Keck Agreement and Verdugo Agreement.

27. Additionally, FCL and/or its Agents further engaged in intentional fraud and/or negligent misrepresentation by informing VHH that authorizations were not required pursuant to an alleged insurance policy issued to a California resident in violation of the Cease-and-Desist Order.

28. FCL and/or its Agents have improperly denied VHH's claim citing conflicting reasons for such denial, when the Hospital provided lifesaving emergency services to the Patient while at VHH.

29. Pursuant to the federal Emergency Medical Treatment and Active Labor Act (EMTALA) at 42 USC §1385dd, hospitals are required to provide services to any patient regardless of the patient's ability to pay as long as the services are necessary to stabilize the patient. However, once a patient has been stabilized, a hospital may determine whether to continue to provide services or transfer the Patient to an alternative facility (such as a County Hospital), depending on whether the patient has coverage pursuant to a health care plan or otherwise has the ability to pay.

30. When the Patient was stable, VHH verified the Patient's eligibility with Defendants and notified Defendants of the Patient's admission to the Hospital. VHH requested authorization of the services the Hospital would be providing the Patient and, in so doing, specifically informed that Defendants what type of care and illness the Patient was receiving care for from the Hospital.

31. On more than one occasion after VHH provided the Defendants information regarding the Plaintiff's medical status and clinical care and before the Patient's transfer from VHH to Keck for a higher level of care. The Defendants provided the Hospitals information regarding the Patient's insurance benefits and lack of authorization requirement. The information Defendants provided to the

Hospitals did not disclose that the Patient's plan through FCL did not cover charges for the care Patient was and would be receiving.

32.    Unbeknownst to the Hospitals, the information the Hospitals provided to the Defendants was sufficient for the Defendants to make a determination that the Hospitals' services were not covered based on information that the Defendants exclusively possessed about the terms of the Patient's insurance plan through FCL.

33.    However, at no time before the Patient's discharge from VHH and admission to Keck did the Hospitals know or have any reasonable way of knowing that the Patient's injuries were not covered under the Patient's insurance plan through FCL.

34.    Despite these facts, before the Hospitals provided all acute care hospital services to the Patient, Defendants: (1) provided to the Hospitals oral verification of the Patient's eligibility, coverage, and benefits under the Patient's plan through FCL; (2) repeatedly informed VHH that authorization was not required; and (3) requested that the Hospitals provide clinical information regarding the Patient's medical condition.  In making such communications and taking such actions, Defendants expressly and/or impliedly communicated, and the Hospitals reasonably understood Defendants' communications and actions to communicate, that the services the Hospitals provided to the Patient were covered under the Patient's plan through FCL, and thus that Defendants were legally obligated to pay for such services.

35.    The Hospitals are informed and believe that in engaging in such communications and taking such actions the Defendants and/or its Agents, were acting within the scope of its agency and employment and with the permission and consent of each of the other Defendants, including specifically, but not limited to, FCL and Coventry Company.

36.    The Hospitals would not have provided all of the acute care hospital services that they provided to the Patient without such assurances of payment by Defendants.

37.    Additionally, the Defendants caused the Hospitals to reasonably believe that each of the other Defendants were their actual and/or ostensible agents.  Specifically, the Defendants caused the Patient and their family to present member identification cards to the Hospitals identifying each of the Defendants as the entities to contact for information from the Defendants regarding the Patient's

1    eligibility and benefits, and for authorization of services. Additionally, each of the Defendants

2    provided the other Defendants confidential, private, and protected health information regarding the

3    Patient, which the other Defendants then communicated to Verdugo; the other Defendants would not

4    be entitled to have access to said confidential, private, and protected health information if they were

5    not authorized agents of the Defendants.

6        38.    Ultimately, Verdugo provided acute care hospital services to the Patient with total

7    charges of $190,521.35, with the expected reimbursement of $34,651.66 based on the VHH

8    Agreement rate.

9        39.    Hospitals sent a claim for reimbursement to the Defendants and/or its Agents. On

10   August 18, 2023, months after the Patient's discharge, Defendants for the first time communicated that

11   the services VHH provided were not covered by the Patient's plan through FCL because of the

12   "exclusion of the alcohol related diagnoses."

13       40.    The Defendants chose to ignore the majority of the Patient's diagnosis such as

14   Legionnaires' disease and acute respiratory distress syndrome and denied the claim in its entirety.

15       41.    To date, Defendants have paid nothing to VHH for such services. Thus, Verdugo has

16   sustained damages in the amount of $34,651.66, plus interest.

17   **B.    KECK HOSPITAL OF USC CLAIM**

18       42.    When the Patient's physicians at VHH determined the Patient required transfer to a

19   higher level of care for extracorporeal membrane oxygenation (ECMO), which is a method of

20   providing cardiac and respiratory support to a person whose heart and lungs are unable to provide

21   enough oxygen to sustain life, VHH contacted the Transfer Center at Keck to request transfer for a

22   higher level of care.

23       43.    Because the Patient was an inpatient at VHH, Keck did financial clearance for the

24   Patient prior to accepting the transfer. Specifically, Keck called FCL and/or its agents and was

25   informed that Patient had active coverage and no authorization was required.

26       44.    FCL and/or its agents verified the Patient's coverage and benefits. Keck relied upon

27   such verifications and the plan's participation in the First Health Network/Coventry Company to

28   "financially clear" the Patient prior to accepting the Patient for lateral transfer that same day for non-

---

8

COMPLAINT

EMTALA services. Keck registered the Patient under "First Health" coverage and expected reimbursement from the plan at the Coventry Company Network rates under the Keck and Verdugo Agreement with Coventry Companies.

45. Prior to admission, the following health insurance identification card identifying the plan as participating in the Coventry Company network (See Exhibit A - Insurance card attached).

46. Defendants verified the Patient's coverage and benefits with ACI once again in March 2023, and Keck was told once again that no authorization was required. Keck relied upon such verifications and the plan's participation in the Coventry Company Network to "financially clear" the Patient prior to accepting the Patient for transfer for higher level of care. Keck registered the Patient under "First Health" coverage and expected reimbursement from the plan at the Coventry Company rates under the Keck and Verdugo Agreement.

47. The Hospitals' records indicate at no time prior to or concurrent with the Hospitals' provision of services to the Patient did Payors inform Hospitals that February 14, 2023, was the last day the Patient had insurance coverage. The Hospitals' records indicate Payors further failed to inform Hospitals of any policy exclusions or benefits limitations until months after the Patient discharged from the Hospitals.

48. The Patient was admitted to Keck for emergency services related to multifocal pneumonia and bacteremia. The Patient was treated at Keck from February into March 2023.

49. On March 6, 2023, Keck faxed Patient's clinical notes to ACI.

50. Keck received correspondence from ACI dated April 24, 2023, asking for the toxicology report, admission summary, and discharge summary.

51. Again, on May 5, 2023, Keck spoke with ACI and was told that Patient was active on the dates of service and was still active.

52. At no time before the Patient's discharge from Keck did Hospitals know or have any reasonable way of knowing that the Patient's coverage had terminated on February 14, 2023.

53. Despite these facts, before Keck provided all acute care hospital services to the Patient, Defendants: (1) provided to the Hospitals oral verification of the Patient's eligibility, coverage, and benefits under the Patient's plan through FCL; (2) repeatedly informed Keck that authorization was

1    not required; and (3) requested that the Hospitals provide clinical information regarding the Patient's

2    medical condition.  In making such communications and taking such actions, Defendants expressly

3    and/or impliedly communicated, and the Hospitals reasonably understood Defendants'

4    communications and actions to communicate, that the Patient had active coverage and the services

5    Keck provided to the Patient were covered under the Patient's plan through FCL, and thus that

6    Defendants were legally obligated to pay for such services.

7        54.    FCL initially denied payment for both Keck and VHH claims for reimbursement on the

8    basis of an unspecified exclusion for a particular diagnosis.  The explanations of benefits, dated May

9    30, 2023 and September 26, 2023, denying the claims expressly state that the payor accessed the

10   Coventry Company contract rates.

11       55.    On the EOB dated September 26, 2023, FCL changed the denial reason from denial

12   based on an exclusion to denial based on the termination of Patient's coverage starting on February 14,

13   2023.

14       56.    Months after the Patient's discharge, the Plan Defendants for the first time

15   communicated that the services Keck provided were not covered by the Patient's plan through FCL

16   because the Patient's services were rendered after the Patient insurance had terminated on February

17   14, 2023.

18       57.    In all previous communications, Defendants had communicated to Keck that the Patient

19   had active coverage and no authorization was required before Patient's transfer occurred and requested

20   clinical information regarding the Patient.  In engaging in such communications and taking such

21   actions, Defendants expressly and/or impliedly communicated, and the Hospitals reasonably

22   understood Defendants' communications and actions to communicate, that the services Keck provided

23   to the Patient were covered under the Patient's plan through FCL.

24       58.    Keck would not have accepted the transfer of the Patient to its acute rehabilitation

25   hospital, nor would it have provided the acute rehabilitation hospital services that it provided to the

26   Patient without such assurances of payment by Defendants.

27       59.    Additionally, the Defendants caused Keck to reasonably believe that each of the other

28   Defendants were their actual and/or ostensible agents.  Specifically, the Defendants caused the Patient

and their family to present member identification cards to the Hospitals identifying each of the Defendants as the entities to contact for information from the Defendants regarding the Patient's eligibility and benefits, and for authorization of services. Additionally, each of the Defendants provided the other Defendants confidential, private, and protected health information regarding the Patient, which the other Defendants then communicated to the Hospitals; the other Defendants would not be entitled to have access to said confidential, private, and protected health information if they were not authorized agents of the Defendants.

60. FCL, ACI, and its other co-conspirators (collectively referred to as the "Payors") and/or its agents improperly denied payment for the emergency and post-stabilization hospital services the Hospitals provided.

61. Meanwhile, unbeknownst to Hospitals, on February 2, 2022, the California Department Insurance issued a Cease-and-Desist Order that FCL stop operating an insurance plan in California. The Order finds that FCL unlawfully acted as an insurance company in California without the requisite certificate of authority.

62. It is the Hospitals' understanding this Patient was a California resident during the dates of services at issue. Thus, each of the Payors continued to operate in California in violation of the Cease-and-Desist Order.

63. The Cease-and-Desist Order also instructed Coventry Companies, First Health Network, its officers, directors, employees, agents, affiliates, and representatives, ordering it to end its business practices aiding and abetting First Continental's unlawful transaction of insurance in California.

64. The Cease-and-Desist Order concludes First Health Network aided and abetted First Continental in violation of California Insurance Code section 703, which makes it a misdemeanor offense to in any manner aid a non-admitted insurer to transact insurance business in California.

65. As reflected in the attached exhibits, Coventry Company's unlawful activities in aiding and abetting FCL's illegal business of insurance in California continued. Specifically, Coventry Company permitted FCL to continue to identify Coventry Company on insurance identification cards in February 2023.

66.     Coventry Company also improperly and illegally granted FCL access to rates in the Hospitals' Agreements for one or more of the Hospitals' claims for services provided in February 2023. In doing so, Coventry Company breached the Keck Agreement and Verdugo Agreement.

67.     Ultimately, Keck provided acute rehabilitation hospital services to the Patient with total charges of $785,657.29, with the expected reimbursement of $510,677.24 from the plan at the Coventry Company rates under the Keck and Verdugo Hills Agreement.

68.     To date, Defendants have paid nothing to the Hospital for such services. Thus, the Hospital has sustained damages in the amount of $510,677.24, plus interest.

### FIRST CAUSE OF ACTION

### NEGLIGENT MISREPRESENTATION

### (AS TO ALL DEFENDANTS)

69.     The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

70.     Prior to the Hospitals agreeing to accept the admission of the Patient and/or providing post-stabilization care to the Patient in their hospitals, Defendants expressly and/or impliedly represented that no pre-authorization was required, and the hospital services the Hospitals would be providing the Patient were covered under the Patient's PPO medical insurance plan through FCL, and thus that Defendants were legally obligated to pay for such services.

71.     The Patient identified to Hospitals that he was a California resident. The Patient presented an insurance identification card identifying "Evolve Health" sponsored by the Service Industry Trade Alliance. The card claims the plan offers "Limited medical benefits underwritten by: First Continental Life and Accident Insurance Company." The card further identifies First Health as the applicable network and directed providers to submit claims to Administrative Concepts, Inc. (See Exhibit A - Insurance card attached).

72.     The Hospitals would not have admitted the Patient for post-stabilization services at VHH, and Keck would not have accepted transfer of the Patient to its hospital for higher level of care or provided acute care hospital services to the Patient without such assurances by Defendants.

73.     Prior to each of Defendants' representations, the Hospitals had informed Defendants that the Patient was being treated for sepsis, Legionnaires' disease, toxic encephalopathy, acute respiratory distress syndrome, and severe sepsis with septic shock.

74.     Thus, at the time Defendants made their representations, they were not true, and Defendants had no reasonable grounds for believing the representations to be true when they made them because the Patient's plan through ACI did either not cover charges due to the plan exclusions and/or being rendered after the Patient's coverage had been terminated.

75.     The Hospitals are informed and believe that in engaging in such communications and taking such actions each of the Defendants was the agent and/or employee of each of the remaining Defendants, including specifically but not limited to FCL and Coventry Companies and/or their agents, and in engaging in such communications and taking such actions, were acting within the scope of its agency and employment and with the permission and consent of each of the other Defendants, including specifically, but not limited to, FCL and Coventry Company.

76.     Additionally, Defendants are also liable to the Hospitals in failing to maintain license and certification in compliance with California law, and wrongful denial of coverage.  FCL, ACI and its other co-conspirators (collectively referred to as the "Payors") engaged in a series of communications and conduct that constitute intentional fraud and/or negligent misrepresentation, including but not limited to: 1) engaging in the business of insurance without a license or certification under California law; 2) issuing to a California resident an insurance policy that fails to not comply with California law;  3) verifying the Patient's coverage and benefits in February 2023, (prior to admission at VHH), and again in February 2023, (prior to admission at Keck) without disclosing the Patient's policy ended that very day, the policy exclusions, and the benefits limitations;  and 4) engaging in communications and conduct on and after February 14, 2023, causing Keck to believe the Patient's coverage remained active.

77.     Defendants failed to inform Hospitals of any policy exclusions or benefits limitations until months after the Patient discharged from the Hospitals.

78.     Defendants also failed to inform Hospitals that, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist Order to FCL ordering it to end its unlawful

transaction of insurance in California. The Order further orders ACI, Coventry Company, and coconspirators to stop aiding and abetting FCL's unlawful practices. (See Exhibit B - Cease and Desist Order). The Order finds that FCL unlawfully acted as an insurance company in California without the requisite certificate of authority. The Order identifies multiple violations by FCL, including misrepresentation of fixed-benefit indemnity insurance as "health insurance" in violation of Insurance Code sections 106(b)(2), 780(a), 781 and 790.03(b). CDI cited, as grounds for finding that First Health aided and abetted FCL's illegal conduct, the appearance of the First Health Network logo on health insurance identification cards virtually identical to the ones the Patient presented to the Hospitals. (*See*, e.g., id., p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11). The Order concludes ACI and First Health Network aided and abetted FCL in violation of California Insurance Code section 703, which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact insurance business in California. (*Id.* at 21, lines 4-7). The Order commanded ACI., First Health and other coconspirators to cease and desist their unlawful activities.

79. Payors' unlawful activities in aiding and abetting FCL's illegal business of insurance in California continued. Specifically, FCL and/or ACI verified to the Hospitals on multiple occasions that the Patient had active health insurance coverage through FCL. Payors continued to identify Coventry Company on the Patient's insurance identification cards in February 2023. Coventry Company also improperly and illegally granted FCL access to rates in the Hospitals' Agreements for one or more of the Hospitals' claims for services provided in February 2023. Such conduct constitutes unfair and deceptive acts or practices in the business of insurance, in violation of California Insurance Code sections 790.02 and 790.03(b).

80. Additionally, the fixed-benefit indemnity insurance FCL issued to the California-resident Patient fails to comply with California essential benefit requirements, and in and of itself constitutes a breach of the Coventry Company's Agreement with Keck and VHH. Under California law, "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *California Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 484. "[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary

1 clauses are interpreted narrowly against the insurer." *MacKinnon v. Truck Ins. Exchange* (2003) 31

2 Cal.4th 635, 648, 3 Cal.Rptr.3d 228 (internal quotations and alterations omitted).

3       81.     Defendants intended that the Hospitals rely upon Defendants' representations.

4       82.     The Hospitals reasonably relied on Defendants' representations by continuing to care

5 for the Patient rather than seeking the Patient's transfer to another hospital facility.

6       83.     The Hospitals were harmed. Specifically, the Hospitals provided the Patient medically

7 necessary and physician-ordered acute care hospital services with total charges of $976,178.64. The

8 Hospitals expected reimbursement at the Coventry Company contract rate of $545,328.90. The

9 Hospitals have received no payment from the Defendants for the lifesaving and medically necessary

10 care provided to the Patient. Thus, the Hospitals have been damaged in an amount not less than

11 $545,328.90, plus interest.

12       84.     The Hospitals' reliance on Defendants' representations was a substantial factor in

13 causing the Hospital's harm.

14 **SECOND CAUSE OF ACTION**

15 **DECEIT**

16 **(AS TO ALL DEFENDANTS)**

17       85.     The Hospitals re-allege and incorporate by reference each and every allegation set forth

18 above.

19       86.     Defendants provided to the Hospitals written and oral verification of the Patient's

20 eligibility, coverage, and benefits under the Patient's plan through FCL, repeatedly informed Hospitals

21 that no authorization was required for the Hospitals' provision of services to the Patient, participated

22 in decisions regarding the Patient's medical care and requested that the Hospitals provide clinical

23 information regarding the Patient's medical condition. In engaging in such communications and

24 taking such actions, Defendants expressly and/or impliedly communicated, and the Hospitals

25 reasonably understood Defendants' communications and actions to communicate, that the services the

26 Hospitals would be providing to the Patient were covered under the Patient's plan through FCL, and

27 thus that FCL and Coventry Company were legally obligated to pay for such services.

28

87.     The Hospitals would not have provided all of the acute care hospital services they provided to the Patient without such assurances by Defendants.

88.     Defendants did not communicate that the Patient's plan through FCL either did not cover charges or were incurred while Patient's plan had terminated. Thus, the disclosures Defendants made were deceptive.

89.     Defendants intentionally failed to disclose the fact that the Patient's plan through FCL did not cover the Patient's care and, thus, that FCL and Coventry Company would not pay the Hospitals for the services provided to the Patient.  Such facts were known only to Defendants and Hospitals could not have discovered them.

90.     Additionally, Defendants are also liable to the Hospitals in failing to maintain license and certification in compliance with California law, and wrongful denial of coverage.  FCL, ACI and its other co-conspirators (collectively referred to as the "Payors") engaged in a series of communications and conduct that constitute intentional fraud and/or negligent misrepresentation, including but not limited to: 1) engaging in the business of insurance without a license or certification under California law; 2) issuing to a California resident an insurance policy that fails to not comply with California law;  3) verifying the Patient's coverage and benefits in February 2023, (prior to admission at VHH), and again in February 2023, (prior to admission at Keck) without disclosing the Patient's policy ended that very day, the policy exclusions, and the benefits limitations; and 4) engaging in communications and conduct on and after February 14, 2023, causing Keck to believe the Patient's coverage remained active.

91.     Defendants failed to inform Hospitals of any policy exclusions or benefits limitations until months after the Patient discharged from the Hospitals.

92.     Defendants also failed to inform Hospitals that, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist Order to FCL ordering it to end its unlawful transaction of insurance in California.  The Order further orders ACI, Coventry Companies, and coconspirators to stop aiding and abetting FCL's unlawful practices. The Order finds that FCL unlawfully acted as an insurance company in California without the requisite certificate of authority. The Order identifies multiple violations by FCL, including misrepresentation of fixed-benefit

indemnity insurance as "health insurance" in violation of Insurance Code sections 106(b)(2), 780(a), 781 and 790.03(b). CDI cited, as grounds for finding that Coventry Company aided and abetted FCL's illegal conduct, the appearance of the First Health Network logo on health insurance identification cards virtually identical to the ones the Patient presented to the Hospitals. (*See,* e.g., id., p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11). The Order concludes ACI and First Health Network aided and abetted FCL in violation of California Insurance Code section 703, which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact insurance business in California. (Id. at 21, lines 4-7). The Order commanded ACI., First Health and other coconspirators to cease and desist their unlawful activities.

93.    Payors' unlawful activities in aiding and abetting FCL's illegal business of insurance in California continued. Specifically, FCL and/or ACI verified to the Hospitals on multiple occasions that the Patient had active health insurance coverage through FCL. Payors continued to identify First Health Network on the Patient's insurance identification cards in February 2023. Coventry Company also improperly and illegally granted FCL access to rates in the Hospitals' Agreement with Coventry Company. Such conduct constitutes unfair and deceptive acts or practices in the business of insurance, in violation of California Insurance Code sections 790.02 and 790.03(b).

94.    The fixed-benefit indemnity insurance FCL issued to the California-resident Patient fails to comply with California essential benefit requirements, and in and of itself constitutes a breach of the Coventry Company Agreement with Hospitals. Under California law, "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *California Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 484. "[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted narrowly against the insurer." *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648, 3 Cal.Rptr.3d 228 (internal quotations and alterations omitted).

95.    The Hospitals are informed and believe that in engaging in such communications and taking such actions each of the Defendants was the agent and/or employee of each of the remaining Defendants, including specifically but not limited to FCL and Coventry Company, and in engaging in

1  such communications and taking such actions, were acting within the scope of its agency and
2  employment and with the permission and consent of each of the other Defendants, including
3  specifically, but not limited to, FCL and Coventry Company.

4      96.    The Hospitals did not know of the concealed facts at any time before the Patient was
5  discharged from the Hospitals.

6      97.    Defendants intended to deceive the Hospitals by concealing these facts.

7      98.    The Hospitals reasonably relied on Defendants' deception by continuing to care for the
8  Patient rather than seeking the Patient's transfer to another hospital facility.

9      99.    The Hospitals were harmed. Specifically, the Hospitals provided the Patient medically
10  necessary and physician-ordered acute care hospital services with total charges of $976,178.64. The
11  Hospitals expected reimbursement at the Coventry Company contract rate of $545,328.90. The
12  Hospitals have received no payment from the Defendants for the lifesaving and medically necessary
13  care provided to the Patient. Thus, the Hospitals have been damaged in an amount not less than
14  $545,328.90, plus interest.

15      100.    Defendants' concealment was a substantial factor in causing the Hospitals' harm.

16  **THIRD CAUSE OF ACTION**

17  **BREACH OF IMPLIED-IN-FACT CONTRACT**

18  **(AS TO ALL DEFENDANTS)**

19      101.    The Hospitals re-allege and incorporate by reference each and every allegation set forth
20  above.

21      102.    The Patient identified to Hospitals that he was a California resident. The Patient
22  presented an insurance identification card identifying "Evolve Health" sponsored by the Service
23  Industry Trade Alliance. The card claims the plan offers "Limited medical benefits underwritten by:
24  First Continental Life and Accident Insurance Company." The card further identifies First Health as
25  the applicable network and directed providers to submit claims to Administrative Concepts, Inc.

26      103.    Prior to providing acute care hospital services to the Patient, the Hospitals notified the
27  Defendants of the Patient's inpatient admission and verified the Patient's eligibility, coverage, and
28  benefits with the Defendants and or their agents.

104.    Defendants provided to the Hospitals written and oral verification of the Patient's eligibility, coverage, and benefits under the Patient's plan through FCL, repeatedly informed Hospitals that no authorization was required for the Hospital's provision of services to the Patient

105.    On numerous occasions, Defendants requested from the Hospitals clinical information regarding the Patient's medical condition.    In engaging in such communications and taking such actions, Defendants expressly and/or impliedly communicated, and the Hospitals reasonably understood Defendants' communications and actions to communicate, that the services the Hospitals would be providing to the Patient were covered under the Patient's plan through FCL, and thus that FCL and Coventry Company were legally obligated to pay for such services.

106.    The Hospitals reasonably understood the actions and communications by Defendants to constitute an express and/or implied request by Defendants that the Hospitals provide services to the Patient and an agreement by Defendants to pay the Hospitals for such requested services.

107.    The Hospitals are informed and believe that in engaging in such communications and taking such actions each of the Defendants was the agent and/or employee of each of the remaining Defendants, including specifically but not limited to FCL and Coventry Company, and in engaging in such communications and taking such actions, were acting within the scope of its agency and employment and with the permission and consent of each of the other Defendants, including specifically, but not limited to, FCL and Coventry Company.

108.    Additionally, the Cease-and-Desist Order concludes Coventry Company aided and abetted FCL in violation of California Insurance Code Section 703, which makes it a misdemeanor offense to in any manner aid a non-admitted insurer to transact insurance business in California.

109.    As reflected in the attached exhibits, Coventry Company's unlawful activities in aiding and abetting FCL's illegal business of insurance in California continued.    Specifically, Coventry Company permitted FCL to continue to identify Coventry Company on insurance identification cards in February 2023.

110.    Coventry Company improperly and illegally granted FCL access to rates in the Hospitals' Agreements for one or more of the Hospitals' claims for services provided. In doing so, Coventry Company breached the Keck Agreement and Verdugo Agreement.

111.    The conduct of Defendants gave rise to an implied-in-fact contract between the Hospitals and Defendants to pay for the care and treatment rendered by the Hospitals to the Patient.

112.    The Hospitals performed all of its obligations under its implied contract with Defendants.    Specifically, the Hospitals provided medically necessary and physician-ordered acute care hospital services to the Patient with total charges of $976,178.64.

113.    The Hospitals submitted complete claims to Defendants for payment.    Defendants failed to pay the Hospitals for the services rendered to the Patient.

114.    Defendants have paid nothing to the Hospitals for these services.

115.    Defendants have breached the implied-in-fact contract by failing to pay the Hospitals the full amounts owed to the Hospitals for the medically necessary services provided to the Patient.

116.    The Hospitals expected reimbursement at the Coventry Company contract rate of $545,328.90. As a result of this breach, the Hospitals have received no payment from the Defendants for the lifesaving and medically necessary care provided to the Patient.    Thus, the Hospitals have been damaged in an amount not less than $545,328.90, plus interest.

## FOURTH CAUSE OF ACTION

## QUANTUM MERUIT

## (AS TO ALL DEFENDANTS)

117.    The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

118.    As alleged herein, the Hospitals believe they are entitled to full and complete payment from the Defendants in accordance with the written and implied-in-fact contracts.    However, to the extent the written or implied-in-fact contracts alleged do not apply and/or are deemed unenforceable against the Defendants for any of the services at issue, the Hospitals allege in the alternative that the Defendants owe the Hospitals for these services based on *quantum meruit.*

119.    Defendants expressly and/or impliedly requested that the Hospitals provide emergent and acute care hospital services to the Patient in circumstances that gave rise to the Hospitals' reasonable belief that Defendants would pay for such services.

120.    Thereafter, the Hospitals provided such services to the Patient pursuant to such Requests and communications.

121.    The Hospitals' provision of said medical services to the Patient was intended to and, in fact, benefited Defendants.

122.    The reasonable value of the services the Hospitals provided to the Patient at the express and/or implied requests of the Defendants is $976,178.64.

123.    Defendants have paid nothing to the Hospitals for these services.

124.    Thus, the Hospitals are entitled to *quantum meruit* recovery in the amount of $545,328.90, plus statutory interest.

## FIFTH CAUSE OF ACTION

### PROMISSORY ESTOPPEL

### (AS TO ALL DEFENDANTS)

125.    The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

126.    Prior to the Hospitals' providing hospital services to the Patient, the Defendants informed Hospitals that the Patient had active coverage and no preauthorization was required for the services the Hospitals would provide the Patient.

127.    In so doing, Defendants knew and/or should have known that Hospitals would be reasonably induced to rely on their representations by providing hospital services to the Patient, and refraining from taking other action, such as seeking to transfer the Patient to another facility.

128.    Hospitals reasonably relied on the communications and conduct of Defendants by providing lifesaving and medically necessary hospital services to the Patient with total charges of $976,178.64, and refraining from taking other action, such as seeking to transfer the Patient to another facility.

129.    Defendants have paid nothing to the Hospitals for the services provided to the Patient.

130.    As a proximate result of the failure of Defendants to perform according to the representations that they made to the Hospitals, the Hospitals have been damaged in the amount of $545,328.90 (pursuant to the Coventry Company contract rates), plus interest.

131.    Justice requires that the promises of Defendants be enforced.

**SIXTH CAUSE OF ACTION**

**UNFAIR BUSINESS PRACTICES**

**(CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200)**

**(AS TO ALL DEFENDANTS)**

132.    The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

133.    California Business & Professions Code §17200 provides that "unfair competition shall mean and include any unlawful, unfair, or fraudulent business act or practice."

134.    Defendants have utilized unfair business acts and practices that are designed to preclude Plaintiff from obtaining proper reimbursement for the services that they provided to the Patient, a member of Defendants' health service plans.

135.    These unfair acts and practices are in violation of the Knox-Keene Act, the regulations promulgated thereunder, and the Unfair Business Practices Act.

136.    California Business & Professions Code §17200 provides that "unfair competition shall mean and include any unlawful, unfair, or fraudulent business act or practice."

137.    The Knox-Keene Act requires health plans to pay health care providers on a timely, reasonable and fair basis, and not to engage in unfair payment patterns.

138.    Based on information and belief, beginning on an exact date unknown to the Hospitals, but within two years preceding the filing of this complaint, Defendants engaged in the following unlawful, unfair and/or fraudulent conduct:

        a.  Failing to timely and fully reimburse the claim, including accrued interest, for the Patient in violation of 28 Cal. Code Reg. § 1300.71;

        b.  Failing to issue payment to Hospitals for emergency medical services pursuant to Health and Safety Code section 1371.4(b);

        c.  Deliberately misleading the Hospitals in believing that the patient had insurance coverage, the services were covered, and no authorization was required;

      d.  Routinely and systematically using methodologies designed to deny claims based on coverage exclusions for Defendants' own financial benefit;

      e.  Failing to reimburse claims citing nothing more than an unknown and arbitrary Standards;

      f.  Intentionally failing to disclose the fact that the Patient's plan through FCL did not cover the Patient's care and, thus, that Payors would not pay the Hospitals for the services provided to the Patient. Such facts were known only to Defendants and the Hospitals could not have discovered them;

      g.  Failing to maintain license and certification in compliance with California law;

      h.  Engaging in the business of insurance without a license or certification under California law;

      i.  Issuing to a California resident an insurance policy that fails to comply with California law;

      j.  Verifying the Patient's coverage and benefits in February 2023, (prior to admission at VHH), and again in February 2023, (prior to admission at Keck) without disclosing the Patient's policy ended that very day, the policy exclusions, and the benefits limitations;

      k.  Engaging in communications and conduct on and after February 14, 2023, causing Keck to believe the Patient's coverage remained active;

      l.  Failing to inform Hospitals of any policy exclusions or benefits limitations until months after the Patient discharged from the Hospitals;

      m.  Failing to inform Hospitals that, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist Order to FCL ordering it to end its unlawful transaction of insurance in California. The Order further orders ACI, First Health, and coconspirators to stop aiding and abetting FCL's unlawful practices[1].

---

[1] The Order finds that FCL unlawfully acted as an insurance company in California without the requisite certificate of authority. The Order identifies multiple violations by FCL, including misrepresentation of fixed-benefit indemnity insurance as "health insurance" in violation of Insurance Code sections 106(b)(2), 780(a), 781 and 790.03(b). CDI cited, as grounds for finding that First Health aided and abetted FCL's illegal conduct, the appearance of the First Health Network

n. Coventry Company's unlawful activities in aiding and abetting FCL's illegal business of insurance in California. Specifically, FCL and/or ACI verified to the Hospitals on multiple occasions that the Patient had active health insurance coverage through FCL. Payors continued to identify First Health Network on the Patient's insurance identification cards in February 2023;

o. Coventry Company improperly and illegally granting FCL access to rates in the Hospitals' Agreements. Such conduct constitutes unfair and deceptive acts or practices in the business of insurance, in violation of California Insurance Code sections 790.02 and 790.03(b); and is breach of the Agreement between Coventry Company and Hospitals; and

p. FCL improperly issued a fixed-benefit indemnity insurance to the California - resident Patient failing to comply with California essential benefit requirements, and in and of itself constitutes a breach of the Coventry Company Agreement with Hospitals[2].

139. Defendants' conduct constitutes unlawful, unfair, and fraudulent business practices under California Business & Professions Code sections 17200, et seq.

140. The Hospitals suffered injury-in-fact when Defendants failed to properly and timely pay the Hospitals' claims for the medically necessary and physician-ordered services provided to the Patient.

141. Plaintiff has standing to bring this claim pursuant to California Business & Professions Code §17204 on the grounds stated herein, because Plaintiff has suffered injury-in-fact and lost money

---

logo on health insurance identification cards virtually identical to the ones the Patient presented to the Hospitals. (See Ex. B., p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11). The Order concludes ACI and First Health Network aided and abetted FCL in violation of California Insurance Code section 703, which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact insurance business in California. (Id. at 21, lines 4-7). The Order commanded ACI., First Health and other coconspirators to cease and desist their unlawful activities.

[2] Under California law, "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *California Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 484. "[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted narrowly against the insurer." *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648, 3 Cal.Rptr.3d 228 (internal quotations and alterations omitted).

1  and/or property as the result of Defendants' refusal to pay for medical services the Hospitals provided
2  to the Patient, a member of FCL's health plan.

3      142.   As a direct and proximate result of Defendants' wrongful acts, the Hospitals have
4  suffered and will continue to suffer substantial pecuniary losses and irreparable injury-in-fact.

5      143.   Plaintiff is informed and believes that Defendants will continue their ongoing unfair
6  business practices toward Plaintiffs if not enjoined from doing so.

7      144.   The equitable remedies under California Business & Professions Code §17200, are
8  subject to the broad discretion of the Court (*Hambrick v. Healthcare Partners Medical Group, Inc.*,
9  (2015) 238 Cal. App. 4th). As a direct and proximate result of the Plan's wrongful, misleading, and
10 illegal acts, Hospitals have suffered substantial pecuniary losses and irreparable injury-in-fact. Under
11 California Business & Professions Code §17200, said violations render Defendants liable to Hospitals
12 for restitution and injunctive relief to restore Hospitals' money which the Plan acquired by means of
13 such unfair business practices, plus statutory interest.

14     145.   Plaintiff also seeks restitution and disgorgement of an amount to be proven at trial,
15 which is the amount that Defendants improperly received and retained that they were obligated to pay
16 the Hospitals for the services provided, plus any statutory penalties and/or attorneys' fees as available

17         **SEVENTH CAUSE OF ACTION**
18         **BREACH OF WRITTEN CONTRACT**
19         **(AS TO ALL DEFENDANTS)**

20     146.   The Hospitals re-allege and incorporate by reference each and every allegation set forth
21 above.

22     147.   Prior to providing hospital services to the Patient, the Hospitals notified the Defendants
23 of the Patient's inpatient admission and verified the Patient's eligibility, coverage, and benefits with
24 the Defendants and/or their agents.

25     148.   The Patient's insurance card lists entities Evolve Health, First Health Network, First
26 Continental Life and Accident Insurance Company, and Administrative Concepts Inc. (See Ex. A).

27     149.   The Patient's insurance card is almost identical to the insurance card identified in the
28 Cease-and-Desist order (See Ex. B). Evolve Health is an unlicensed entity, First Heath Network is an

1  unlicensed entity[3], First Continental Life & Accidental Insurance is a non-admitted insurer, and

2  Administrative Concepts, Inc. is a non-resident Registered Administrator.

3      150.    Keck relied upon the plan's participation in Coventry Company to "financially clear"

4  the Patient in February 2023, prior to accepting the Patient for lateral transfer that same day for non-

5  EMTALA services. Keck registered the Patient under "First Health" coverage and expected

6  reimbursement from Defendants at the Coventry Company network rates under the Keck Agreement.

7      151.    Defendants provided to Keck written and oral verification of the Patient's eligibility,

8  coverage, and benefits under the Patient's plan through FCL, and repeatedly informed Keck that no

9  authorization was required for the Hospital's provision of services to the Patient

10     152.    On numerous occasions, Defendants requested from Keck clinical Information

11 regarding the Patient's medical condition.  In engaging in such communications and taking such

12 actions, Defendants expressly and/or impliedly communicated, and Keck reasonably understood

13 Defendants' communications and actions to communicate, that the services Keck would be providing

14 to the Patient were covered under the Patient's plan through FCL, and thus that Defendants were

15 legally obligated to pay for such services.

16     153.    Defendants' unlawful activities in aiding and abetting FCL's illegal business of

17 insurance in California continued.  Specifically, Defendants permitted FCL to continue to identify

18 First Health Network on insurance identification cards in February 2023.  (See Ex. A).  Defendants

19 also improperly and illegally granted First Continental access to rates in the Keck Agreement for the

20 Hospital's claims for reimbursement for services provided to the Patient.

21     154.    Defendants breached the Keck Agreement.  Specifically, Section 3.3 of the Keck

22 Agreement provides, in pertinent part:

23

24 [3] Unbeknownst to the Hospitals, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist Order to First Health Network, its officers, directors, employees, agents, affiliates, and representatives, ordering it to end its

25 business practices aiding and abetting First Continental's unlawful transaction of insurance in California.  Ex. B.  The Order finds that First Continental unlawfully acted as an insurance company in California without the requisite certificate of

26 authority.  *Id.*, p. 4, lines 10-15. CDI cited, as grounds for finding that First Health aided and abetted First Continental's illegal conduct, the appearance of the First Health Network logo on health insurance identification cards virtually identical

27 to the ones the Patient presented to the Hospitals.  *See, e.g., id.*, p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11.  The Order concludes First Health Network aided and abetted First Continental in violation of California Insurance Code section

28 703, which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact insurance business in California.  *Id.* at 21, lines 4-7.  The Order commanded First Health to cease and desist its unlawful activities.

**Non-Coventry Payors.** When a Coventry Company is not the Payor, the Payor, not Coventry or a Coventry Company, shall have the obligation and liability to Hospital with respect to any claim or fee for health care services relating to or arising under the Agreement. *Coventry shall, however, require each Payors to comply with applicable state and federal laws and regulations and the relevant terms and conditions of this Agreement.*

155.   Coventry Company breached Section 3.3 by failing to require FCL to comply with California Insurance law.

156.   Per Section 6.11 of the Keck Agreement, the Agreement shall be governed by the laws of the State of California. Furthermore, Section 3.4 of the Keck Agreement provides, in pertinent part:

**Compliance with Law.** Coventry and Coventry Companies agree to comply with all applicable ... state ... laws and the directives of applicable agencies, and regulations of CMS, any other oversight agencies and in the state(s) in which Coventry Company operates, including, without limitation, requirements that shall cause or require Coventry Company Coventry [sic] to amend the terms and conditions of the Agreement. Coventry Companies understand and agree that CMS and the appropriate State agencies may change or add to such requirements, laws, rules, and regulations from time to time.

Defendants breached the Keck Agreement by aiding and abetting First Continental insurer to transact insurance business in California in violation of California Insurance Code section 703. Defendants further breached the Keck Agreement by failing to comply with CDI's Cease-and-Desist Order.

157.   Defendants also breached Section 3.5 of the Keck Agreement by failing to require FCL maintain the necessary licenses and certifications to transact insurance business in California. Defendants further breached Section 3.5 by failing to notify Hospitals of CDI's Cease-and- Desist Order.

158.   Keck submitted a complete claim to Defendants for payment. Defendants failed to pay Keck for the services rendered to the Patient.

159.   Defendants have paid nothing to the Hospital for these services.

160.   Defendants' breaches of contract damaged Keck by denying it full reimbursement for the claims at issue at the rates under the Keck Agreement. Keck is entitled to recover from Defendants $510,677.24, the expected reimbursement under the Keck Agreement, plus statutory interest.

///

///

**EIGHTH CAUSE OF ACTION**

**BREACH OF WRITTEN CONTRACT**

**(AS TO COVENTRY COMPANY AND DOES 1-25)**

161.    The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

162.    Prior to providing hospital services to the Patient, VHH notified the Defendants of the Patient's inpatient admission and verified the Patient's eligibility, coverage, and benefits with the Defendants and or their agents.

163.    The Patient's insurance card lists entities Evolve Health, First Health Network, First Continental Life and Accident Insurance Company, and Administrative Concepts Inc. (See Ex. A).

164.    Patient's insurance card is almost identical to the insurance card identified in the Cease-and-Desist order (See Ex. B). Evolve Health is an unlicensed entity, First Heath Network is an unlicensed entity[4], First Continental Life and Accidental Insurance is a non-admitted insurer, and Administrative Concepts, Inc. is a non-resident Registered Administrator.

165.    VHH registered the Patient under "First Health" coverage and expected reimbursement from the plan at the Coventry Company network rates under the Verdugo Agreement.

166.    FCL and/or its agents provided to VHH written and oral verification of the Patient's eligibility, coverage, and benefits under the Patient's plan through FCL, and repeatedly informed VHH that no authorization was required for the Hospital's provision of services to the Patient

167.    On numerous occasions, FCL and/or its agents requested from VHH clinical Information regarding the Patient's medical condition.   In engaging in such communications and taking such actions, Defendants expressly and/or impliedly communicated, and VHH reasonably

---

[4] Unbeknownst to the Hospitals, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist Order to First Health Network, its officers, directors, employees, agents, affiliates, and representatives, ordering it to end its business practices aiding and abetting First Continental's unlawful transaction of insurance in California. Ex. B. The Order finds that First Continental unlawfully acted as an insurance company in California without the requisite certificate of authority. *Id.*, p. 4, lines 10-15. CDI cited, as grounds for finding that First Health aided and abetted First Continental's illegal conduct, the appearance of the First Health Network logo on health insurance identification cards virtually identical to the ones the Patient presented to the Hospitals. *See, e.g., id.*, p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11. The Order concludes First Health Network aided and abetted First Continental in violation of California Insurance Code section 703, which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact insurance business in California. *Id.* at 21, lines 4-7. The Order commanded First Health to cease and desist its unlawful activities.

understood Defendants' communications and actions to communicate, that the services VHH would be providing to the Patient were covered under the Patient's plan through FCL, and thus that Defendants were legally obligated to pay for such services.

168. Defendants' unlawful activities in aiding and abetting FCL's illegal business of insurance in California continued. Specifically, Defendants permitted FCL to continue to identify First Health Network on insurance identification cards in February 2023. (See Ex. A). Defendants also improperly and illegally granted First Continental access to rates in the VHH Agreement for VHH's claim for reimbursement for services provided to the Patient.

169. Defendants breached the Verdugo Agreement by failing to require FCL maintain the necessary licenses and certifications to transact insurance business in California. Defendants further breached Section 3.5 by failing to notify Hospitals of CDI's Cease-and- Desist Order.

170. VHH submitted complete claims to Defendants for payment. Defendants failed to pay VHH for the services rendered to the Patient.

171. Defendants have paid nothing to VHH for these services.

172. Defendants' breaches of contract damaged VHH by denying it reimbursement for the claims at issue at the rates under the Verdugo Agreement. VHH is entitled to recover from Defendants $34,651.66, the expected reimbursement under the VHH Agreement, plus statutory interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as set forth below:

1. For damages and payment in amounts according to proof at trial;

2. For *quantum meruit* in the amount according to proof at trial;

3. For injunctive relief from unfair business practices;

4. For pre-judgment interest as provided by law;

///

///

///

///

///

5.    For attorneys' fees according to statute; and

6.    For costs of suit herein incurred, and for such other and further relief as the Court deems just and proper.

DATED: February 27, 2025                    HELTON LAW GROUP, APC

By: _____
CARRIE MCLAIN
MIKAELA COX
THOMAS YAU
Attorney for Plaintiff

30
COMPLAINT

# Exhibit A



## MEMBER SERVICES

For all billing, membership and non-claims related questions.

Call: 855-577-1610
Monday to Friday
9am to 7pm EST.

## CLAIMS SUBMISSION

EDI Payor ID: ▮▮▮▮▮

Mail: Administrative Concepts Inc.
994 Old Eagle School Rd., Ste. 1005
Wayne PA 19087

Web: www.visit-aci.com

Call: (800) 565-6052

## ADDITIONAL BENEFITS

Access the Member Portal site to download additional membership materials, instruction guides, temporary ID cards, benefits and much more by visiting www.MyMemberInfo.com

**ASSOCIATION MEMBER BENEFITS**
www.serviceindustrytradealliance.org
Access Code: SITA18

SITA

## ELIGIBILITY

To confirm eligibility and/or obtain benefit determinations, please call: (800) 565-6052

By using this card, member agrees with all terms and conditions of the plan. This card does not guarantee coverage.

Limited medical benefits underwritten by: First Continental Life and Accident Insurance Company.

# Exhibit B

1   TYLER MCKINNEY, SBN 263717

2   CHRISTINA CARROLL, SBN 263713
    CALIFORNIA DEPARTMENT OF INSURANCE

3   300 Capitol Mall, 17th Floor
    Sacramento, California 95814

4   Telephone: 916 492-3283
    E-mail: christina.carroll@insurance.ca.gov

5

    *Attorneys for the California Department of Insurance*

6

7

8                     **STATE OF CALIFORNIA**

9             **DEPARTMENT OF INSURANCE**

10

11   In the Matter of:                       File No. LA202100084

12

13   **ADMINISTRATIVE CONCEPTS, INC.,**   **ORDER TO CEASE AND DESIST (Ins.**
    **[Lic. No. 0C38805]**                 **Code § 12921.8)**

14

15   **ASSOCIATION FOR BETTER HEALTH,**

16   **ASSOCIATION HEALTH CARE**       **ORDER TO SHOW CAUSE WHY AN**
    **MANAGEMENT, INC.,**                 **ORDER IMPOSING A MONETARY**

17   **DBA FAMILY CARE**                 **PENALTY SHOULD NOT ISSUE (Ins.**
                                      **Code § 12921.8)**

18   **MATTHEW DEPREY,**

19   **[Lic. No. 0M50797]**                 **NOTICE OF RIGHT TO HEARING**

20   **EVOLVE HEALTH,**

21

22   **FIRST CONTINENTAL LIFE & ACCIDENT**
    **INSURANCE COMPANY,**

23

    **FIRST HEALTH NETWORK,**

24

25   **CURTIS GARCEAU,**
    **[Lic. No. 4026934]**

26

27   **GET ME CARE,**
    **AKA GETMECARE,**

28

1   **SAMANTHA MABIE,**
    **[Lic. No. 0L30001]**

2

3   **NATIONAL ASSOCIATION OF PREFERRED**
    **PROVIDERS,**

4
    **SCOTT RUSSELL,**
5   **[Lic. No. 0N03621]**

6   **SERVICE INDUSTRY TRADE ALLIANCE,**

7
    **FABIAN VERGARA,**
8   **[Lic. No. 0M31165]**

9                      Respondents.

10

11

12      . TO: ADMINISTRATIVE CONCEPTS, INC. ("ACI"), 400 CAMPUS DRIVE, SUITE

13   300, COLLEGEVILLE, PENNSYLVANIA, 19426, its officers, directors, employees, trustees,

14   agents, brokers, affiliates, successors, and service representatives; and,

15      ASSOCIATION HEALTH CARE MANAGEMENT, INC., DBA FAMILY CARE, 11111

16   RICHMOND AVENUE, SUITE 200, HOUSTON, TEXAS, 77082, its officers, directors,

17   employees, trustees, agents, brokers, affiliates, successors, and service representatives;

18   and,

19      ASSOCIATION FOR BETTER HEALTH, 1630 DES PERES ROAD, SUITE 140, ST.

20   LOUIS, MISSOURI, 63131, its officers, directors, employees, trustees, agents, brokers,

21   affiliates, successors, and service representatives; and,

22      MATTHEW DEPREY, 141 NW 20TH STREET, SUITE G6, BOCA RATON, FLORIDA,

23   33431; and,

24      EVOLVE HEALTH, 994 OLD EAGLE SCHOOL ROAD, SUITE 1005, WAYNE,

25   PENNSYLVANIA, 19087, its officers, directors, employees, trustees, agents, brokers,

26   affiliates, successors, and service representatives; and,

27

28

---

1  FIRST CONTINENTAL LIFE & ACCIDENT INSURANCE COMPANY, 101

2  PARKLANE BOULEVARD, SUITE 301, SUGAR LAND, TEXAS 77478, its officers,

3  directors, employees, trustees, agents, brokers, affiliates, successors, and service

4  representatives; and

5  FIRST HEALTH NETWORK, 7400 WEST CAMPUS ROAD, SUITE F510, NEW

6  ALBANY, OHIO, 43054, its officers, directors, employees, trustees, agents, brokers,

7  affiliates, successors, and service representatives; and,

8  CURTIS GARCEAU, 123 NW 13TH STREET, BOCA RATON, FLORIDA, 33432; and,

9  GET ME CARE, AKA GETMECARE, 123 NW 13TH STREET, SUITE 101, BOCA

10  RATON, FLORIDA, 33432, its officers, directors, employees, trustees, agents, brokers,

11  affiliates, successors, and service representatives; and,

12  SAMANTHA MABIE, 1000 NW 65TH STREET, SUITE 110, FORT LAUDERDALE,

13  FLORIDA, 33309; and,

14

15  NATIONAL ASSOCIATION OF PREFERRED PROVIDERS, 11111 RICHMOND

16  AVENUE, SUITE 250, HOUSTON, TEXAS, 77082, its officers, directors, employees,

17  trustees, agents, brokers, affiliates, successors, and service representatives; and,

18  SCOTT RUSSELL, PO BOX 1619, POMPANO BEACH, FLORIDA, 33061; and,

19  SERVICE INDUSTRY TRADE ALLIANCE, 16476 Wild Horse Creek Road,

20  Chesterfield, Missouri, 63017, its officers, directors, employees, trustees, agents, brokers,

21  affiliates, successors, and service representatives; and,

22  FABIAN VERGARA, 8700 WEST FLAGLER STREET, SUITE 405, MIAMI,

23  FLORIDA, 33174; and,

24  WHEREAS, California Insurance Code Section 12921.8(a)(1) authorizes the

25  Commissioner to issue a cease and desist order to a person who has acted in a capacity for

26  which a license, registration, or certificate of authority from the Commissioner was required

27  but not possessed; and,

28

1    WHEREAS, California Insurance Code Section 12921.8(a)(2) authorizes the

2    Commissioner to issue a cease and desist order to a person who has aided or abetted a

3    person described in Section 12921.8(a)(1); and,

4    WHEREAS, California Insurance Code Section 12921.8(a)(3) authorizes the

5    Commissioner to issue an order to show cause for imposition of a monetary penalty against

6    a person described in 12921.8(a)(1) or 12921.8(a)(2); and,

7    WHEREAS, California Insurance Code Section 12921.8(c) authorizes the

8    Commissioner to issue said order to show cause without holding a hearing prior to issuance

9    of the order; and,

10   WHEREAS, commencing on or before October 15, 2019, Respondent FIRST

11   CONTINENTAL LIFE & ACCIDENT INSURANCE COMPANY ("FIRST CONTINENTAL"),

12   has in this State unlawfully acted as an insurance company in California, and has in that

13   capacity unlawfully transacted the business of insurance in this State without the requisite

14   certificate of authority; and,

15

16   WHEREAS, FIRST CONTINENTAL is a nonadmitted insurer not authorized to

17   transact insurance in California.[1] FIRST CONTINENTAL is domiciled in Texas and licensed

18   to transact insurance in several states and territories.[2] FIRST CONTINENTAL was

19   previously authorized to transact Life and Disability insurance in California on March 31,

20   1980. On or about July 3, 2002, the California Department of Insurance ("Department")

21   issued a Cease and Desist Order against FIRST CONTINENTAL due to its failure to meet

22   the mandatory minimum policyholder surplus requirement. As a result, FIRST

23   CONTINENTAL stopped writing business in California. On or about June 26, 2012, the

24   Department accepted FIRST CONTINENTAL's request to officially withdraw from the State

25

26   [1] California Insurance Code §25.

27   [2] Arkansas, Arizona, Colorado, District of Columbia, Delaware, Florida, Georgia, Hawaii, Indiana, Kansas, Louisiana, Maryland, Maine, Missouri, Mississippi, Montana, North Dakota, Nebraska, New Mexico,
28   Oklahoma, South Dakota, Tennessee, Texas, Utah, the U.S. Virgin Islands, Vermont, and Wisconsin.

1  of California.  FIRST CONTINENTAL does not currently hold a certificate of authority to

2  transact business in the State of California, and has not held a certificate of authority during

3  any time period relevant to the matter at issue; and,

4      WHEREAS, FIRST CONTINENTAL has acted in a capacity for which a certificate of

5  authority is required but not possessed by insuring at least 12 Californians[3] as set forth

6  below; and,

7      WHEREAS, all other Respondents have aided and abetted FIRST CONTINENTAL in

8  the unlawful transaction of insurance in this State as outlined below.

9      WHEREAS, additional violations include, but are not limited to:

10  (a)    Misrepresentation of fixed-benefit indemnity insurance as "health insurance,"

11         in violation of sections 106(b)(2), 780(a), 781, and 790.03(b) of the California

12         Insurance Code.

13

14  (b)    Issuance of fixed-benefit indemnity insurance to Californians who did not have

15         comprehensive health insurance, in violation of section 10198.61(b) of the

16         California Insurance Code.

17  (c)    Failure to comply with sections 10198.61(a) and 10198.8 of the California

18         Insurance Code, which require insurers to certify annually to the

19         Commissioner that they do not market their indemnity insurance as a

20         substitute for Affordable Care Act health insurance, "regardless of the situs of

21         the contract or group master policyholder."

22      WHEREAS, the complainants below were California residents during all relevant time

23  periods.

24  //

25  //

26

27  _____

28  [3] More than 12 Californians have filed complaints with the Department of Insurance alleging misrepresentation and other misconduct.  It is unknown how many other Californians have actually been insured by FIRST CONTINENTAL.

1 | **1. COMPLAINANT B.S.**

2 | WHEREAS, on or about February 19, 2020, Respondent MATTHEW DEPREY

3 | ("DEPREY"), sold B.S.[4] "health insurance" for $369.90 down and $269.95 per month.

4 | According to B.S.:

> I contacted [Matthew] in Feb 2020 about an insurance coverage.
> He set me up with a policy and he stated it has zero deductible and
> covers everything except being pregnant. On Friday 06/26/2020 i
> had to go to the ER and then had heart surgery on Saturday
> because my main artery was 99.9% blocked. Today i get a call from
> the hospital billing department. Saying my insurance only covers
> only $350 per day. My balance now is $100,000 for the hospital bill
> plus the doctors as they are bill separately and that could be
> another $40,000. I call [Matthew] and pretended that a friend of
> mine was looking for ins and wanted to confirm my coverage. I
> asked about the zero deductible and he said yes. Then I asked if a
> heart attack and the need to go to the ER and have heart surgery.
> He said all of that is covered. Which is a total lie and he told me in
> those exact words in February. Please follow up and call him and
> ask about the coverage and she [sic] if he tells you the same thing.
> This is fraud.

WHEREAS, the policy was sold circuitously - DEPREY enrolled B.S. in Respondent

SERVICE INDUSTRY TRADE ALLIANCE's ("SITA's") Membership Plan. SITA was the

policyholder on FIRST CONTINENTAL group policy number FCL-GLI-001-002-AZ, which

stated "all [SITA] members between the ages of 18 and 64" were eligible for coverage. Due

to the SITA membership, B.S. was covered on the group policy for limited benefit indemnity

insurance with FIRST CONTINENTAL. The situation was so confusing that B.S. did not

---

[4] All identifying and privileged information regarding consumers has been removed for purposes of publication on the Department's public website pursuant to the provisions of Insurance Code Section 12938. Accordingly, consumers, victims and other non-parties may be identified by fictitious names or initials. The actual identities of these individuals are provided in Exhibit A, attached hereto and incorporated herein by this reference, for purposes of this Accusation only. Exhibit A will not appear on the Department's public website.

1  know who the insurer was – on the Department's Request for Assistance form, B.S. stated

2  that the insurer was FIRST HEALTH NETWORK; and,

3      WHEREAS, SITA, FIRST CONTINENTAL, and FIRST HEALTH NETWORK are

4  unlicensed.[5]  Since 2018, DEPREY has been licensed with the Department as a non-

5  resident Accident and Health Agent, license number 0M50797.[6]

6

7              **2.  COMPLAINANT Y.B.**

8      WHEREAS, Respondent EVOLVE HEALTH, an unlicensed entity, issued a medical

9  plan insurance card to Y.B. effective October 15, 2019.  The insurance card contains a

10 confusing litany of names and contact information:

11



19     WHEREAS, EVOLVE HEALTH is the name at the top of the card, and the policy

20 number is FCL-GLI-001-AZ. The Medical Plan is through unlicensed Respondent FIRST

21 HEALTH NETWORK, www.firsthealthlbp.com, with "[i]nsurance benefits underwritten by

22 FIRST CONTINENTAL," a nonadmitted insurer as discussed above. Claims handling is

23 through Respondent ADMINISTRATIVE CONCEPTS, INC. ("ACI"), 800-565-6052,

24 www.visit-aci.com.  ACI has been licensed with the Department since 1998 as a non-

25

26

27  _____

28  [5] Any reference to "unlicensed" means unlicensed with the California Department of Insurance.

    [6] The Department has issued an Accusation against DEPREY.

resident Registered Administrator, license number 0C38805.[7] The policyholder is instructed to call 855-577-1610 for "all billing, customer service and non-claims related questions," 800-565-6052 to verify eligibility and/or obtain benefits, and go to www.associationforbetterhealth.org to access member benefits. The information was so confusing that Y.B. did not know who the insurer was – on the Department's Request for Assistance form, Y.B. stated that the insurer was EVOLVE; and,

WHEREAS, according to Y.B., she paid about $300 per month for the insurance. Subsequently, Y.B. said she received a letter from ACI and FIRST CONTINENTAL claiming that she owed five thousand, two hundred and twelve dollars ($5,212.00) for a hospital visit on January 8, 2020. Y.B. claims she never visited any hospital on that date.

### 3. COMPLAINANT T.A.

WHEREAS, on or about August 28, 2020, T.A. found health insurance online, and purchased the coverage over the phone with an EVOLVE HEALTH agent for $297.90 down and $197.95 per month. All payments were made to EVOLVE HEALTH. According to T.A.:

> I was told I had broad coverage for a healthcare plan I purchased. I recently found out that this plan I was sold has no out-of-pocket maximum, and only pays 80% of the costs up to $2,500. This is extremely low for a healthcare plan. I even told the agent that I had just been denied after an accident, in another policy I had with another insurer, and that I wanted to make sure I was covered.

In actuality, T.A. was sold a "membership" in SITA that included limited indemnity benefits. SITA was the policyholder on FIRST CONTINENTAL group policy number FCL-GLI-001-002-AZ; and,

WHEREAS, EVOLVE HEALTH issued a medical plan insurance card to T.A. According to the insurance card, the Medical Plan is through FIRST HEALTH NETWORK,

---

[7] The Department has issued an Accusation against ACI.

1  with "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The policy number on

2  T.A.'s insurance card is identical to the policy number above for Y.B., but does not match

3  the policy number on T.A.'s actual policy, which is FCL-GLI-001-002-AZ. The insurance

4  card states that SITA association member benefits can be accessed at

5  www.serviceindustrytradealliance.org. All other information appears identical to the

6  information on the insurance card for Y.B.



15  The situation was so confusing that T.A. did not know who the insurer was – on the

16  Department's Request for Assistance form, T.A. stated that the insurer was EVOLVE

17  HEALTH.  After T.A. discovered that the policy was "essentially worthless," he cancelled the

18  coverage and is requesting a full refund.

20  ## 4. COMPLAINANTS M.A. AND J.M.

21  WHEREAS, on or about February 7, 2020, M.A. and his wife J.M. obtained "health

22  insurance" with FIRST CONTINENTAL. Their intent was to obtain coverage for regular

23  doctor visits. Instead, they were sold a membership in ABH for $539.90 down and $439.95

24  per month, which included limited indemnity coverage. ABH was the policyholder on FIRST

25  CONTINENTAL group policy number FCL-GLI-001-AZ, which stated "all [ABH] members

26  between the ages of 18 and 64" were eligible for limited indemnity coverage; and,

27  WHEREAS, EVOLVE HEALTH issued a medical plan insurance card to M.A. and

28  J.M., showing the Medical Plan through FIRST HEALTH NETWORK, with "[i]nsurance

1   benefits underwritten by FIRST CONTINENTAL."Strangely, the insurance card indicates

2   that the membership association is SITA, not ABH. The other information on the insurance

3   card is similar to the information on the insurance card for Y.B.



12   The information was so confusing that J.M. did not know who the insurer was – on the

13   Department's Request for Assistance form, J.M. stated that the insurer was EVOLVE

14   HEALTH; and,

15       WHEREAS, on or about April 16, 2020, J.M. had COVID-19 symptoms and went to a

16   clinic to get a COVID-19 test.  FIRST CONTINENTAL paid $65, leaving J.M. with a $185.81

17   balance; and,

18       WHEREAS, in November 2020, J.M. went to the doctor and, for unknown reasons,

19   FIRST CONTINENTAL refused to pay any portion of the bill, leaving J.M. with a balance of

20   $243.64; and,

21       WHEREAS, on March 9, 2021, EVOLVE HEALTH sent M.A. a verification letter

22   confirming that he "purchased a brand of membership in the SERVICE INDUSTRY TRADE

23   ALLIANCE called EVOLVE HEALTH with an effective date of 2/7/2020."  The letter makes

24   no mention of FIRST CONTINENTAL or insurance coverage.

25   //

26   //

27   //

28

## 5. COMPLAINANT M.F.

WHEREAS, Respondent GETMECARE, an unlicensed entity, issued a medical plan insurance card in M.F.'s name effective August 20, 2020. The insurance card includes a confusing array of names and contact information. GETMECARE is the name at the top of the card. The policy number is FCL-GLI-001-AZ. The Medical Plan is through FIRST HEALTH NETWORK, with "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The number 855-648-6927 is for "all billing, customer service and non-claims related questions." SITA association member benefits can be accessed at www.serviceindustrytradealliance.org. Most of the other contact information appears similar to the information on the insurance card for Y.B.



The information was so confusing that M.F. did not know who the insurer was – on the Department's Request for Assistance form, M.F. stated that the insurers were GETMECARE and HealthFirst.

WHEREAS, according to M.F., health insurance representatives misrepresented coverage to attract policyholders. M.F. was told, and the medical plan insurance card indicates, that there was only a $10 co-pay for doctor visits. Subsequently, M.F. discovered that the insurance only paid about 10 percent of the amount of the doctor visits.

//

//

1

### 6. COMPLAINANT J.G.

2      WHEREAS, J.G. lost his job on January 8, 2021 and attempted to purchase health

3   insurance under COBRA. The person J.G. spoke with on a recorded line assured him that

4   he was signing him up for health insurance coverage; and,

5      WHEREAS, instead of issuing J.G. a health insurance policy, J.G. was issued a

6   "SecureCare Mini" limited benefit policy and an Accidental Death and Dismemberment

7   ("AD&D") policy for $320.40 down and $221.40 per month. The SecureCare Mini policy

8   stated: "Insurance benefits are underwritten by FIRST CONTINENTAL LIFE AND

9   ACCIDENT INSURANCE COMPANY for members of the ASSOCIATION FOR BETTER

10  HEALTH"; and,

11     WHEREAS, Respondent NATIONAL ASSOCIATION OF PREFERRED PROVIDERS

12  ("NAPP"), an unlicensed entity, issued a claims identification card in J.G.'s name effective

13
14  February 2, 2021, which appears to be for the AD&D policy.[8]  The claims card includes the

15  following information:

16      • Member eligibility: 1-866-910-6173.  Submit claims on HFCA 1500 or UB92 to:

17        Claims, 11111 Richmond Ave., Ste. 200, Houston, TX 77082,[9] or Fax to: 713-

18        270-1391.

19      • VOLUNTARY ACCIDENT INSURANCE PROGRAM, ISSUED TO NAPP

20        ASSOCIATION.

21     WHEREAS, it would appear from the documents submitted by J.G. that he was

22  required to purchase memberships in both ABH and NAPP to obtain the "SecureCare Mini"

23  and the AD&D policies; and,

24     WHEREAS, when J.G. attempted to make a doctor's appointment, he was informed

25  that the doctor did not take the insurance, even though the doctor's name was on his

26

27  [8] The AD&D insurer is unknown.

28
    [9] This address belongs to Respondent ASSOCIATION HEALTH CARE MANAGEMENT, INC.

1   insurance card. When J.G. attempted to contact the person he initially spoke with, he stated

2   every phone number was disconnected or out of service, so he was unable to reach

3   anyone. Soon after, J.G. was rushed to emergency with an infected gallbladder and had to

4   have it removed immediately. J.G. believes that the applicable Respondents should be

5   responsible for the costs of his surgery and recovery, due to their misinformation and

6   fraudulent actions, which prevented J.G. from acquiring proper health insurance before he

7   fell ill.

8

9

### 7. COMPLAINANT V.C.

10

11       WHEREAS, V.C. had health insurance through her employer until she was laid off.

  According to V.C., she conducted an Internet search for "ObamaCare," which led her to

12   EVOLVE HEALTH. V.C. stated she told the agent, Respondent FABIAN VERGARA

13   ("VERGARA"), that she mainly needed coverage for her new baby's visits and checkups.

14   VERGARA assured her the plan she was getting would be the best fit. VERGARA sold V.C.

15   "health insurance" for $567.90 down and $467.95 per month. Since 2018, VERGARA has

16   been licensed with the Department as a non-resident Accident and Health Agent, license

17   number 0M31165;[10] and,

18

19       WHEREAS, EVOLVE HEALTH issued a medical plan insurance card to V.C. and her

20   baby, L.C., effective August 1, 2020, showing the Medical Plan through FIRST HEALTH

21   NETWORK, with "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The other

22   contact information on the insurance card is similar to the information on the insurance card

23   for Y.B. The information was so confusing that V.C. did not know who the insurer was – on

24   the Department's Request for Assistance form, V.C. stated that the insurer was EVOLVE

25   HEALTH; and,

26

27

28

_____

[10] The Department has issued an Accusation against VERGARA.

WHEREAS, after a few doctor visits, V.C. started to receive bills from Children's Health Orange County ("CHOC") showing that she owed money for her baby's wellness checkups and vaccinations because they were not covered by insurance. V.C. attempted to call her insurance company but was transferred from one department to another with no resolution. As a result, V.C. cancelled her policy on January 20, 2021 and enrolled her baby in MediCal, but still has an outstanding balance from CHOC for three thousand, six hundred dollars ($3,600.00). V.C. does not believe she should be responsible for this amount since VERGARA assured her that the plan he sold her was a regular health plan that would cover her baby's wellness checkups. Had V.C. been told up front that she was being sold a limited policy, she stated she would never have purchased it; and,

WHEREAS, on June 2, 2021, EVOLVE HEALTH sent V.C. a verification letter confirming she "purchased a brand of membership in the SERVICE INDUSTRY TRADE ALLIANCE called EVOLVE HEALTH with an effective date of August 1, 2020." The letter made no mention of FIRST CONTINENTAL or insurance coverage.

### 8. COMPLAINANT A.U.

WHEREAS, in or about September 2020, Respondent CURTIS GARCEAU ("GARCEAU") sold A.U. "health insurance" for $260.90 down and $160.95 per month. According to A.U., "I signed up for FIRST HEALTH and United Business Association ["UBA"] for supplemental insurance through GETMECARE …" A.U. was told that between FIRST HEALTH and UBA she would have full health coverage. According to A.U., GARCEAU told her there was a $10 copay for doctor visits, $250 for ambulance, and $350 for emergency treatment, with the remaining balance covered by UBA, subject to an annual limit of two million dollars. GARCEAU never told A.U. that she had a limited plan. Since 2019,

1  GARCEAU has been licensed with the Department as a non-resident Life, Accident and

2  Health Agent, license number 4026934;[11] and

3      WHEREAS, GETMECARE issued a medical plan insurance card in A.U.'s name

4  effective September 5, 2020. The Medical Plan is through FIRST HEALTH NETWORK; with

5  "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The number 855-648-6927 is

6  for "all billing, customer service and non-claims related questions." Association member

7  benefits are through SITA, and all other contact information appears identical to the

8  information on the insurance card for Y.B.

9      WHEREAS, A.U. learned she had a limited plan when she saw a cardiologist and

10  had an echocardiogram, and neither FIRST HEALTH nor UBA would provide any coverage.

11  A.U. had to pay for the cardiologist and the echocardiogram herself.

12

13

14                              **9. COMPLAINANT D.M.**

15      WHEREAS, on or about March 24, 2020, Respondent SAMANTHA MABIE

16  ("MABIE"), sold D.M. "health insurance" for $369.90 down and $269.95 per month.

17  According to D.M., she found the insurance on www.healthcare.gov and:

18

19          [A]gent made the policy sound like a full coverage plan. What I
           signed was never supplied to me, policy and cards never sent to
20          me. Paid almost $400.00 a month for a year asked for a policy
           more than once never received. Finally received a portal sign in
21          that had a confirmation clause to see policy that stated I didn't have
           medical coverage at all. When I called I was told that is what I
22          signed the first day that I never received a copy of in my instant
           messages. I would never have paid 400 for a sub par policy I have
23          a pneumonia background I cancelled a Blue Shield policy for this
24          plan.

25

26

27

28
   _____
   [11] The Department has issued an Accusation against GARCEAU.

WHEREAS, MABIE had enrolled D.M. in SITA's Membership Plan, which included limited benefit "health insurance." The health insurer is not explicitly stated on the receipt, but is believed to be FIRST CONTINENTAL. The situation was so confusing that D.M. believed her health insurer was EVOLVE HEALTH. Since 2016, MABIE has been licensed with the Department as a non-resident Accident and Health Agent, license number 0L30001.[12] D.M. is requesting a full refund.

### 10. COMPLAINANT D.W.

WHEREAS, D.W. states:

> I was sold this insurance policy after filling out an online questionnaire that I thought was with the Covered California Website. Unfortunately, it was a pop-up site belonging to a private broker. I was sold a policy that I was told was Aetna, and paid $743.95 with my debit card for a policy covering me and my family, with a PPO health and dental plan. Within 24 hours, I realized this was not through Covered California and is indeed not an Aetna plan, and called back to cancel. I also called Covered California, and signed up with a new policy with them. I have made numerous phone calls to the previous insurer and have followed the exact protocol told to me: to send an email, along with proof of my existing insurance, requesting immediate cancellation. I sent this email on Monday, July 19, 2021. I have yet to hear from them, have not been refunded, and am unable to reach them by phone.

WHEREAS, D.W. received a temporary medical plan insurance card. SecureCare Preferred Starter is the name at the top of the card. No policy number is listed. Other information on the card includes the following: MDLIVE Doctor Visit Fee: $0; Unlimited # of Visits; 866-976-0802; www.mdlive.com/mywellness. The Medical Plan is through FIRST HEALTH, with "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The number 866-910-6173 or benefitsportal.net is for "member services." ABH association member

---

[12] The Department has issued an Accusation against MABIE.

benefits can be accessed at www.associationforbetterhealth.org. Claims submission: ACI, 994 Old Eagle School Road, Ste. 1005, Wayne, PA 19087. www.visit-aci.com or 800-565-6053. To confirm eligibility and obtain benefit determinations, please call 800-565-6053. At some point, D.W. apparently dealt with Prosperity Health Group. The information was so confusing that D.W. believed her insurer was Prosperity Health Group.

## 11. COMPLAINANT M.S.

WHEREAS, on or about June 10, 2021, M.S. purchased what she believed to be full coverage health insurance through FIRST CONTINENTAL, policy number FCL-GLI-001-AZ. M.S. was never informed that the coverage was a limited benefit plan. M.S. states:

> When purchasing this health insurance I was told there was a $10 copay for doctor visits. After visiting the doctor in July [2021] I received a bill for $857.25 instead of the $10 copay as initially outlined in my call with the company. I have since cancelled my insurance with them however at the time I called to cancel it was again confirmed I [sic] this insurance had a $10 copay. This isn't really insurance as I paid almost $800 per month for a $10 copay. It would have been less expensive to forgo the insurance and pay the doctor directly for the appointment.

WHEREAS, M.S.'s bank statement shows that Respondent FAMILY CARE of Texas, 800-323-4057, took the initial payment of $848.45 and the first installment of $738.45 from her bank account. FAMILY CARE is the DBA of Respondent ASSOCIATION HEALTH CARE MANAGEMENT, INC.

## 12. COMPLAINANTS E.P. AND N.P.

WHEREAS, on or about December 4, 2020, E.P. and N.P. received a call from insurance agent and Respondent SCOTT RUSSELL ("RUSSELL"), who told them he could give them better health coverage with lower premiums than E.P. had through his previous insurer, Blue Cross; and,

WHEREAS, from June 18, 2019 until his license expired for failure to renew on June 30, 2021, RUSSELL was licensed with the Department as a non-resident Accident and Health Agent, license number 0N03621;[13] and,

WHEREAS, E.P. and N.P. talked extensively about the coverage with RUSSELL, and it sounded good, so they purchased the "health insurance" through FIRST CONTINENTAL, with ACI as the administrator. The medical plan was called "SecureCare Enterprise," and policy documents indicate that E.P. and N.P. were enrolled as members of ABH to obtain the coverage for $593.40 down and $468.40 per month; and,

WHEREAS, RUSSELL told E.P. and N.P. they would be receiving medical identification cards and a booklet with all the information about medical and dental coverage within a few weeks. Although the medical cards arrived, the booklet never came. E.P. and N.P. forgot about the booklet until March 2021, and when they called member services, they were informed that the insurer does not have medical coverage booklets but there is a website. When N.P. accessed the website, she discovered that RUSSELL had included a life insurance policy at $105.45 per month, which they had not requested. At N.P.'s request, the life insurance was removed; and,

WHEREAS, on or about March 27, 2021, E.P. had to go to the emergency room for about two hours. On or about April 29, 2021, ACI sent E.P. an explanation of benefits form stating that the coverage was a limited benefit plan and did not provide any emergency room coverage, contrary to what they had been told by RUSSELL. E.P. and N.P. were understandably upset, as RUSSELL told them they had the best policy. The emergency room bill was $8,287.49, and FIRST CONTINENTAL refused to pay any portion of it; and,

WHEREAS, N.P. tried diligently to obtain a refund by contacting the various numbers provided, but was constantly put on hold for excessive amounts of time, transferred,

---

[13] The Department has issued an Accusation against RUSSELL.

1  disconnected, and told she needed to call a different number. When N.P. tried to go to the

2  website to see if there was a refund, it showed the following message:

**Access Request**

This account cannot be accessed due to an unresolved issue. Please contact a services leader to assist in resolving this matter.

Member Services  |  (866) 910-6173  |  memberservices@ahcminc.com

8  AHCM Inc. is Respondent ASSOCIATION HEALTH CARE MANAGEMENT INC., DBA

9  FAMILY CARE; and,

10      The phone game is a common theme among complainants, and appears to be a

11  scheme by which FIRST CONTINENTAL, ACI and possibly other Respondents attempt to

12  evade policyholder requests for refunds and payments, probably hoping the policyholders

13  will just go away - and many probably do - leaving Respondents with a handsome profit.

14

15

16                              **ILLEGAL INSURANCE**

17      WHEREAS, the fixed-benefit policies at issue in this case work in the opposite

18  manner of standard health insurance policies.  Typical health policies often require the

19  policyholder to pay a deductible or co-pay, then the insurer pays the remainder of the

20  charges.  But with the fixed-benefit policies, the <u>insurer</u> pays fixed amounts (analogous to a

21  deductible or co-pay), and the <u>policyholder</u> pays the remainder of the charges.  The

22  policyholder is essentially self-insured, since the fixed amounts paid by the insurer are fairly

23  low and only cover a small fraction of the actual costs. This type of supplementary insurance

24  might be acceptable to fill in the gaps for someone who has existing health insurance with

25  high deductibles, but it is not intended to be a primary health insurance policy, although

26  Respondents sold it as such. As stated above, this type of coverage is illegal in California

27  when sold as a primary health insurance policy, notwithstanding the fact that it was backed

28  by a nonadmitted, illegal insurer, and sold by misrepresentation.

## VIOLATIONS

### *Unlawful Activities*

WHEREAS, FIRST CONTINENTAL has acted in a capacity for which a certificate of authority is required but not possessed, in violation of California Insurance Code section 700; has misrepresented fixed-benefit indemnity insurance as "health insurance," in violation of sections 106(b)(2), 780(a), 781, and 790.03(b); has issued fixed-benefit indemnity insurance to Californians who did not have comprehensive health insurance, in violation of section 10198.61(b); and failed to comply with sections 10198.61(a) and 10198.8, which require insurers to certify annually to the Commissioner that they do not market their indemnity insurance as a substitute for Affordable Care Act health insurance, "regardless of the situs of the contract or group master policyholder."

WHEREAS, ADMINISTRATIVE CONCEPTS, INC. ("ACI") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, the ASSOCIATION FOR BETTER HEALTH ("ABH") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, ASSOCIATION HEALTH CARE MANAGEMENT, INC., DBA FAMILY CARE ("AHCM") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, MATTHEW DEPREY has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, EVOLVE HEALTH has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

(WHEREAS, FIRST HEALTH NETWORK has aided and abetted FIRST) (CONTINENTAL, an entity not licensed to transact the business of insurance in California, to) (transact insurance with California residents, in violation of California Insurance Code section) (703; and,)

WHEREAS, CURTIS GARCEAU has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, GET ME CARE, AKA GETMECARE, has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, SAMANTHA MABIE has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, the NATIONAL ASSOCIATION OF PREFERRED PROVIDERS ("NAPP") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, SCOTT RUSSELL has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, the SERVICE INDUSTRY TRADE ALLIANCE ("SITA") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance

1  in California, to transact insurance with California residents, in violation of California

2  Insurance Code section 703; and,

3  WHEREAS, FABIAN VERGARA has aided and abetted FIRST CONTINENTAL, an

4  entity not licensed to transact the business of insurance in California, to transact insurance

5  with California residents, in violation of California Insurance Code section 703; and,

6

7  ### *Dates of Unlawful Activities*

8  WHEREAS, FIRST CONTINENTAL is not licensed by the Commissioner to transact

9  insurance business as an insurer, and began engaging in the unlawful activity set forth

10  herein on or before October 15, 2019.

11  WHEREAS, ACI, ABH, EVOLVE HEALTH, and FIRST HEALTH NETWORK began

12  engaging in the unlawful activity set forth herein on or before October 15, 2019; and,

13  WHEREAS, AHCM and NAPP began engaging in the unlawful activity set forth

14  herein on or before February 2, 2021; and,

15  WHEREAS, MATTHEW DEPREY and SITA began engaging in the unlawful activity

16  set forth herein on or before February 19, 2020; and,

17  WHEREAS, GET ME CARE began engaging in the unlawful activity set forth herein

18  on or before August 20, 2020; and,

19  WHEREAS, CURTIS GARCEAU began engaging in the unlawful activity set forth

20  herein on or before September 5, 2020; and,

21  WHEREAS, SAMANTHA MABIE began engaging in the unlawful activity set forth

22  herein on or before March 24, 2020; and,

23  WHEREAS, SCOTT RUSSELL began engaging in the unlawful activity set forth

24  herein on or before December 4, 2020; and,

25  WHEREAS, FABIAN VERGARA began engaging in the unlawful activity set forth

26  herein on or before August 1, 2020; and,

27

28

1

## **ORDER TO CEASE AND DESIST**

2   WHEREAS, all Respondents are ordered to CEASE and DESIST the unlawful

3   activities set forth herein.

4

5

## **ORDER TO SHOW CAUSE**

6   NOW THEREFORE, FIRST CONTINENTAL IS HEREBY ORDERED to SHOW

7   CAUSE why the facts recited above do not establish grounds for the Commissioner to

8   impose a monetary penalty pursuant to Insurance Code section 12921.8 of five times the

9   amount of money received by FIRST CONTINENTAL while acting in the capacity for which

10   a license, registration or certificate of authority was required but not possessed, or five

11   thousand dollars ($5,000) for each day FIRST CONTINENTAL has acted in the capacity for

12   which a license, registration or certificate of authority was required but not possessed,

13

14   whichever is greater. In the absence of contrary evidence, it shall be presumed that a

15   person continuously acted in a capacity for which a license, registration, or certificate of

16   authority was required on each day from the date of the earliest such act until the date those

17   acts were discontinued, as proven by the person at a hearing; and,

18   NOW THEREFORE, ABH; AHCM; EVOLVE HEALTH; FIRST HEALTH NETWORK;

19   GET ME CARE; NAPP and SITA ARE HEREBY ORDERED to SHOW CAUSE why the

20   facts recited above do not establish grounds for the Commissioner to impose a monetary

21   penalty pursuant to Insurance Code section 12921.8 of five times the amount of money

22   received by any of said Respondents while aiding and abetting FIRST CONTINENTAL to

23   act in a capacity for which a license, registration or certificate of authority was required but

24   not possessed, or five thousand dollars ($5,000) for each day any of said Respondents

25   have aided or abetted FIRST CONTINENTAL to act in a capacity for which a license,

26   registration or certificate of authority was required but not possessed, whichever is greater.

27   //

28

## **NOTICE OF RIGHT TO HEARING**

Insurance Code § 12921.8(c), a copy of which is attached to this Order as Exhibit B, provides in part, as follows:

> "A person to whom a cease and desist order…has been issued, may, within <u>seven days</u> after service of the order…request a hearing by filing a request for the hearing with the commissioner."

If you desire a hearing in this matter, your written request for a hearing must be received within seven days after you are personally served with this Order. The seven-day period begins on the day after you are served with this Order, and if the seventh day falls on a weekend or holiday, the deadline is extended to the next business day. Your written request for a hearing must be directed to Christina Carroll, attorney for the California Department of Insurance, at the address at the top of the first page of this order.

IN WITNESS WHEREOF, I have set my hand and affixed my official seal this 2nd day of February, 2022.

RICARDO LARA
Insurance Commissioner

By:
Digitally signed
by Tyler P.
McKinney
Date: 2022.02.02
12:31:27 -08'00'

TYLER MCKINNEY
Assistant Chief Counsel

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:
**Stanley Mosk Courthouse**
**111 North Hill Street, Los Angeles, CA 90012**

PLAINTIFF:
**UNIVERSITY OF SOUTHERN CALIFORNIA**

DEFENDANT:
**COVENTRY HEALTH CARE NATIONAL NETWORK, INC., et al.**

## NOTICE OF CASE MANAGEMENT CONFERENCE

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles

03/04/2025

David W. Slayton, Executive Officer / Clerk of Court

By: S. Shumate    Deputy

CASE NUMBER:
**25STCV05606**

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled at the courthouse address shown above on:

Date: **08/25/2025**    Time: **10:00 AM**    Dept.: **50**

NOTICE TO DEFENDANT:    THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 calendar days prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions, pursuant to LASC Local Rule 3.37, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code section 68608, subdivision (b), and California Rules of Court, rule 2.2 et seq.

Dated: **03/04/2025**

*Teresa A. Beaudet*
Judicial Officer

## CERTIFICATE OF SERVICE    Teresa A. Beaudet / Judge

I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below:

☑ by depositing in the United States mail at the courthouse in **Los Angeles**_____, California, one copy of the original filed herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid.

☐ by personally giving the party notice upon filing of the complaint.

Mikaela G. Cox
1590 Corporate Drive
Costa Mesa, CA 92626

David W. Slayton, Executive Officer / Clerk of Court

Dated: **03/04/2025**

By **S. Shumate**
Deputy Clerk

LASC LACIV 132 Rev. 01/23
For Optional Use

## NOTICE OF
## CASE MANAGEMENT CONFERENCE

Cal. Rules of Court, rules 3.720-3.730
LASC Local Rules, Chapter 7KUHH

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>03/04/2025<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ S. Shumate _____ Deputy |
| PLAINTIFF/PETITIONER:<br>UNIVERSITY OF SOUTHERN CALIFORNIA | |
| DEFENDANT/RESPONDENT:<br>COVENTRY HEALTH CARE NATIONAL NETWORK, INC., et al. | |
| **CERTIFICATE OF MAILING** | CASE NUMBER:<br>25STCV05606 |

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Mikaela G. Cox
HELTON LAW GROUP, APC
1590 Corporate Drive
Costa Mesa, CA 92626

David W. Slayton, Executive Officer / Clerk of Court

Dated: 03/4/2025

By: S. Shumate
Deputy Clerk

**CERTIFICATE OF MAILING**

# DEPARTMENT 50

## Judge Teresa A. Beaudet

111 N. Hill Street, Room 508
Los Angeles, CA 90012
(213) 633-0650

## MANDATORY COURTESY COPIES REQUIRED FOR *ALL FILINGS*

### FAILURE TO PROVIDE COURTESY COPIES MAY NEGATIVELY IMPACT THE COURT'S ABILITY TO CONSIDER YOUR FILING

Courtesy Copies of *all filings* are to be lodged directly with Department 50 within one court day after any electronic filing. A failure to timely provide courtesy copies may impact the calendaring of your motion or the Court's review of your papers.

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**02/27/2025**<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ S. Ruiz _____ Deputy |
| **NOTICE OF CASE ASSIGNMENT**<br>**UNLIMITED CIVIL CASE** | |
| Your case is assigned for all purposes to the judicial officer indicated below. | CASE NUMBER:<br>25STCV05606 |

<u>**THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT**</u>

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Teresa A. Beaudet | 50 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record    David W. Slayton, Executive Officer / Clerk of Court

on 02/28/2025 _____    By S. Ruiz _____, Deputy Clerk
   (Date)

LACIV 190 (Rev 6/18)
LASC Approved 05/06    **NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within **15** days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**



*Superior Court of California, County of Los Angeles*
**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE**

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS MUST SERVE THIS ADR INFORMATION PACKAGE ON ANY NEW PARTIES NAMED TO THE ACTION WITH THE CROSS-COMPLAINT.**

**WHAT IS ADR?**

Alternative Dispute Resolution (ADR) helps people find solutions to their legal disputes without going to trial. The Court offers a variety of ADR resources and programs for various case types.

**TYPES OF ADR**

- **Negotiation.** Parties may talk with each other about resolving their case at any time. If the parties have attorneys, they will negotiate for their clients.

- **Mediation.** Mediation may be appropriate for parties who want to work out a solution but need help from a neutral third party. A mediator can help the parties reach a mutually acceptable resolution. Mediation may be appropriate when the parties have communication problems and/or strong emotions that interfere with resolution. Mediation may not be appropriate when the parties want a public trial, lack equal bargaining power, or have a history of physical or emotional abuse.

- **Arbitration.** Less formal than a trial, parties present evidence and arguments to an arbitrator who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision.

- **Settlement Conferences.** A judge or qualified settlement officer assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Mandatory settlement conferences may be ordered by a judicial officer. In some cases, voluntary settlement conferences may be requested by the parties.

**ADVANTAGES OF ADR**

- **Save time and money.** Utilizing ADR methods is often faster than going to trial and parties can save on court costs, attorney's fees, and other charges.
- **Reduce stress and protect privacy.** ADR is conducted outside of a courtroom setting and does not involve a public trial.
- **Help parties maintain control.** For many types of ADR, parties may choose their ADR process and provider.

**DISADVANTAGES OF ADR**

- **Costs.** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial.** ADR does not provide a public trial or decision by a judge or jury.

**WEBSITE RESOURCES FOR ADR**

- **Los Angeles Superior Court ADR website:** www.lacourt.org/ADR
- **California Courts ADR website:** www.courts.ca.gov/programs-adr.htm

**Los Angeles Superior Court ADR Programs for Unlimited Civil (cases valued over $35,000)**
Litigants should closely review the requirements for each program and the types of cases served.

- **Civil Mediation Vendor Resource List.** Litigants in unlimited civil cases may use the Civil Mediation Vendor Resource List to arrange voluntary mediations without Court referral or involvement. The Resource List includes organizations that have been selected through a formal process that have agreed to provide a limited number of low-cost or no-cost mediation sessions with attorney mediators or retired judges. Organizations may accept or decline cases at their discretion. Mediations are scheduled directly with these organizations and are most often conducted through videoconferencing. The organizations on the Resource List target active civil cases valued between $50,000-$250,000, though cases outside this range may be considered. *For more information and to view the list of vendors and their contact information, download the Resource List Flyer and FAQ Sheet at www.lacourt.org/ADR/programs.html.*
  **RESOURCE LIST DISCLAIMER:** The Court provides this list as a public service. The Court does not endorse, recommend, or make any warranty as to the qualifications or competency of any provider on this list. Inclusion on this list is based on the representations of the provider. The Court assumes no responsibility or liability of any kind for any act or omission of any provider on this list.

- **Mediation Volunteer Panel (MVP).** Unlimited civil cases referred by judicial officers to the Court's Mediation Volunteer Panel (MVP) are eligible for three hours of virtual mediation at no cost with a qualified mediator from the MVP. Through this program, mediators volunteer preparation time and three hours of mediation at no charge. If the parties agree to continue the mediation after three hours, the mediator may charge their market hourly rate. When a case is referred to the MVP, the Court's ADR Office will provide information and instructions to the parties. The Notice directs parties to meet and confer to select a mediator from the MVP or they may request that the ADR Office assign them a mediator. The assigned MVP mediator will coordinate the mediation with the parties. *For more information or to view MVP mediator profiles, visit the Court's ADR webpage at www.lacourt.org/ADR or email ADRCivil@lacourt.org.*

- **Mediation Center of Los Angeles (MCLA) Referral Program.** The Court may refer unlimited civil cases to mediation through a formal contract with the Mediation Center of Los Angeles (MCLA), a nonprofit organization that manages a panel of highly qualified mediators. Cases must be referred by a judicial officer or the Court's ADR Office. The Court's ADR Office will provide the parties with information for submitting the case intake form for this program. MCLA will assign a mediator based on the type of case presented and the availability of the mediator to complete the mediation in an appropriate time frame. MCLA has a designated fee schedule for this program. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

- **Resolve Law LA (RLLA) Virtual Mandatory Settlement Conferences (MSC).** Resolve Law LA provides three-hour virtual Mandatory Settlement Conferences at no cost for personal injury and non-complex employment cases. Cases must be ordered into the program by a judge pursuant to applicable Standing Orders issued by the Court and must complete the program's online registration process. The program leverages the talent of attorney mediators with at least 10 years of litigation experience who volunteer as settlement officers. Each MSC includes two settlement officers, one each from the plaintiff and defense bars. Resolve Law LA is a joint effort of the Court, Consumer Attorneys Association of Los Angeles County (CAALA), Association of Southern California Defense Counsel (ASCDC), Los Angeles Chapter of the American Board of Trial Advocates (LA-ABOTA), Beverly Hills Bar Foundation (BHBF), California Employment Lawyers Association (CELA), and Los Angeles County Bar Association (LACBA). *For more information, visit https://resolvelawla.com.*

- **Judicial Mandatory Settlement Conferences (MSCs).** Judicial MSCs are ordered by the Court for unlimited civil cases and may be held close to the trial date or on the day of trial. The parties and their attorneys meet with a judicial officer who does not make a decision, but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For more information, visit https://www.lacourt.org/division/civil/CI0047.aspx.

**Los Angeles Superior Court ADR Programs for Limited Civil (cases valued below $35,000)**
Litigants should closely review the requirements for each program and the types of cases served.

- **Online Dispute Resolution (ODR).** Online Dispute Resolution (ODR) is a free online service provided by the Court to help small claims and unlawful detainer litigants explore settlement options before the hearing date without having to come to court. ODR guides parties through a step-by-step program. After both sides register for ODR, they may request assistance from trained mediators to help them reach a customized agreement. The program creates settlement agreements in the proper form and sends them to the Court for processing. Parties in small claims and unlawful detainer cases must carefully review the notices and other information they receive about ODR requirements that may apply to their case. *For more information, visit https://my.lacourt.org/odr.*

- **Dispute Resolution Program Act (DRPA) Day-of-Hearing Mediation.** Through the Dispute Resolution Program Act (DRPA), the Court works with county-funded agencies, including the Los Angeles County Department of Consumer & Business Affairs (DCBA) and the Center for Conflict Resolution (CCR), to provide voluntary day-of-hearing mediation services for small claims, unlawful detainer, limited civil, and civil harassment matters. DCBA and CCR staff and trained volunteers serve as mediators, primarily for self-represented litigants. There is no charge to litigants. *For more information, visit https://dcba.lacounty.gov/countywidedrp.*

- **Temporary Judge Unlawful Detainer Mandatory Settlement Conference Pilot Program.** Temporary judges who have been trained as settlement officers are deployed by the Court to designated unlawful detainer court locations one day each week to facilitate settlement of unlawful detainer cases on the day of trial. For this program, cases may be ordered to participate in a Mandatory Settlement Conference (MSC) by judicial officers at Stanley Mosk, Long Beach, Compton, or Santa Monica. Settlement rooms and forms are available for use on the designated day at each courthouse location. There is no charge to litigants for the MSC. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

# EXHIBIT E

**Wolters Kluwer**

CT Corporation
**Service of Process Notification**
03/18/2025
CT Log Number 548670536

## Service of Process Transmittal Summary

**TO:**   David Scott, Paralegal Consumer Litigation Team
Aetna Inc
151 Farmington Ave
Hartford, CT 06156-0002

**RE:**   **Process Served in Delaware**

**FOR:**   COVENTRY HEALTH CARE NATIONAL NETWORK, INC.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its KECK HOSPITAL OF USC and on behalf of its USC VERDUGO HILLS HOSPITAL vs. COVENTRY HEALTH CARE NATIONAL NETWORK, INC. |
| **CASE #:** | 25STCV05606 |
| **PROCESS SERVED ON:** | The Corporation Trust Company, Wilmington, DE |
| **DATE/METHOD OF SERVICE:** | By Process Server on 03/18/2025 at 16:08 |
| **JURISDICTION SERVED:** | Delaware |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 03/19/2025, Expected Purge Date: 03/24/2025 |
| | Image SOP |
| | Email Notification,  Desiree Beatty  beattyd@aetna.com |
| | Email Notification,  David Scott  ScottD4@aetna.com |
| | Email Notification,  Kim Lees  kimberly.lees@cvshealth.com |
| **REGISTERED AGENT CONTACT:** | The Corporation Trust Company
1209 Orange Street
Wilmington, DE 19801
877-564-7529
MajorAccountTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

Wolters Kluwer

# PROCESS SERVER DELIVERY DETAILS

**Date:**                              Tue, Mar 18, 2025
**Server Name:**              Wilmington Drop Serve

| Entity Served | COVENTRY HEALTH CARE NATIONAL NETWORK, INC. |
|---|---|
| Case Number | 25STCV05606 |
| Jurisdiction | DE |

| Inserts | | |
|---|---|---|
| | | |



**SUM-100**

# SUMMONS
## (CITACION JUDICIAL)

<table>
<tr>
<td>

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

COVENTRY HEALTH CARE NATIONAL NETWORK, INC.; FIRST
CONTINENTAL LIFE & ACCIDENT INSURANCE CO.; FIRST HEALTH GROUP
CORP.; and DOES 1 through 25, inclusive
**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its KECK HOSPITAL OF
USC and on behalf of its USC VERDUGO HILLS HOSPITAL

</td>
<td>

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**Electronically FILED by
Superior Court of California,
County of Los Angeles
2/27/2025 7:25 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk**

</td>
</tr>
</table>

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

<table>
<tr>
<td>

The name and address of the court is:
*(El nombre y dirección de la corte es):*

LOS ANGELES COUNTY SUPERIOR COURT
111 N. Hill St., Los Angeles, CA 90012

</td>
<td>

CASE NUMBER
*(Número del Caso):*

**25STCV05606**

</td>
</tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Carrie McLain (SBN 181674) / Mikaela Cox (SBN 316886) / Thomas Yau (SBN 339222)    Fax No.: (562) 901-4488
HELTON LAW GROUP, APC - 1590 Corporate Dr., Costa Mesa, CA 92626    Phone No.: (562) 901-4499

<table>
<tr>
<td>

DATE:
*(Fecha)*    02/27/2025

</td>
<td>

Clerk, by   David W. Slayton, Executive Officer/Clerk of Court  Deputy
*(Secretario)*                                     S. Ruiz    *(Adjunto)*

</td>
</tr>
</table>

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

<table>
<tr>
<td>

[SEAL]

</td>
<td>

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☒ on behalf of *(specify):*   COVENTRY HEALTH CARE NATIONAL NETWORK, INC.

   under: ☒ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
       ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
       ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)

       ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

</td>
</tr>
</table>

Page 1 of 1

<table>
<tr>
<td>

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

</td>
<td>

**SUMMONS**

</td>
<td>

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov
*LexisNexis® Automated California Judicial Council Forms*

</td>
</tr>
</table>

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Carrie McLain (SBN 181674) / Mikaela Cox (SBN 316886) / Thomas Yau (SBN 339222) HELTON LAW GROUP, APC - 1590 Corporate Dr., Costa Mesa, CA 92626 | **Electronically FILED by Superior Court of California, County of Los Angeles 2/27/2025 7:25 PM David W. Slayton, Executive Officer/Clerk of Court, By S. Ruiz, Deputy Clerk** |

TELEPHONE NO.: (562) 901-4499    FAX NO.: (562) 901-4488
EMAIL ADDRESS: cmclain@helton.law / mcox@helton.law / tyau@helton.law
ATTORNEY FOR *(Name)*: Plaintiffs

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
University of Southern California, et al. v. Coventry, et al.

| **CIVIL CASE COVER SHEET** | **Complex Case Designation** | CASE NUMBER: **25STCV05606** |
|---|---|---|
| [x] Unlimited (Amount demanded exceeds $35,000) | [ ] Limited (Amount demanded is $35,000 or less) | [ ] Counter [ ] Joinder Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[ ] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)

**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[x] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)

**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)

**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)

**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
[ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [ ] is [x] is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties
   b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. [ ] Substantial amount of documentary evidence
   d. [ ] Large number of witnesses
   e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply)*: a. [x] monetary b. [x] nonmonetary; declaratory or injunctive relief c. [ ] punitive
4. Number of causes of action *(specify)*: EIGHT (8)
5. This case [ ] is [x] is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*
Date: February 27, 2025
Mikaela Cox

_____
(TYPE OR PRINT NAME)

_____
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. January 1, 2024]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740
Cal. Standards of Judicial Administration, std. 3.10
*www.courts.ca.gov*

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**CM-010**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property
  Damage/Wrongful Death
Uninsured Motorist (46) *(if the
  case involves an uninsured
  motorist claim subject to
  arbitration, check this item
  instead of Auto)*
**Other PI/PD/WD (Personal Injury/
Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/
    Wrongful Death
Product Liability *(not asbestos or
  toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice–
    Physicians & Surgeons
  Other Professional Health Care
    Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip
    and fall)
  Intentional Bodily Injury/PD/WD
    (e.g., assault, vandalism)
  Intentional Infliction of
    Emotional Distress
  Negligent Infliction of
    Emotional Distress
  Other PI/PD/WD
**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business
  Practice (07)
Civil Rights (e.g., discrimination,
  false arrest) *(not civil
  harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice
    *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)
**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease
    Contract *(not unlawful detainer
      or wrongful eviction)*
  Contract/Warranty Breach–Seller
    Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/
    Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open
  book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally
  complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute
**Real Property**
Eminent Domain/Inverse
  Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent
    domain, landlord/tenant, or
    foreclosure)*
**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal
  drugs, check this item; otherwise,
  report as Commercial or Residential)*
**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court
    Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner
    Appeals

**Provisionally Complex Civil Litigation (Cal.
Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims
  *(arising from provisionally complex
  case type listed above)* (41)
**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic
    relations)*
  Sister State Judgment
  Administrative Agency Award
    *(not unpaid taxes)*
  Petition/Certification of Entry of
    Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case
**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-
    harassment)*
  Mechanics Lien
  Other Commercial Complaint
    Case *(non-tort/non-complex)*
  Other Civil Complaint
    *(non-tort/non-complex)*
**Miscellaneous Civil Petition**
Partnership and Corporate
  Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

| SHORT TITLE | CASE NUMBER |
|---|---|
| University of Southern California, et al. v. Coventry, et al. | 25STCV05606 |

## CIVIL CASE COVER SHEET ADDENDUM AND STATEMENT OF LOCATION

### (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

**This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court**

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

### Applicable Reasons for Choosing Courthouse Location (Column C)

| | | | |
|---|---|---|---|
| 1. | Class Actions must be filed in the Stanley Mosk Courthouse, Central District. | 7. | Location where petitioner resides. |
| 2. | Permissive filing in Central District. | 8. | Location wherein defendant/respondent functions wholly. |
| 3. | Location where cause of action arose. | 9. | Location where one or more of the parties reside. |
| 4. | Location where bodily injury, death or damage occurred. | 10. | Location of Labor Commissioner Office. |
| 5. | Location where performance required, or defendant resides. | 11. | Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection). |
| 6. | Location of property or permanently garaged vehicle. | | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ 2201 Motor Vehicle – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | Uninsured Motorist (46) | ☐ 4601 Uninsured Motorist – Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| **Other Personal Injury/ Property Damage/ Wrongful Death** | Other Personal Injury/ Property Damage/ Wrongful Death (23) | ☐ 2301 Premise Liability (e.g., dangerous conditions of property, slip/trip and fall, dog attack, etc.) | 1, 4 |
| | | ☐ 2302 Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, battery, vandalism, etc.) | 1, 4 |
| | | ☐ 2303 Intentional Infliction of Emotional Distress | 1, 4 |
| | | ☐ 2304 Other Personal Injury/Property Damage/Wrongful Death | 1, 4 |
| | | ☐ 2305 Elder/Dependent Adult Abuse/Claims Against Skilled Nursing Facility | 1, 4 |
| | | ☐ 2306 Intentional Conduct – Sexual Abuse Case (in any form) | 1, 4 |

| SHORT TITLE<br>University of Southern California, et al. v. Coventry, et al. | | CASE NUMBER | |
|---|---|---|---|

| | A<br>Civil Case Cover<br>Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable<br>Reasons (see<br>Step 3 above) |
|---|---|---|---|
| **Other Personal Injury/ Property Damage/ Wrongful Death** | | ☐ 2307 Construction Accidents | 1, 4 |
| | | ☐ 2308 Landlord – Tenant Habitability (e.g., bed bugs, mold, etc.) | 1, 4 |
| | Product Liability (24) | ☐ 2401 Product Liability (not asbestos or toxic/ environmental) | 1, 4 |
| | | ☐ 2402 Product Liability – Song-Beverly Consumer Warranty Act (CA Civil Code §§1790-1795.8) (Lemon Law) | 1, 3, 5 |
| | Medical Malpractice (45) | ☐ 4501 Medical Malpractice – Physicians & Surgeons | 1, 4 |
| | | ☐ 4502 Other Professional Health Care Malpractice | 1, 4 |
| **Non-Personal Injury/Property Damage/Wrongful Death Tort** | Business Tort (07) | ☐ 0701 Other Commercial/Business Tort (not fraud or breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ 0801 Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ 1301 Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☐ 1601 Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ 2501 Legal Malpractice | 1, 2, 3 |
| | | ☐ 2502 Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ 3501 Other Non-Personal Injury/Property Damage Tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ 3601 Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ 1501 Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ 1502 Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract / Warranty (06) (not insurance) | ☐ 0601 Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ 0602 Contract/Warranty Breach – Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ 0603 Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☑ 0604 Other Breach of Contract/Warranty (no fraud/ negligence) | 1, ②⑤ |
| | | ☐ 0605 Breach of Rental/Lease Contract (COVID-19 Rental Debt) | 2, 5 |
| | Collections (09) | ☐ 0901 Collections Case – Seller Plaintiff | 5, 6, 11 |
| | | ☐ 0902 Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ 0903 Collections Case – Purchased Debt (charged off consumer debt purchased on or after January 1, 2014) | 5, 6, 11 |
| | | ☐ 0904 Collections Case – COVID-19 Rental Debt | 5, 11 |
| | Insurance Coverage (18) | ☐ 1801 Insurance Coverage (not complex) | 1, 2, 5, 8 |

| SHORT TITLE | CASE NUMBER |
|---|---|
| University of Southern California, et al. v. Coventry, et al. | |

| | A<br>Civil Case Cover Sheet Case Type | B<br>Type of Action<br>(check only one) | C<br>Applicable Reasons (see Step 3 above) |
|---|---|---|---|
| **Contract** (Continued) | Other Contract (37) | ☐ 3701 Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ 3702 Tortious Interference | 1, 2, 3, 5 |
| | | ☐ 3703 Other Contract Dispute (not breach/insurance/fraud/ negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/ Inverse Condemnation (14) | ☐ 1401 Eminent Domain/Condemnation<br>Number of Parcels _____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ 3301 Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ 2601 Mortgage Foreclosure | 2, 6 |
| | | ☐ 2602 Quiet Title | 2, 6 |
| | | ☐ 2603 Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer – Commercial (31) | ☐ 3101 Unlawful Detainer – Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Residential (32) | ☐ 3201 Unlawful Detainer – Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer – Post Foreclosure (34) | ☐ 3401 Unlawful Detainer – Post Foreclosure | 2, 6, 11 |
| | Unlawful Detainer – Drugs (38) | ☐ 3801 Unlawful Detainer – Drugs | 2, 6, 11 |
| **Judicial Review** | Asset Forfeiture (05) | ☐ 0501 Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ 1101 Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ 0201 Writ – Administrative Mandamus | 2, 8 |
| | | ☐ 0202 Writ – Mandamus on Limited Court Case Matter | 2 |
| | | ☐ 0203 Writ – Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ 3901 Other Writ/Judicial Review | 2, 8 |
| | | ☐ 3902 Administrative Hearing | 2, 8 |
| | | ☐ 3903 Parking Appeal | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ 0301 Antitrust/Trade Regulation | 1, 2, 8 |
| | Asbestos (04) | ☐ 0401 Asbestos Property Damage | 1, 11 |
| | | ☐ 0402 Asbestos Personal Injury/Wrongful Death | 1, 11 |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

| SHORT TITLE | CASE NUMBER |
|---|---|
| University of Southern California, et al. v. Coventry, et al. | |

| | **A**<br>Civil Case Cover<br>Sheet Case Type | **B**<br>Type of Action<br>(check only one) | **C**<br>Applicable<br>Reasons (see<br>Step 3 above) |
|---|---|---|---|
| **Provisionally Complex Litigation** (Continued) | Construction Defect (10) | ☐ 1001 Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ 4001 Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ 2801 Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort Environmental (30) | ☐ 3001 Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims from Complex Case (41) | ☐ 4101 Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement of Judgment (20) | ☐ 2001 Sister State Judgment | 2, 5, 11 |
| | | ☐ 2002 Abstract of Judgment | 2, 6 |
| | | ☐ 2003 Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ 2004 Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ 2005 Petition/Certificate for Entry of Judgment Unpaid Tax | 2, 8 |
| | | ☐ 2006 Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ 2701 Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints (not specified above) (42) | ☐ 4201 Declaratory Relief Only | 1, 2, 8 |
| | | ☐ 4202 Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ 4203 Other Commercial Complaint Case (non-tort/noncomplex) | 1, 2, 8 |
| | | ☐ 4304 Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation Governance (21) | ☐ 2101 Partnership and Corporation Governance Case | 2, 8 |
| | Other Petitions (not specified above) (43) | ☐ 4301 Civil Harassment with Damages | 2, 3, 9 |
| | | ☐ 4302 Workplace Harassment with Damages | 2, 3, 9 |
| | | ☐ 4303 Elder/Dependent Adult Abuse Case with Damages | 2, 3, 9 |
| | | ☐ 4304 Election Contest | 2 |
| | | ☐ 4305 Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ 4306 Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ 4307 Other Civil Petition | 2, 9 |

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

| SHORT TITLE | CASE NUMBER |
|---|---|
| University of Southern California, et al. v. Coventry, et al. | |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address, which is the basis for the filing location including zip code. (No address required for class action cases.)

| REASON:<br>☐ 1. ☑ 2. ☐ 3. ☐ 4. ☑ 5. ☐ 6. ☐ 7. ☐ 8. ☐ 9. ☐ 10. ☐ 11 | ADDRESS:<br>1500 San Pablo St. | |
|---|---|---|
| CITY:<br>LOS ANGELES | STATE:<br>CA | ZIP CODE:<br>90033 |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code of Civ. Proc., 392 et seq., and LASC Local Rule 2.3(a)(1)(E)]

Dated: __02/27/2025__

_____
(SIGNATURE OF ATTORNEY/FILING PARTY

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.
2. If filing a Complaint, a completed Summons form for issuance by the Clerk.
3. Civil Case Cover Sheet Judicial Council form CM-010.
4. Civil Case Cover Sheet Addendum and Statement of Location form LASC CIV 109 (10/22).
5. Payment in full of the filing fee, unless there is a court order for waiver, partial or schedule payments.
6. A signed order appointing a Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court to issue a Summons.
7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the Summons and Complaint, or other initiating pleading in the case.

CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION

LASC Local Rule 2.3

**HELTON LAW GROUP**
A PROFESSIONAL CORPORATION
CARRIE MCLAIN (State Bar No. 181674)
MIKAELA COX (State Bar No. 316886)
THOMAS YAU (State Bar No. 339222)
ATTORNEY AT LAW
1590 Corporate Drive
Costa Mesa, CA 92626
TELEPHONE: (562) 901-4499
FACSIMILE: (562) 901-4488

ATTORNEYS FOR PLAINTIFF

Electronically FILED by
Superior Court of California,
County of Los Angeles
2/27/2025 7:25 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Ruiz, Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its KECK HOSPITAL OF USC and on behalf of its USC VERDUGO HILLS HOSPITAL,<br><br>Plaintiff,<br><br>vs.<br><br>COVENTRY HEALTH CARE NATIONAL NETWORK, INC.; FIRST CONTINENTAL LIFE & ACCIDENT INSURANCE CO.; FIRST HEALTH GROUP CORP.; and DOES 1 through 25, inclusive,<br><br>Defendants. | Case No.:  25STCV05606<br><br>ASSIGNED TO:<br>DEPT.:<br><br>UNLIMITED - DAMAGES IN EXCESS OF $35,000<br><br>**COMPLAINT FOR DAMAGES FOR:**<br><br>1. **NEGLIGENT MISREPRESENTATION**<br>2. **DECEIT**<br>3. **BREACH OF IMPLIED-IN-FACT CONTRACT**<br>4. **QUANTUM MERUIT**<br>5. **PROMISSORY ESTOPPEL**<br>6. **UNFAIR BUSINESS PRACTICES (CAL. BUS. & PROF. CODE § 17200 et seq.)**<br>7. **BREACH OF WRITTEN CONTRACT**<br>8. **BREACH OF WRITTEN CONTRACT** |

TO ALL INTERESTED PARTIES AND THEIR ATTORNEYS OF RECORD:

1.    Plaintiff UNIVERSITY OF SOUTHERN CALIFORNIA on behalf of its KECK HOSPITAL OF USC and on behalf of its USC VERDUGO HILLS HOSPITAL, (collectively "Plaintiff" or "Hospitals") bring this action against Defendants COVENTRY HEALTH CARE NATIONAL NETWORK, INC., FIRST CONTINENTAL LIFE & ACCIDENT INSURANCE CO., FIRST HEALTH GROUP CORP. and Does 1 through 25 for failure to pay $545,328.90 for hospital services provided to the Patient, who allegedly had health care insurance through Defendants.

**THE PARTIES**

2.    Plaintiff UNIVERSITY OF SOUTHERN CALIFORNIA ("USC") on behalf of its KECK HOSPITAL OF USC ("Keck") and on behalf of its USC VERDUGO HILLS HOSPITAL ("VHH") is a nonprofit public benefit corporation licensed to do business in the State of California, with its principal place of business in the City of Los Angeles, County of Los Angeles. USC owns and operates Keck Hospital of USC and USC Verdugo Hills Hospital, which at all relevant times discussed herein are and have been licensed as acute-care hospitals by the California Department of Public Health ("CDPH").

3.    USC, Keck and Verdugo are referred to herein collectively as "Plaintiff" or "Hospitals."

4.    Plaintiff is informed and believes and, on this basis alleges the following: Defendant COVENTRY HEALTH CARE NATIONAL NETWORK, INC. ("Coventry") is a corporation domiciled, organized and existing under the laws of the State of Delaware.

5.    Plaintiff is informed and believes and, on this basis alleges the following: Defendant FIRST CONTINENTAL LIFE & ACCIDENT INSURANCE CO. ("FCL" or "FIRST CONTINENTAL") is a corporation domiciled, organized and existing under the laws of the State of Utah and licensed to transact insurance in several states and territories. Commencing on or before October 15, 2019, FIRST CONTINENTAL unlawfully acted as an insurance company in California and has, in that capacity unlawfully transacted the business of insurance in California without the requisite certificate of authority.

6.    Plaintiff is informed and believes and, on this basis alleges the following: Defendant FIRST HEALTH GROUP CORP. ("First Health") is a corporation domiciled, organized and existing under the laws of the State of Delaware.

7.    As explained further below, Coventry Health Care National Network, Inc., and its affiliates, including but not limited to First Health Network, (collectively, "Coventry Companies" or "Coventry Company") breached the Coventry Health Care National Network, Inc. Participating Hospital Agreement, effective February 1, 2008, with Keck USC ("Keck USC Agreement") and the Coventry Agreement, effective November 1, 2011, with Verdugo Hills ("Verdugo Hills Agreement").

8.      Plaintiff is unaware of the true names, identities, and capacities of the Defendants sued as Does 1 through 25, inclusive, and each of them as based thereon, sue said defendants by such fictitious names. When their true names and capacities are ascertained, Plaintiff will amend this complaint by inserting their true names and capacities. Plaintiff is informed and believes and alleges that each of the fictitiously named Defendants is responsible in some manner for the occurrences alleged herein, and that the Plaintiff's damages as alleged herein were proximately caused by those Defendants.

9.      Plaintiff is informed and believes and alleges that at all times mentioned, each of the Defendants, including all Defendants sued under fictitious names, were the agent and/or employee of each of the remaining Defendants, and in so doing the things alleged, were acting within the scope of his, her or its agency and employment, and with the permission and consent of the other defendants.

10.     Plaintiff is withholding the full name of the patient addressed in this complaint to preserve the patient's protected rights to privacy concerning health care information. Plaintiff will refer to the patient individually as patient. The Patient's name and claims information have been, and/or will be made available to Defendants upon request consistent with HIPAA and the minimum necessary requirement.

11.     FCL, COVENTRY. FIRST HEALTH, and Does 1 through 25 are collectively referred to herein as "Defendants."

## AGENCY

12.     The Hospitals are informed and believe and thereon allege that at all times mentioned herein, each of the Defendants, including all Defendants sued under fictitious names, were the agent and/or employee of each of the remaining Defendants, including specifically but not limited to FCL and FIRST HEALTH, and in so doing the things alleged herein, were acting within the scope of his or her agency and employment and with the permission and consent of each of the other Defendants.

13.     The Hospitals are informed and believe and thereon alleges that Defendants have entered into an administrative service agreement or other contracts with Administrative Concepts Inc. ("ACI") and Zelis to act as agents for Defendants, and have provided ACI and Zelis actual or ostensible authority to act on Defendants' behalf for: communicating with policyholders and medical

1   providers, such as the Hospitals; creating agreements with medical providers so that Defendant's
2   policy holders may receive medical services; verifying member policy information and eligibility to
3   medical providers, such as the Hospitals, interpreting plan terms and provisions; authorizing services
4   to be provided by the Hospitals to FCL policyholders; determining medical necessity and coverage of
5   services; receiving the Hospitals' claims; processing and administering the Hospitals' claims and
6   appeals; approving or denying the Hospitals' claims and appeals; interpreting policy documents;
7   determining whether and how to pay the Hospitals' claims; issuing payment advices, claim status
8   reports and explanation of benefits ("EOBs") and making and administering payments.

9       14.     With respect to the claims at issue in this case, the Hospitals dealt directly with FCL,
10  ACI, and/or Zelis in obtaining agreements to pay for services, seeking authorization for the services,
11  obtaining eligibility and coverage information, submitting claims for reimbursement, communicating
12  about the claims, appealing the denial or underpayment of the claim, submitting additional information
13  concerning the claim, and receiving explanation of benefits ("EOB").

14                                    **BACKGROUND**
15  **A.     VERDUGO HILLS HOSPITAL CLAIM**
16      15.     In early 2023, Patient was admitted to the Emergency Department at VHH to receive
17  emergency medical services.  Patient presented with a fever, productive cough, chills, nausea,
18  shortness of breath and headache for more than seven days.  While in the ED, the Patient was febrile,
19  tachypneic, tachycardic and hypoxic.

20      16.     The Patient identified to VHH that he was a California resident.  The Patient presented
21  an insurance identification card identifying "Evolve Health" sponsored by the Service Industry Trade
22  Alliance.  The card claims the plan offers "Limited medical benefits underwritten by: First Continental
23  Life and Accident Insurance Company."  The card further identifies First Health as the applicable
24  network and directed providers to submit claims to Administrative Concepts, Inc. ("ACI").

25      17.     On the Patient was admitted, a VHH employee called ACI and verified the Patient's
26  eligibility under the plan.  The following day, the VHH employee phoned ACI again and verified the
27  Patient's insurance type as "PPO."  ACI's employee Joyce Robert provided tracking number
28  EV2022458 and verified the Patient's insurance benefits and coverage as 100% with zero copy and

1  deductible. Ms. Robert further instructed that the hospital fax clinicals to ACI and represented no
2  precertification was required.

3    18.    The Patient was diagnosed with sepsis, Legionnaires' disease, toxic encephalopathy,
4  acute respiratory distress syndrome, and severe sepsis with septic shock. During the stay, the Patient
5  was placed on mechanical ventilation. During the Patient's inpatient stay, VHH provided hospital
6  services with charges totaling $190,521.35.

7    19.    Five (5) days after the Patient was admitted, the Patient's physicians determined the
8  Patient required transfer to a higher level of care for extracorporeal membrane oxygenation (ECMO),
9  which is a method of providing cardiac and respiratory support to a person whose heart and lungs are
10  unable to provide enough oxygen to sustain life. VHH contacted the Transfer Center at Keck to
11  request transfer for a higher level of care.

12    20.    FCL, ACI, and its other co-conspirators (collectively referred to as the "Payors") and/or
13  its agents improperly denied payment for the emergency and post-stabilization hospital services the
14  Hospitals provided.

15    21.    Meanwhile, unbeknownst to Plaintiff, on February 2, 2022, the California Department
16  of Insurance ("CDI") issued a Cease-and-Desist Order that FCL stop operating an insurance plan in
17  California. The Order finds that FCL unlawfully acted as an insurance company in California without
18  the requisite certificate of authority.

19    22.    It is the Plaintiff's understanding this Patient was a California resident during the dates
20  of services at issue. Thus, each of the Payors continued to operate in California in violation of the
21  Cease-and-Desist Order.

22    23.    The Cease-and-Desist Order also instructed First Health Network, its officers, directors,
23  employees, agents, affiliates, and representatives, ordering it to end its business practices aiding and
24  abetting First Continental's unlawful transaction of insurance in California.

25    24.    The Cease-and-Desist Order concludes First Health Network aided and abetted First
26  Continental in violation of California Insurance Code section 703, which makes it a misdemeanor
27  offense to in any manner aid a non-admitted insurer to transact insurance business in California.

28

25. As reflected in the attached exhibits, Defendants' unlawful activities in aiding and abetting FCL's illegal business of insurance in California continued. Specifically, Coventry Company permitted FCL to continue to identify Coventry Company on insurance identification cards in February 2023.

26. Coventry Company also improperly and illegally granted FCL access to rates in the Hospitals' Agreements for one or more of the Hospitals' claims for services provided. In doing so, Coventry Company breached the Keck Agreement and Verdugo Agreement.

27. Additionally, FCL and/or its Agents further engaged in intentional fraud and/or negligent misrepresentation by informing VHH that authorizations were not required pursuant to an alleged insurance policy issued to a California resident in violation of the Cease-and-Desist Order.

28. FCL and/or its Agents have improperly denied VHH's claim citing conflicting reasons for such denial, when the Hospital provided lifesaving emergency services to the Patient while at VHH.

29. Pursuant to the federal Emergency Medical Treatment and Active Labor Act (EMTALA) at 42 USC §1385dd, hospitals are required to provide services to any patient regardless of the patient's ability to pay as long as the services are necessary to stabilize the patient. However, once a patient has been stabilized, a hospital may determine whether to continue to provide services or transfer the Patient to an alternative facility (such as a County Hospital), depending on whether the patient has coverage pursuant to a health care plan or otherwise has the ability to pay.

30. When the Patient was stable, VHH verified the Patient's eligibility with Defendants and notified Defendants of the Patient's admission to the Hospital. VHH requested authorization of the services the Hospital would be providing the Patient and, in so doing, specifically informed that Defendants what type of care and illness the Patient was receiving care for from the Hospital.

31. On more than one occasion after VHH provided the Defendants information regarding the Plaintiff's medical status and clinical care and before the Patient's transfer from VHH to Keck for a higher level of care. The Defendants provided the Hospitals information regarding the Patient's insurance benefits and lack of authorization requirement. The information Defendants provided to the

1  Hospitals did not disclose that the Patient's plan through FCL did not cover charges for the care
2  Patient was and would be receiving.

3       32.    Unbeknownst to the Hospitals, the information the Hospitals provided to the
4  Defendants was sufficient for the Defendants to make a determination that the Hospitals' services
5  were not covered based on information that the Defendants exclusively possessed about the terms of
6  the Patient's insurance plan through FCL.

7       33.    However, at no time before the Patient's discharge from VHH and admission to Keck
8  did the Hospitals know or have any reasonable way of knowing that the Patient's injuries were not
9  covered under the Patient's insurance plan through FCL.

10      34.    Despite these facts, before the Hospitals provided all acute care hospital services to the
11 Patient, Defendants: (1) provided to the Hospitals oral verification of the Patient's eligibility,
12 coverage, and benefits under the Patient's plan through FCL; (2) repeatedly informed VHH that
13 authorization was not required; and (3) requested that the Hospitals provide clinical information
14 regarding the Patient's medical condition.  In making such communications and taking such actions,
15 Defendants expressly and/or impliedly communicated, and the Hospitals reasonably understood
16 Defendants' communications and actions to communicate, that the services the Hospitals provided to
17 the Patient were covered under the Patient's plan through FCL, and thus that Defendants were legally
18 obligated to pay for such services.

19      35.    The Hospitals are informed and believe that in engaging in such communications and
20 taking such actions the Defendants and/or its Agents, were acting within the scope of its agency and
21 employment and with the permission and consent of each of the other Defendants, including
22 specifically, but not limited to, FCL and Coventry Company.

23      36.    The Hospitals would not have provided all of the acute care hospital services that they
24 provided to the Patient without such assurances of payment by Defendants.

25      37.    Additionally, the Defendants caused the Hospitals to reasonably believe that each of the
26 other Defendants were their actual and/or ostensible agents.  Specifically, the Defendants caused the
27 Patient and their family to present member identification cards to the Hospitals identifying each of the
28 Defendants as the entities to contact for information from the Defendants regarding the Patient's

1   eligibility and benefits, and for authorization of services.   Additionally, each of the Defendants
2   provided the other Defendants confidential, private, and protected health information regarding the
3   Patient, which the other Defendants then communicated to Verdugo; the other Defendants would not
4   be entitled to have access to said confidential, private, and protected health information if they were
5   not authorized agents of the Defendants.

6       38.     Ultimately, Verdugo provided acute care hospital services to the Patient with total
7   charges of $190,521.35, with the expected reimbursement of $34,651.66 based on the VHH
8   Agreement rate.

9       39.     Hospitals sent a claim for reimbursement to the Defendants and/or its Agents.   On
10  August 18, 2023, months after the Patient's discharge, Defendants for the first time communicated that
11  the services VHH provided were not covered by the Patient's plan through FCL because of the
12  "exclusion of the alcohol related diagnoses."

13      40.     The Defendants chose to ignore the majority of the Patient's diagnosis such as
14  Legionnaires' disease and acute respiratory distress syndrome and denied the claim in its entirety.

15      41.     To date, Defendants have paid nothing to VHH for such services. Thus, Verdugo has
16  sustained damages in the amount of $34,651.66, plus interest.

17  **B.     KECK HOSPITAL OF USC CLAIM**

18      42.     When the Patient's physicians at VHH determined the Patient required transfer to a
19  higher level of care for extracorporeal membrane oxygenation (ECMO), which is a method of
20  providing cardiac and respiratory support to a person whose heart and lungs are unable to provide
21  enough oxygen to sustain life, VHH contacted the Transfer Center at Keck to request transfer for a
22  higher level of care.

23      43.     Because the Patient was an inpatient at VHH, Keck did financial clearance for the
24  Patient prior to accepting the transfer.   Specifically, Keck called FCL and/or its agents and was
25  informed that Patient had active coverage and no authorization was required.

26      44.     FCL and/or its agents verified the Patient's coverage and benefits.   Keck relied upon
27  such verifications and the plan's participation in the First Health Network/Coventry Company to
28  "financially clear" the Patient prior to accepting the Patient for lateral transfer that same day for non-

EMTALA services.   Keck registered the Patient under "First Health" coverage and expected reimbursement from the plan at the Coventry Company Network rates under the Keck and Verdugo Agreement with Coventry Companies.

45.    Prior to admission, the following health insurance identification card identifying the plan as participating in the Coventry Company network (See Exhibit A - Insurance card attached).

46.    Defendants verified the Patient's coverage and benefits with ACI once again in March 2023, and Keck was told once again that no authorization was required.   Keck relied upon such verifications and the plan's participation in the Coventry Company Network to "financially clear" the Patient prior to accepting the Patient for transfer for higher level of care.   Keck registered the Patient under "First Health" coverage and expected reimbursement from the plan at the Coventry Company rates under the Keck and Verdugo Agreement.

47.    The Hospitals' records indicate at no time prior to or concurrent with the Hospitals' provision of services to the Patient did Payors inform Hospitals that February 14, 2023, was the last day the Patient had insurance coverage. The Hospitals' records indicate Payors further failed to inform Hospitals of any policy exclusions or benefits limitations until months after the Patient discharged from the Hospitals.

48.    The Patient was admitted to Keck for emergency services related to multifocal pneumonia and bacteremia. The Patient was treated at Keck from February into March 2023.

49.    On March 6, 2023, Keck faxed Patient's clinical notes to ACI.

50.    Keck received correspondence from ACI dated April 24, 2023, asking for the toxicology report, admission summary, and discharge summary.

51.    Again, on May 5, 2023, Keck spoke with ACI and was told that Patient was active on the dates of service and was still active.

52.    At no time before the Patient's discharge from Keck did Hospitals know or have any reasonable way of knowing that the Patient's coverage had terminated on February 14, 2023.

53.    Despite these facts, before Keck provided all acute care hospital services to the Patient, Defendants: (1) provided to the Hospitals oral verification of the Patient's eligibility, coverage, and benefits under the Patient's plan through FCL; (2) repeatedly informed Keck that authorization was

not required; and (3) requested that the Hospitals provide clinical information regarding the Patient's medical condition. In making such communications and taking such actions, Defendants expressly and/or impliedly communicated, and the Hospitals reasonably understood Defendants' communications and actions to communicate, that the Patient had active coverage and the services Keck provided to the Patient were covered under the Patient's plan through FCL, and thus that Defendants were legally obligated to pay for such services.

54.    FCL initially denied payment for both Keck and VHH claims for reimbursement on the basis of an unspecified exclusion for a particular diagnosis. The explanations of benefits, dated May 30, 2023 and September 26, 2023, denying the claims expressly state that the payor accessed the Coventry Company contract rates.

55.    On the EOB dated September 26, 2023, FCL changed the denial reason from denial based on an exclusion to denial based on the termination of Patient's coverage starting on February 14, 2023.

56.    Months after the Patient's discharge, the Plan Defendants for the first time communicated that the services Keck provided were not covered by the Patient's plan through FCL because the Patient's services were rendered after the Patient insurance had terminated on February 14, 2023.

57.    In all previous communications, Defendants had communicated to Keck that the Patient had active coverage and no authorization was required before Patient's transfer occurred and requested clinical information regarding the Patient. In engaging in such communications and taking such actions, Defendants expressly and/or impliedly communicated, and the Hospitals reasonably understood Defendants' communications and actions to communicate, that the services Keck provided to the Patient were covered under the Patient's plan through FCL.

58.    Keck would not have accepted the transfer of the Patient to its acute rehabilitation hospital, nor would it have provided the acute rehabilitation hospital services that it provided to the Patient without such assurances of payment by Defendants.

59.    Additionally, the Defendants caused Keck to reasonably believe that each of the other Defendants were their actual and/or ostensible agents. Specifically, the Defendants caused the Patient

and their family to present member identification cards to the Hospitals identifying each of the Defendants as the entities to contact for information from the Defendants regarding the Patient's eligibility and benefits, and for authorization of services. Additionally, each of the Defendants provided the other Defendants confidential, private, and protected health information regarding the Patient, which the other Defendants then communicated to the Hospitals; the other Defendants would not be entitled to have access to said confidential, private, and protected health information if they were not authorized agents of the Defendants.

60. FCL, ACI, and its other co-conspirators (collectively referred to as the "Payors") and/or its agents improperly denied payment for the emergency and post-stabilization hospital services the Hospitals provided.

61. Meanwhile, unbeknownst to Hospitals, on February 2, 2022, the California Department Insurance issued a Cease-and-Desist Order that FCL stop operating an insurance plan in California. The Order finds that FCL unlawfully acted as an insurance company in California without the requisite certificate of authority.

62. It is the Hospitals' understanding this Patient was a California resident during the dates of services at issue. Thus, each of the Payors continued to operate in California in violation of the Cease-and-Desist Order.

63. The Cease-and-Desist Order also instructed Coventry Companies, First Health Network, its officers, directors, employees, agents, affiliates, and representatives, ordering it to end its business practices aiding and abetting First Continental's unlawful transaction of insurance in California.

64. The Cease-and-Desist Order concludes First Health Network aided and abetted First Continental in violation of California Insurance Code section 703, which makes it a misdemeanor offense to in any manner aid a non-admitted insurer to transact insurance business in California.

65. As reflected in the attached exhibits, Coventry Company's unlawful activities in aiding and abetting FCL's illegal business of insurance in California continued. Specifically, Coventry Company permitted FCL to continue to identify Coventry Company on insurance identification cards in February 2023.

66.    Coventry Company also improperly and illegally granted FCL access to rates in the Hospitals' Agreements for one or more of the Hospitals' claims for services provided in February 2023. In doing so, Coventry Company breached the Keck Agreement and Verdugo Agreement.

67.    Ultimately, Keck provided acute rehabilitation hospital services to the Patient with total charges of $785,657.29, with the expected reimbursement of $510,677.24 from the plan at the Coventry Company rates under the Keck and Verdugo Hills Agreement.

68.    To date, Defendants have paid nothing to the Hospital for such services. Thus, the Hospital has sustained damages in the amount of $510,677.24, plus interest.

## FIRST CAUSE OF ACTION

## NEGLIGENT MISREPRESENTATION

## (AS TO ALL DEFENDANTS)

69.    The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

70.    Prior to the Hospitals agreeing to accept the admission of the Patient and/or providing post-stabilization care to the Patient in their hospitals, Defendants expressly and/or impliedly represented that no pre-authorization was required, and the hospital services the Hospitals would be providing the Patient were covered under the Patient's PPO medical insurance plan through FCL, and thus that Defendants were legally obligated to pay for such services.

71.    The Patient identified to Hospitals that he was a California resident.   The Patient presented an insurance identification card identifying "Evolve Health" sponsored by the Service Industry Trade Alliance.   The card claims the plan offers "Limited medical benefits underwritten by: First Continental Life and Accident Insurance Company."   The card further identifies First Health as the applicable network and directed providers to submit claims to Administrative Concepts, Inc. (See Exhibit A - Insurance card attached).

72.    The Hospitals would not have admitted the Patient for post-stabilization services at VHH, and Keck would not have accepted transfer of the Patient to its hospital for higher level of care or provided acute care hospital services to the Patient without such assurances by Defendants.

73.     Prior to each of Defendants' representations, the Hospitals had informed Defendants that the Patient was being treated for sepsis, Legionnaires' disease, toxic encephalopathy, acute respiratory distress syndrome, and severe sepsis with septic shock.

74.     Thus, at the time Defendants made their representations, they were not true, and Defendants had no reasonable grounds for believing the representations to be true when they made them because the Patient's plan through ACI did either not cover charges due to the plan exclusions and/or being rendered after the Patient's coverage had been terminated.

75.     The Hospitals are informed and believe that in engaging in such communications and taking such actions each of the Defendants was the agent and/or employee of each of the remaining Defendants, including specifically but not limited to FCL and Coventry Companies and/or their agents, and in engaging in such communications and taking such actions, were acting within the scope of its agency and employment and with the permission and consent of each of the other Defendants, including specifically, but not limited to, FCL and Coventry Company.

76.     Additionally, Defendants are also liable to the Hospitals in failing to maintain license and certification in compliance with California law, and wrongful denial of coverage.  FCL, ACI and its other co-conspirators (collectively referred to as the "Payors") engaged in a series of communications and conduct that constitute intentional fraud and/or negligent misrepresentation, including but not limited to: 1) engaging in the business of insurance without a license or certification under California law; 2) issuing to a California resident an insurance policy that fails to not comply with California law;  3) verifying the Patient's coverage and benefits in February 2023, (prior to admission at VHH), and again in February 2023, (prior to admission at Keck) without disclosing the Patient's policy ended that very day, the policy exclusions, and the benefits limitations;  and 4) engaging in communications and conduct on and after February 14, 2023, causing Keck to believe the Patient's coverage remained active.

77.     Defendants failed to inform Hospitals of any policy exclusions or benefits limitations until months after the Patient discharged from the Hospitals.

78.     Defendants also failed to inform Hospitals that, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist Order to FCL ordering it to end its unlawful

1   transaction of insurance in California.   The Order further orders ACI, Coventry Company, and
2   coconspirators to stop aiding and abetting FCL's unlawful practices. (See Exhibit B - Cease and Desist
3   Order). The Order finds that FCL unlawfully acted as an insurance company in California without the
4   requisite certificate of authority. The Order identifies multiple violations by FCL, including
5   misrepresentation of fixed-benefit indemnity insurance as "health insurance" in violation of Insurance
6   Code sections 106(b)(2), 780(a), 781 and 790.03(b). CDI cited, as grounds for finding that First Health
7   aided and abetted FCL's illegal conduct, the appearance of the First Health Network logo on health
8   insurance identification cards virtually identical to the ones the Patient presented to the Hospitals.
9   (*See*, e.g., id., p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11).  The Order concludes ACI and
10  First Health Network aided and abetted FCL in violation of California Insurance Code section 703,
11  which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact
12  insurance business in California. (*Id.* at 21, lines 4-7). The Order commanded ACI., First Health and
13  other coconspirators to cease and desist their unlawful activities.

14      79.     Payors' unlawful activities in aiding and abetting FCL's illegal business of insurance in
15  California continued.  Specifically, FCL and/or ACI verified to the Hospitals on multiple occasions
16  that the Patient had active health insurance coverage through FCL. Payors continued to identify
17  Coventry Company on the Patient's insurance identification cards in February 2023. Coventry
18  Company also improperly and illegally granted FCL access to rates in the Hospitals' Agreements for
19  one or more of the Hospitals' claims for services provided in February 2023.  Such conduct constitutes
20  unfair and deceptive acts or practices in the business of insurance, in violation of California Insurance
21  Code sections 790.02 and 790.03(b).

22      80.     Additionally, the fixed-benefit indemnity insurance FCL issued to the California-
23  resident Patient fails to comply with California essential benefit requirements, and in and of itself
24  constitutes a breach of the Coventry Company's Agreement with Keck and VHH. Under California
25  law, "where a contract confers on one party a discretionary power affecting the rights of the other, a
26  duty is imposed to exercise that discretion in good faith and in accordance with fair dealing."
27  *California Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 484.  "[I]nsurance coverage is
28  interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary

1  clauses are interpreted narrowly against the insurer." *MacKinnon v. Truck Ins. Exchange* (2003) 31
2  Cal.4th 635, 648, 3 Cal.Rptr.3d 228 (internal quotations and alterations omitted).

3      81.    Defendants intended that the Hospitals rely upon Defendants' representations.

4      82.    The Hospitals reasonably relied on Defendants' representations by continuing to care
5  for the Patient rather than seeking the Patient's transfer to another hospital facility.

6      83.    The Hospitals were harmed.  Specifically, the Hospitals provided the Patient medically
7  necessary and physician-ordered acute care hospital services with total charges of $976,178.64. The
8  Hospitals expected reimbursement at the Coventry Company contract rate of $545,328.90.    The
9  Hospitals have received no payment from the Defendants for the lifesaving and medically necessary
10 care provided to the Patient.  Thus, the Hospitals have been damaged in an amount not less than
11 $545,328.90, plus interest.

12     84.    The Hospitals' reliance on Defendants' representations was a substantial factor in
13 causing the Hospital's harm.

**SECOND CAUSE OF ACTION**

**DECEIT**

**(AS TO ALL DEFENDANTS)**

17     85.    The Hospitals re-allege and incorporate by reference each and every allegation set forth
18 above.

19     86.    Defendants provided to the Hospitals written and oral verification of the Patient's
20 eligibility, coverage, and benefits under the Patient's plan through FCL, repeatedly informed Hospitals
21 that no authorization was required for the Hospitals' provision of services to the Patient, participated
22 in decisions regarding the Patient's medical care and requested that the Hospitals provide clinical
23 information regarding the Patient's medical condition.  In engaging in such communications and
24 taking such actions, Defendants expressly and/or impliedly communicated, and the Hospitals
25 reasonably understood Defendants' communications and actions to communicate, that the services the
26 Hospitals would be providing to the Patient were covered under the Patient's plan through FCL, and
27 thus that FCL and Coventry Company were legally obligated to pay for such services.

28

87.    The Hospitals would not have provided all of the acute care hospital services they provided to the Patient without such assurances by Defendants.

88.    Defendants did not communicate that the Patient's plan through FCL either did not cover charges or were incurred while Patient's plan had terminated. Thus, the disclosures Defendants made were deceptive.

89.    Defendants intentionally failed to disclose the fact that the Patient's plan through FCL did not cover the Patient's care and, thus, that FCL and Coventry Company would not pay the Hospitals for the services provided to the Patient.  Such facts were known only to Defendants and Hospitals could not have discovered them.

90.    Additionally, Defendants are also liable to the Hospitals in failing to maintain license and certification in compliance with California law, and wrongful denial of coverage.  FCL, ACI and its other co-conspirators (collectively referred to as the "Payors") engaged in a series of communications and conduct that constitute intentional fraud and/or negligent misrepresentation, including but not limited to: 1) engaging in the business of insurance without a license or certification under California law; 2) issuing to a California resident an insurance policy that fails to not comply with California law;  3) verifying the Patient's coverage and benefits in February 2023, (prior to admission at VHH), and again in February 2023, (prior to admission at Keck) without disclosing the Patient's policy ended that very day, the policy exclusions, and the benefits limitations; and 4) engaging in communications and conduct on and after February 14, 2023, causing Keck to believe the Patient's coverage remained active.

91.    Defendants failed to inform Hospitals of any policy exclusions or benefits limitations until months after the Patient discharged from the Hospitals.

92.    Defendants also failed to inform Hospitals that, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist Order to FCL ordering it to end its unlawful transaction of insurance in California.  The Order further orders ACI, Coventry Companies, and coconspirators to stop aiding and abetting FCL's unlawful practices. The Order finds that FCL unlawfully acted as an insurance company in California without the requisite certificate of authority. The Order identifies multiple violations by FCL, including misrepresentation of fixed-benefit

1    indemnity insurance as "health insurance" in violation of Insurance Code sections 106(b)(2), 780(a),

2    781 and 790.03(b). CDI cited, as grounds for finding that Coventry Company aided and abetted FCL's

3    illegal conduct, the appearance of the First Health Network logo on health insurance identification

4    cards virtually identical to the ones the Patient presented to the Hospitals. (*See*, e.g., id., p. 7, lines 11-

5    21; p. 9, lines 7-14, and p. 10, lines 4-11). The Order concludes ACI and First Health Network aided

6    and abetted FCL in violation of California Insurance Code section 703, which makes it a misdemeanor

7    offense to in any manner aid a nonadmitted insurer to transact insurance business in California. (Id. at

8    21, lines 4-7). The Order commanded ACI, First Health and other coconspirators to cease and desist

9    their unlawful activities.

10       93.    Payors' unlawful activities in aiding and abetting FCL's illegal business of insurance in

11   California continued. Specifically, FCL and/or ACI verified to the Hospitals on multiple occasions

12   that the Patient had active health insurance coverage through FCL. Payors continued to identify First

13   Health Network on the Patient's insurance identification cards in February 2023. Coventry Company

14   also improperly and illegally granted FCL access to rates in the Hospitals' Agreement with Coventry

15   Company. Such conduct constitutes unfair and deceptive acts or practices in the business of insurance,

16   in violation of California Insurance Code sections 790.02 and 790.03(b).

17       94.    The fixed-benefit indemnity insurance FCL issued to the California-resident Patient

18   fails to comply with California essential benefit requirements, and in and of itself constitutes a breach

19   of the Coventry Company Agreement with Hospitals. Under California law, "where a contract confers

20   on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that

21   discretion in good faith and in accordance with fair dealing." *California Lettuce Growers v. Union*

22   *Sugar Co.* (1955) 45 Cal.2d 474, 484. "[I]nsurance coverage is interpreted broadly so as to afford the

23   greatest possible protection to the insured, whereas exclusionary clauses are interpreted narrowly

24   against the insurer." *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648, 3 Cal.Rptr.3d 228

25   (internal quotations and alterations omitted).

26       95.    The Hospitals are informed and believe that in engaging in such communications and

27   taking such actions each of the Defendants was the agent and/or employee of each of the remaining

28   Defendants, including specifically but not limited to FCL and Coventry Company, and in engaging in

1  such communications and taking such actions, were acting within the scope of its agency and

2  employment and with the permission and consent of each of the other Defendants, including

3  specifically, but not limited to, FCL and Coventry Company.

4      96.    The Hospitals did not know of the concealed facts at any time before the Patient was

5  discharged from the Hospitals.

6      97.    Defendants intended to deceive the Hospitals by concealing these facts.

7      98.    The Hospitals reasonably relied on Defendants' deception by continuing to care for the

8  Patient rather than seeking the Patient's transfer to another hospital facility.

9      99.    The Hospitals were harmed.  Specifically, the Hospitals provided the Patient medically

10  necessary and physician-ordered acute care hospital services with total charges of $976,178.64. The

11  Hospitals expected reimbursement at the Coventry Company contract rate of $545,328.90.    The

12  Hospitals have received no payment from the Defendants for the lifesaving and medically necessary

13  care provided to the Patient.  Thus, the Hospitals have been damaged in an amount not less than

14  $545,328.90, plus interest.

15      100.    Defendants' concealment was a substantial factor in causing the Hospitals' harm.

16  **THIRD CAUSE OF ACTION**

17  **BREACH OF IMPLIED-IN-FACT CONTRACT**

18  **(AS TO ALL DEFENDANTS)**

19      101.    The Hospitals re-allege and incorporate by reference each and every allegation set forth

20  above.

21      102.    The Patient identified to Hospitals that he was a California resident.    The Patient

22  presented an insurance identification card identifying "Evolve Health" sponsored by the Service

23  Industry Trade Alliance.  The card claims the plan offers "Limited medical benefits underwritten by:

24  First Continental Life and Accident Insurance Company."  The card further identifies First Health as

25  the applicable network and directed providers to submit claims to Administrative Concepts, Inc.

26      103.    Prior to providing acute care hospital services to the Patient, the Hospitals notified the

27  Defendants of the Patient's inpatient admission and verified the Patient's eligibility, coverage, and

28  benefits with the Defendants and or their agents.

104.    Defendants provided to the Hospitals written and oral verification of the Patient's eligibility, coverage, and benefits under the Patient's plan through FCL, repeatedly informed Hospitals that no authorization was required for the Hospital's provision of services to the Patient

105.    On numerous occasions, Defendants requested from the Hospitals clinical information regarding the Patient's medical condition.  In engaging in such communications and taking such actions, Defendants expressly and/or impliedly communicated, and the Hospitals reasonably understood Defendants' communications and actions to communicate, that the services the Hospitals would be providing to the Patient were covered under the Patient's plan through FCL, and thus that FCL and Coventry Company were legally obligated to pay for such services.

106.    The Hospitals reasonably understood the actions and communications by Defendants to constitute an express and/or implied request by Defendants that the Hospitals provide services to the Patient and an agreement by Defendants to pay the Hospitals for such requested services.

107.    The Hospitals are informed and believe that in engaging in such communications and taking such actions each of the Defendants was the agent and/or employee of each of the remaining Defendants, including specifically but not limited to FCL and Coventry Company, and in engaging in such communications and taking such actions, were acting within the scope of its agency and employment and with the permission and consent of each of the other Defendants, including specifically, but not limited to, FCL and Coventry Company.

108.    Additionally, the Cease-and-Desist Order concludes Coventry Company aided and abetted FCL in violation of California Insurance Code Section 703, which makes it a misdemeanor offense to in any manner aid a non-admitted insurer to transact insurance business in California.

109.    As reflected in the attached exhibits, Coventry Company's unlawful activities in aiding and abetting FCL's illegal business of insurance in California continued.  Specifically, Coventry Company permitted FCL to continue to identify Coventry Company on insurance identification cards in February 2023.

110.    Coventry Company improperly and illegally granted FCL access to rates in the Hospitals' Agreements for one or more of the Hospitals' claims for services provided. In doing so, Coventry Company breached the Keck Agreement and Verdugo Agreement.

111.    The conduct of Defendants gave rise to an implied-in-fact contract between the Hospitals and Defendants to pay for the care and treatment rendered by the Hospitals to the Patient.

112.    The Hospitals performed all of its obligations under its implied contract with Defendants.    Specifically, the Hospitals provided medically necessary and physician-ordered acute care hospital services to the Patient with total charges of $976,178.64.

113.    The Hospitals submitted complete claims to Defendants for payment.    Defendants failed to pay the Hospitals for the services rendered to the Patient.

114.    Defendants have paid nothing to the Hospitals for these services.

115.    Defendants have breached the implied-in-fact contract by failing to pay the Hospitals the full amounts owed to the Hospitals for the medically necessary services provided to the Patient.

116.    The Hospitals expected reimbursement at the Coventry Company contract rate of $545,328.90. As a result of this breach, the Hospitals have received no payment from the Defendants for the lifesaving and medically necessary care provided to the Patient.    Thus, the Hospitals have been damaged in an amount not less than $545,328.90, plus interest.

### FOURTH CAUSE OF ACTION

### QUANTUM MERUIT

### (AS TO ALL DEFENDANTS)

117.    The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

118.    As alleged herein, the Hospitals believe they are entitled to full and complete payment from the Defendants in accordance with the written and implied-in-fact contracts.    However, to the extent the written or implied-in-fact contracts alleged do not apply and/or are deemed unenforceable against the Defendants for any of the services at issue, the Hospitals allege in the alternative that the Defendants owe the Hospitals for these services based on *quantum meruit*.

119.    Defendants expressly and/or impliedly requested that the Hospitals provide emergent and acute care hospital services to the Patient in circumstances that gave rise to the Hospitals' reasonable belief that Defendants would pay for such services.

120.   Thereafter, the Hospitals provided such services to the Patient pursuant to such Requests and communications.

121.   The Hospitals' provision of said medical services to the Patient was intended to and, in fact, benefited Defendants.

122.   The reasonable value of the services the Hospitals provided to the Patient at the express and/or implied requests of the Defendants is $976,178.64.

123.   Defendants have paid nothing to the Hospitals for these services.

124.   Thus, the Hospitals are entitled to *quantum meruit* recovery in the amount of $545,328.90, plus statutory interest.

## FIFTH CAUSE OF ACTION

### PROMISSORY ESTOPPEL

### (AS TO ALL DEFENDANTS)

125.   The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

126.   Prior to the Hospitals' providing hospital services to the Patient, the Defendants informed Hospitals that the Patient had active coverage and no preauthorization was required for the services the Hospitals would provide the Patient.

127.   In so doing, Defendants knew and/or should have known that Hospitals would be reasonably induced to rely on their representations by providing hospital services to the Patient, and refraining from taking other action, such as seeking to transfer the Patient to another facility.

128.   Hospitals reasonably relied on the communications and conduct of Defendants by providing lifesaving and medically necessary hospital services to the Patient with total charges of $976,178.64, and refraining from taking other action, such as seeking to transfer the Patient to another facility.

129.   Defendants have paid nothing to the Hospitals for the services provided to the Patient.

130.   As a proximate result of the failure of Defendants to perform according to the representations that they made to the Hospitals, the Hospitals have been damaged in the amount of $545,328.90 (pursuant to the Coventry Company contract rates), plus interest.

131.    Justice requires that the promises of Defendants be enforced.

## SIXTH CAUSE OF ACTION

## UNFAIR BUSINESS PRACTICES

## (CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200)

## (AS TO ALL DEFENDANTS)

132.    The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

133.    California Business & Professions Code §17200 provides that "unfair competition shall mean and include any unlawful, unfair, or fraudulent business act or practice."

134.    Defendants have utilized unfair business acts and practices that are designed to preclude Plaintiff from obtaining proper reimbursement for the services that they provided to the Patient, a member of Defendants' health service plans.

135.    These unfair acts and practices are in violation of the Knox-Keene Act, the regulations promulgated thereunder, and the Unfair Business Practices Act.

136.    California Business & Professions Code §17200 provides that "unfair competition shall mean and include any unlawful, unfair, or fraudulent business act or practice."

137.    The Knox-Keene Act requires health plans to pay health care providers on a timely, reasonable and fair basis, and not to engage in unfair payment patterns.

138.    Based on information and belief, beginning on an exact date unknown to the Hospitals, but within two years preceding the filing of this complaint, Defendants engaged in the following unlawful, unfair and/or fraudulent conduct:

    a.  Failing to timely and fully reimburse the claim, including accrued interest, for the Patient in violation of 28 Cal. Code Reg. § 1300.71;

    b.  Failing to issue payment to Hospitals for emergency medical services pursuant to Health and Safety Code section 1371.4(b);

    c.  Deliberately misleading the Hospitals in believing that the patient had insurance coverage, the services were covered, and no authorization was required;

d. Routinely and systematically using methodologies designed to deny claims based on coverage exclusions for Defendants' own financial benefit;

e. Failing to reimburse claims citing nothing more than an unknown and arbitrary Standards;

f. Intentionally failing to disclose the fact that the Patient's plan through FCL did not cover the Patient's care and, thus, that Payors would not pay the Hospitals for the services provided to the Patient. Such facts were known only to Defendants and the Hospitals could not have discovered them;

g. Failing to maintain license and certification in compliance with California law;

h. Engaging in the business of insurance without a license or certification under California law;

i. Issuing to a California resident an insurance policy that fails to comply with California law;

j. Verifying the Patient's coverage and benefits in February 2023, (prior to admission at VHH), and again in February 2023, (prior to admission at Keck) without disclosing the Patient's policy ended that very day, the policy exclusions, and the benefits limitations;

k. Engaging in communications and conduct on and after February 14, 2023, causing Keck to believe the Patient's coverage remained active;

l. Failing to inform Hospitals of any policy exclusions or benefits limitations until months after the Patient discharged from the Hospitals;

m. Failing to inform Hospitals that, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist Order to FCL ordering it to end its unlawful transaction of insurance in California. The Order further orders ACI, First Health, and coconspirators to stop aiding and abetting FCL's unlawful practices[1].

---

[1] The Order finds that FCL unlawfully acted as an insurance company in California without the requisite certificate of authority. The Order identifies multiple violations by FCL, including misrepresentation of fixed-benefit indemnity insurance as "health insurance" in violation of Insurance Code sections 106(b)(2), 780(a), 781 and 790.03(b). CDI cited, as grounds for finding that First Health aided and abetted FCL's illegal conduct, the appearance of the First Health Network

n. Coventry Company's unlawful activities in aiding and abetting FCL's illegal business of insurance in California. Specifically, FCL and/or ACI verified to the Hospitals on multiple occasions that the Patient had active health insurance coverage through FCL. Payors continued to identify First Health Network on the Patient's insurance identification cards in February 2023;

o. Coventry Company improperly and illegally granting FCL access to rates in the Hospitals' Agreements. Such conduct constitutes unfair and deceptive acts or practices in the business of insurance, in violation of California Insurance Code sections 790.02 and 790.03(b); and is breach of the Agreement between Coventry Company and Hospitals; and

p. FCL improperly issued a fixed-benefit indemnity insurance to the California - resident Patient failing to comply with California essential benefit requirements, and in and of itself constitutes a breach of the Coventry Company Agreement with Hospitals[2].

139. Defendants' conduct constitutes unlawful, unfair, and fraudulent business practices under California Business & Professions Code sections 17200, et seq.

140. The Hospitals suffered injury-in-fact when Defendants failed to properly and timely pay the Hospitals' claims for the medically necessary and physician-ordered services provided to the Patient.

141. Plaintiff has standing to bring this claim pursuant to California Business & Professions Code §17204 on the grounds stated herein, because Plaintiff has suffered injury-in-fact and lost money

---

logo on health insurance identification cards virtually identical to the ones the Patient presented to the Hospitals. (See Ex. B., p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11). The Order concludes ACI and First Health Network aided and abetted FCL in violation of California Insurance Code section 703, which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact insurance business in California. (Id. at 21, lines 4-7). The Order commanded ACI., First Health and other coconspirators to cease and desist their unlawful activities.

[2] Under California law, "where a contract confers on one party a discretionary power affecting the rights of the other, a duty is imposed to exercise that discretion in good faith and in accordance with fair dealing." *California Lettuce Growers v. Union Sugar Co.* (1955) 45 Cal.2d 474, 484. "[I]nsurance coverage is interpreted broadly so as to afford the greatest possible protection to the insured, whereas exclusionary clauses are interpreted narrowly against the insurer." *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 648, 3 Cal.Rptr.3d 228 (internal quotations and alterations omitted). '

1   and/or property as the result of Defendants' refusal to pay for medical services the Hospitals provided

2   to the Patient, a member of FCL's health plan.

3       142.    As a direct and proximate result of Defendants' wrongful acts, the Hospitals have

4   suffered and will continue to suffer substantial pecuniary losses and irreparable injury-in-fact.

5       143.    Plaintiff is informed and believes that Defendants will continue their ongoing unfair

6   business practices toward Plaintiffs if not enjoined from doing so.

7       144.    The equitable remedies under California Business & Professions Code §17200, are

8   subject to the broad discretion of the Court (*Hambrick v. Healthcare Partners Medical Group, Inc.*,

9   (2015) 238 Cal. App. 4th). As a direct and proximate result of the Plan's wrongful, misleading, and

10   illegal acts, Hospitals have suffered substantial pecuniary losses and irreparable injury-in-fact. Under

11   California Business & Professions Code §17200, said violations render Defendants liable to Hospitals

12   for restitution and injunctive relief to restore Hospitals' money which the Plan acquired by means of

13   such unfair business practices, plus statutory interest.

14       145.    Plaintiff also seeks restitution and disgorgement of an amount to be proven at trial,

15   which is the amount that Defendants improperly received and retained that they were obligated to pay

16   the Hospitals for the services provided, plus any statutory penalties and/or attorneys' fees as available

17   **SEVENTH CAUSE OF ACTION**

18   **BREACH OF WRITTEN CONTRACT**

19   **(AS TO ALL DEFENDANTS)**

20       146.    The Hospitals re-allege and incorporate by reference each and every allegation set forth

21   above.

22       147.    Prior to providing hospital services to the Patient, the Hospitals notified the Defendants

23   of the Patient's inpatient admission and verified the Patient's eligibility, coverage, and benefits with

24   the Defendants and/or their agents.

25       148.    The Patient's insurance card lists entities Evolve Health, First Health Network, First

26   Continental Life and Accident Insurance Company, and Administrative Concepts Inc. (See Ex. A).

27       149.    The Patient's insurance card is almost identical to the insurance card identified in the

28   Cease-and-Desist order (See Ex. B). Evolve Health is an unlicensed entity, First Heath Network is an

1  unlicensed entity[3], First Continental Life & Accidental Insurance is a non-admitted insurer, and

2  Administrative Concepts, Inc. is a non-resident Registered Administrator.

3      150.    Keck relied upon the plan's participation in Coventry Company to "financially clear"

4  the Patient in February 2023, prior to accepting the Patient for lateral transfer that same day for non-

5  EMTALA services. Keck registered the Patient under "First Health" coverage and expected

6  reimbursement from Defendants at the Coventry Company network rates under the Keck Agreement.

7      151.    Defendants provided to Keck written and oral verification of the Patient's eligibility,

8  coverage, and benefits under the Patient's plan through FCL, and repeatedly informed Keck that no

9  authorization was required for the Hospital's provision of services to the Patient

10     152.    On numerous occasions, Defendants requested from Keck clinical Information

11  regarding the Patient's medical condition.  In engaging in such communications and taking such

12  actions, Defendants expressly and/or impliedly communicated, and Keck reasonably understood

13  Defendants' communications and actions to communicate, that the services Keck would be providing

14  to the Patient were covered under the Patient's plan through FCL, and thus that Defendants were

15  legally obligated to pay for such services.

16     153.    Defendants' unlawful activities in aiding and abetting FCL's illegal business of

17  insurance in California continued.  Specifically, Defendants permitted FCL to continue to identify

18  First Health Network on insurance identification cards in February 2023. (See Ex. A).  Defendants

19  also improperly and illegally granted First Continental access to rates in the Keck Agreement for the

20  Hospital's claims for reimbursement for services provided to the Patient.

21     154.    Defendants breached the Keck Agreement.  Specifically, Section 3.3 of the Keck

22  Agreement provides, in pertinent part:

23

24  [3] Unbeknownst to the Hospitals, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist
    Order to First Health Network, its officers, directors, employees, agents, affiliates, and representatives, ordering it to end its
25  business practices aiding and abetting First Continental's unlawful transaction of insurance in California. Ex. B. The
    Order finds that First Continental unlawfully acted as an insurance company in California without the requisite certificate of
26  authority. *Id.*, p. 4, lines 10-15. CDI cited, as grounds for finding that First Health aided and abetted First Continental's
    illegal conduct, the appearance of the First Health Network logo on health insurance identification cards virtually identical
27  to the ones the Patient presented to the Hospitals. *See, e.g., id.*, p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11. The
    Order concludes First Health Network aided and abetted First Continental in violation of California Insurance Code section
28  703, which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact insurance business in
    California. *Id.* at 21, lines 4-7. The Order commanded First Health to cease and desist its unlawful activities.

**Non-Coventry Payors.** When a Coventry Company is not the Payor, the Payor, not Coventry or a Coventry Company, shall have the obligation and liability to Hospital with respect to any claim or fee for health care services relating to or arising under the Agreement. *Coventry shall, however, require each Payors to comply with applicable state and federal laws and regulations and the relevant terms and conditions of this Agreement.*

155.    Coventry Company breached Section 3.3 by failing to require FCL to comply with California Insurance law.

156.    Per Section 6.11 of the Keck Agreement, the Agreement shall be governed by the laws of the State of California. Furthermore, Section 3.4 of the Keck Agreement provides, in pertinent part:

**Compliance with Law.** Coventry and Coventry Companies agree to comply with all applicable … state … laws and the directives of applicable agencies, and regulations of CMS, any other oversight agencies and in the state(s) in which Coventry Company operates, including, without limitation, requirements that shall cause or require Coventry Company Coventry [sic] to amend the terms and conditions of the Agreement. Coventry Companies understand and agree that CMS and the appropriate State agencies may change or add to such requirements, laws, rules, and regulations from time to time.

Defendants breached the Keck Agreement by aiding and abetting First Continental insurer to transact insurance business in California in violation of California Insurance Code section 703. Defendants further breached the Keck Agreement by failing to comply with CDI's Cease-and-Desist Order.

157.    Defendants also breached Section 3.5 of the Keck Agreement by failing to require FCL maintain the necessary licenses and certifications to transact insurance business in California. Defendants further breached Section 3.5 by failing to notify Hospitals of CDI's Cease-and- Desist Order.

158.    Keck submitted a complete claim to Defendants for payment. Defendants failed to pay Keck for the services rendered to the Patient.

159.    Defendants have paid nothing to the Hospital for these services.

160.    Defendants' breaches of contract damaged Keck by denying it full reimbursement for the claims at issue at the rates under the Keck Agreement. Keck is entitled to recover from Defendants $510,677.24, the expected reimbursement under the Keck Agreement, plus statutory interest.

///

///

## EIGHTH CAUSE OF ACTION

### BREACH OF WRITTEN CONTRACT

### (AS TO COVENTRY COMPANY AND DOES 1-25)

161.    The Hospitals re-allege and incorporate by reference each and every allegation set forth above.

162.    Prior to providing hospital services to the Patient, VHH notified the Defendants of the Patient's inpatient admission and verified the Patient's eligibility, coverage, and benefits with the Defendants and or their agents.

163.    The Patient's insurance card lists entities Evolve Health, First Health Network, First Continental Life and Accident Insurance Company, and Administrative Concepts Inc. (See Ex. A).

164.    Patient's insurance card is almost identical to the insurance card identified in the Cease-and-Desist order (See Ex. B). Evolve Health is an unlicensed entity, First Heath Network is an unlicensed entity[4], First Continental Life and Accidental Insurance is a non-admitted insurer, and Administrative Concepts, Inc. is a non-resident Registered Administrator.

165.    VHH registered the Patient under "First Health" coverage and expected reimbursement from the plan at the Coventry Company network rates under the Verdugo Agreement.

166.    FCL and/or its agents provided to VHH written and oral verification of the Patient's eligibility, coverage, and benefits under the Patient's plan through FCL, and repeatedly informed VHH that no authorization was required for the Hospital's provision of services to the Patient

167.    On numerous occasions, FCL and/or its agents requested from VHH clinical Information regarding the Patient's medical condition.    In engaging in such communications and taking such actions, Defendants expressly and/or impliedly communicated, and VHH reasonably

---

[4] Unbeknownst to the Hospitals, on February 2, 2022, the California Department of Insurance issued a Cease-and-Desist Order to First Health Network, its officers, directors, employees, agents, affiliates, and representatives, ordering it to end its business practices aiding and abetting First Continental's unlawful transaction of insurance in California. Ex. B. The Order finds that First Continental unlawfully acted as an insurance company in California without the requisite certificate of authority. *Id.*, p. 4, lines 10-15. CDI cited, as grounds for finding that First Health aided and abetted First Continental's illegal conduct, the appearance of the First Health Network logo on health insurance identification cards virtually identical to the ones the Patient presented to the Hospitals. *See, e.g., id.*, p. 7, lines 11-21; p. 9, lines 7-14, and p. 10, lines 4-11. The Order concludes First Health Network aided and abetted First Continental in violation of California Insurance Code section 703, which makes it a misdemeanor offense to in any manner aid a nonadmitted insurer to transact insurance business in California. *Id.* at 21, lines 4-7. The Order commanded First Health to cease and desist its unlawful activities.

1  understood Defendants' communications and actions to communicate, that the services VHH would be

2  providing to the Patient were covered under the Patient's plan through FCL, and thus that Defendants

3  were legally obligated to pay for such services.

4      168.    Defendants' unlawful activities in aiding and abetting FCL's illegal business of

5  insurance in California continued.   Specifically, Defendants permitted FCL to continue to identify

6  First Health Network on insurance identification cards in February 2023.  (See Ex. A).  Defendants

7  also improperly and illegally granted First Continental access to rates in the VHH Agreement for

8  VHH's claim for reimbursement for services provided to the Patient.

9      169.    Defendants breached the Verdugo Agreement by failing to require FCL maintain the

10  necessary licenses and certifications to transact insurance business in California.  Defendants further

11  breached Section 3.5 by failing to notify Hospitals of CDI's Cease-and- Desist Order.

12     170.    VHH submitted complete claims to Defendants for payment.  Defendants failed to pay

13  VHH for the services rendered to the Patient.

14     171.    Defendants have paid nothing to VHH for these services.

15     172.    Defendants' breaches of contract damaged VHH by denying it reimbursement for the

16  claims at issue at the rates under the Verdugo Agreement.  VHH is entitled to recover from Defendants

17  $34,651.66, the expected reimbursement under the VHH Agreement, plus statutory interest.

18                              **PRAYER FOR RELIEF**

19     WHEREFORE, Plaintiff prays for relief as set forth below:

20     1.    For damages and payment in amounts according to proof at trial;

21     2.    For *quantum meruit* in the amount according to proof at trial;

22     3.    For injunctive relief from unfair business practices;

23     4.    For pre-judgment interest as provided by law;

24  ///

25  ///

26  ///

27  ///

28  ///

5.    For attorneys' fees according to statute; and

6.    For costs of suit herein incurred, and for such other and further relief as the Court deems just and proper.


DATED:  February 27, 2025                    HELTON LAW GROUP, APC


                                             By: _____
                                                 CARRIE MCLAIN
                                                 MIKAELA COX
                                                 THOMAS YAU
                                                 Attorney for Plaintiff

COMPLAINT

Exhibit A

 **E V O L V E**

**Policy#:** FCLGLI001AZ

**Doctor Office Visit:** $10 Pre-pay

**Plan:** **Individual - Choice**

**Member ID:** ▮▮▮▮▮▮▮

**Effective Date:** **02-15-2021**

**MEDICAL PLAN**

♥ **First Health** Network

www.firsthealthlbp.com

**PHARMACY PLAN**

**elixir**

Group:
BIN:
PCN:

**24/7 Pharmacist Help Desk:**
(   ) 864-0032

Exhibit B

1  TYLER MCKINNEY, SBN 263717
2  CHRISTINA CARROLL, SBN 263713
   CALIFORNIA DEPARTMENT OF INSURANCE
3  300 Capitol Mall, 17th Floor
   Sacramento, California 95814
4  Telephone:  916 492-3283
   E-mail: christina.carroll@insurance.ca.gov
5
   *Attorneys for the California Department of Insurance*
6

7

8              **STATE OF CALIFORNIA**

9         **DEPARTMENT OF INSURANCE**

10

11 In the Matter of:                          File No.  LA202100084

12

13 **ADMINISTRATIVE CONCEPTS, INC.,**          **ORDER TO CEASE AND DESIST (Ins.**
14 **[Lic. No. 0C38805]**                       **Code § 12921.8)**

15 **ASSOCIATION FOR BETTER HEALTH,**

16 **ASSOCIATION HEALTH CARE**                 **ORDER TO SHOW CAUSE WHY AN**
   **MANAGEMENT, INC.,**                        **ORDER IMPOSING A MONETARY**
17 **DBA FAMILY CARE**                          **PENALTY SHOULD NOT ISSUE (Ins.**
                                               **Code § 12921.8)**
18
19 **MATTHEW DEPREY,**                          **NOTICE OF RIGHT TO HEARING**
   **[Lic. No. 0M50797]**
20
21 **EVOLVE HEALTH,**

22 **FIRST CONTINENTAL LIFE & ACCIDENT**
   **INSURANCE COMPANY,**
23
   **FIRST HEALTH NETWORK,**
24
25 **CURTIS GARCEAU,**
   **[Lic. No. 4026934]**
26
27 **GET ME CARE,**
   **AKA GETMECARE,**
28

SAMANTHA MABIE,
[Lic. No. 0L30001]

NATIONAL ASSOCIATION OF PREFERRED
PROVIDERS,

SCOTT RUSSELL,
[Lic. No. 0N03621]

SERVICE INDUSTRY TRADE ALLIANCE,

FABIAN VERGARA,
[Lic. No. 0M31165]

                        Respondents.

TO:  ADMINISTRATIVE CONCEPTS, INC. ("ACI"), 400 CAMPUS DRIVE, SUITE 300, COLLEGEVILLE, PENNSYLVANIA, 19426, its officers, directors, employees, trustees, agents, brokers, affiliates, successors, and service representatives; and,

ASSOCIATION HEALTH CARE MANAGEMENT, INC., DBA FAMILY CARE, 11111 RICHMOND AVENUE, SUITE 200, HOUSTON, TEXAS, 77082, its officers, directors, employees, trustees, agents, brokers, affiliates, successors, and service representatives; and,

ASSOCIATION FOR BETTER HEALTH, 1630 DES PERES ROAD, SUITE 140, ST. LOUIS, MISSOURI, 63131, its officers, directors, employees, trustees, agents, brokers, affiliates, successors, and service representatives; and,

MATTHEW DEPREY, 141 NW 20TH STREET, SUITE G6, BOCA RATON, FLORIDA, 33431; and,

EVOLVE HEALTH, 994 OLD EAGLE SCHOOL ROAD, SUITE 1005, WAYNE, PENNSYLVANIA, 19087, its officers, directors, employees, trustees, agents, brokers, affiliates, successors, and service representatives; and,

1    FIRST CONTINENTAL LIFE & ACCIDENT INSURANCE COMPANY, 101

2    PARKLANE BOULEVARD, SUITE 301, SUGAR LAND, TEXAS 77478, its officers,

3    directors, employees, trustees, agents, brokers, affiliates, successors, and service

4    representatives; and,

5    FIRST HEALTH NETWORK, 7400 WEST CAMPUS ROAD, SUITE F510, NEW

6    ALBANY, OHIO, 43054, its officers, directors, employees, trustees, agents, brokers,

7    affiliates, successors, and service representatives; and,

8    CURTIS GARCEAU, 123 NW 13TH STREET, BOCA RATON, FLORIDA, 33432; and,

9    GET ME CARE, AKA GETMECARE, 123 NW 13TH STREET, SUITE 101, BOCA

10   RATON, FLORIDA, 33432, its officers, directors, employees, trustees, agents, brokers,

11   affiliates, successors, and service representatives; and,

12

13   SAMANTHA MABIE, 1000 NW 65TH STREET, SUITE 110, FORT LAUDERDALE,

14   FLORIDA, 33309; and,

15   NATIONAL ASSOCIATION OF PREFERRED PROVIDERS, 11111 RICHMOND

16   AVENUE, SUITE 250, HOUSTON, TEXAS, 77082, its officers, directors, employees,

17   trustees, agents, brokers, affiliates, successors, and service representatives; and,

18   SCOTT RUSSELL, PO BOX 1619, POMPANO BEACH, FLORIDA, 33061; and,

19   SERVICE INDUSTRY TRADE ALLIANCE, 16476 Wild Horse Creek Road,

20   Chesterfield, Missouri, 63017, its officers, directors, employees, trustees, agents, brokers,

21   affiliates, successors, and service representatives; and,

22   FABIAN VERGARA, 8700 WEST FLAGLER STREET, SUITE 405, MIAMI,

23   FLORIDA, 33174; and,

24   WHEREAS, California Insurance Code Section 12921.8(a)(1) authorizes the

25   Commissioner to issue a cease and desist order to a person who has acted in a capacity for

26   which a license, registration, or certificate of authority from the Commissioner was required

27   but not possessed; and,

28

WHEREAS, California Insurance Code Section 12921.8(a)(2) authorizes the Commissioner to issue a cease and desist order to a person who has aided or abetted a person described in Section 12921.8(a)(1); and,

WHEREAS, California Insurance Code Section 12921.8(a)(3) authorizes the Commissioner to issue an order to show cause for imposition of a monetary penalty against a person described in 12921.8(a)(1) or 12921.8(a)(2); and,

WHEREAS, California Insurance Code Section 12921.8(c) authorizes the Commissioner to issue said order to show cause without holding a hearing prior to issuance of the order; and,

WHEREAS, commencing on or before October 15, 2019, Respondent FIRST CONTINENTAL LIFE & ACCIDENT INSURANCE COMPANY ("FIRST CONTINENTAL"), has in this State unlawfully acted as an insurance company in California, and has in that capacity unlawfully transacted the business of insurance in this State without the requisite certificate of authority; and,

WHEREAS, FIRST CONTINENTAL is a nonadmitted insurer not authorized to transact insurance in California.[1]  FIRST CONTINENTAL is domiciled in Texas and licensed to transact insurance in several states and territories.[2]  FIRST CONTINENTAL was previously authorized to transact Life and Disability insurance in California on March 31, 1980. On or about July 3, 2002, the California Department of Insurance ("Department") issued a Cease and Desist Order against FIRST CONTINENTAL due to its failure to meet the mandatory minimum policyholder surplus requirement. As a result, FIRST CONTINENTAL stopped writing business in California. On or about June 26, 2012, the Department accepted FIRST CONTINENTAL's request to officially withdraw from the State

---

[1] California Insurance Code §25.

[2] Arkansas, Arizona, Colorado, District of Columbia, Delaware, Florida, Georgia, Hawaii, Indiana, Kansas, Louisiana, Maryland, Maine, Missouri, Mississippi, Montana, North Dakota, Nebraska, New Mexico, Oklahoma, South Dakota, Tennessee, Texas, Utah, the U.S. Virgin Islands, Vermont, and Wisconsin.

of California.  FIRST CONTINENTAL does not currently hold a certificate of authority to transact business in the State of California, and has not held a certificate of authority during any time period relevant to the matter at issue; and,

WHEREAS, FIRST CONTINENTAL has acted in a capacity for which a certificate of authority is required but not possessed by insuring at least 12 Californians[3] as set forth below; and,

WHEREAS, all other Respondents have aided and abetted FIRST CONTINENTAL in the unlawful transaction of insurance in this State as outlined below.

WHEREAS, additional violations include, but are not limited to:

a)    Misrepresentation of fixed-benefit indemnity insurance as "health insurance," in violation of sections 106(b)(2), 780(a), 781, and 790.03(b) of the California Insurance Code.

b)    Issuance of fixed-benefit indemnity insurance to Californians who did not have comprehensive health insurance, in violation of section 10198.61(b) of the California Insurance Code.

c)    Failure to comply with sections 10198.61(a) and 10198.8 of the California Insurance Code, which require insurers to certify annually to the Commissioner that they do not market their indemnity insurance as a substitute for Affordable Care Act health insurance, "regardless of the situs of the contract or group master policyholder."

WHEREAS, the complainants below were California residents during all relevant time periods.

//

//

---

[3] More than 12 Californians have filed complaints with the Department of Insurance alleging misrepresentation and other misconduct.  It is unknown how many other Californians have actually been insured by FIRST CONTINENTAL.

# 1. COMPLAINANT B.S.

WHEREAS, on or about February 19, 2020, Respondent MATTHEW DEPREY ("DEPREY"), sold B.S.[4] "health insurance" for $369.90 down and $269.95 per month. According to B.S.:

> I contacted [Matthew] in Feb 2020 about an insurance coverage. He set me up with a policy and he stated it has zero deductible and covers everything except being pregnant. On Friday 06/26/2020 i had to go to the ER and then had heart surgery on Saturday because my main artery was 99.9% blocked. Today i get a call from the hospital billing department. Saying my insurance only covers only $350 per day. My balance now is $100,000 for the hospital bill plus the doctors as they are bill separately and that could be another $40,000. I call [Matthew] and pretended that a friend of mine was looking for ins and wanted to confirm my coverage. I asked about the zero deductible and he said yes. Then I asked if a heart attack and the need to go to the ER and have heart surgery. He said all of that is covered. Which is a total lie and he told me in those exact words in February. Please follow up and call him and ask about the coverage and she [sic] if he tells you the same thing. This is fraud.

WHEREAS, the policy was sold circuitously - DEPREY enrolled B.S. in Respondent SERVICE INDUSTRY TRADE ALLIANCE's ("SITA's") Membership Plan. SITA was the policyholder on FIRST CONTINENTAL group policy number FCL-GLI-001-002-AZ, which stated "all [SITA] members between the ages of 18 and 64" were eligible for coverage. Due to the SITA membership, B.S. was covered on the group policy for limited benefit indemnity insurance with FIRST CONTINENTAL. The situation was so confusing that B.S. did not

---

[4] All identifying and privileged information regarding consumers has been removed for purposes of publication on the Department's public website pursuant to the provisions of Insurance Code Section 12938. Accordingly, consumers, victims and other non-parties may be identified by fictitious names or initials. The actual identities of these individuals are provided in Exhibit A, attached hereto and incorporated herein by this reference, for purposes of this Accusation only. Exhibit A will not appear on the Department's public website.

1   know who the insurer was – on the Department's Request for Assistance form, B.S. stated

2   that the insurer was FIRST HEALTH NETWORK; and,

3       WHEREAS, SITA, FIRST CONTINENTAL, and FIRST HEALTH NETWORK are

4   unlicensed.[5]  Since 2018, DEPREY has been licensed with the Department as a non-

5   resident Accident and Health Agent, license number 0M50797.[6]

6

7                          **2.  COMPLAINANT Y.B.**

8       WHEREAS, Respondent EVOLVE HEALTH, an unlicensed entity, issued a medical

9   plan insurance card to Y.B. effective October 15, 2019.  The insurance card contains a

10  confusing litany of names and contact information:



19      WHEREAS, EVOLVE HEALTH is the name at the top of the card, and the policy

20  number is FCL-GLI-001-AZ. The Medical Plan is through unlicensed Respondent FIRST

21  HEALTH NETWORK, www.firsthealthlbp.com, with "[i]nsurance benefits underwritten by

22  FIRST CONTINENTAL," a nonadmitted insurer as discussed above. Claims handling is

23  through Respondent ADMINISTRATIVE CONCEPTS, INC. ("ACI"), 800-565-6052,

24  www.visit-aci.com.  ACI has been licensed with the Department since 1998 as a non-

25

26

27  ───────────────────────

28  [5] Any reference to "unlicensed" means unlicensed with the California Department of Insurance.

   [6] The Department has issued an Accusation against DEPREY.

resident Registered Administrator, license number 0C38805.[7] The policyholder is instructed to call 855-577-1610 for "all billing, customer service and non-claims related questions," 800-565-6052 to verify eligibility and/or obtain benefits, and go to www.associationforbetterhealth.org to access member benefits. The information was so confusing that Y.B. did not know who the insurer was – on the Department's Request for Assistance form, Y.B. stated that the insurer was EVOLVE; and,

WHEREAS, according to Y.B., she paid about $300 per month for the insurance. Subsequently, Y.B. said she received a letter from ACI and FIRST CONTINENTAL claiming that she owed five thousand, two hundred and twelve dollars ($5,212.00) for a hospital visit on January 8, 2020.  Y.B. claims she never visited any hospital on that date.

### 3.  COMPLAINANT T.A.

WHEREAS, on or about August 28, 2020, T.A. found health insurance online, and purchased the coverage over the phone with an EVOLVE HEALTH agent for $297.90 down and $197.95 per month. All payments were made to EVOLVE HEALTH.  According to T.A.:

> I was told I had broad coverage for a healthcare plan I purchased. I recently found out that this plan I was sold has no out-of-pocket maximum, and only pays 80% of the costs up to $2,500. This is extremely low for a healthcare plan. I even told the agent that I had just been denied after an accident, in another policy I had with another insurer, and that I wanted to make sure I was covered.

In actuality, T.A. was sold a "membership" in SITA that included limited indemnity benefits. SITA was the policyholder on FIRST CONTINENTAL group policy number FCL-GLI-001-002-AZ; and,

WHEREAS, EVOLVE HEALTH issued a medical plan insurance card to T.A. According to the insurance card, the Medical Plan is through FIRST HEALTH NETWORK;

---

[7] The Department has issued an Accusation against ACI.

with "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The policy number on T.A.'s insurance card is identical to the policy number above for Y.B., but does not match the policy number on T.A.'s actual policy, which is FCL-GLI-001-002-AZ. The insurance card states that SITA association member benefits can be accessed at www.serviceindustrytradealliance.org. All other information appears identical to the information on the insurance card for Y.B.



The situation was so confusing that T.A. did not know who the insurer was – on the Department's Request for Assistance form, T.A. stated that the insurer was EVOLVE HEALTH.  After T.A. discovered that the policy was "essentially worthless," he cancelled the coverage and is requesting a full refund.

### 4.  COMPLAINANTS M.A. AND J.M.

WHEREAS, on or about February 7, 2020, M.A. and his wife J.M. obtained "health insurance" with FIRST CONTINENTAL. Their intent was to obtain coverage for regular doctor visits. Instead, they were sold a membership in ABH for $539.90 down and $439.95 per month, which included limited indemnity coverage. ABH was the policyholder on FIRST CONTINENTAL group policy number FCL-GLI-001-AZ, which stated "all [ABH] members between the ages of 18 and 64" were eligible for limited indemnity coverage; and,

WHEREAS, EVOLVE HEALTH issued a medical plan insurance card to M.A. and J.M., showing the Medical Plan through FIRST HEALTH NETWORK, with "[i]nsurance

1  benefits underwritten by FIRST CONTINENTAL." Strangely, the insurance card indicates

2  that the membership association is SITA, not ABH. The other information on the insurance

3  card is similar to the information on the insurance card for Y.B.



12  The information was so confusing that J.M. did not know who the insurer was – on the

13  Department's Request for Assistance form, J.M. stated that the insurer was EVOLVE

14  HEALTH; and,

15      WHEREAS, on or about April 16, 2020, J.M. had COVID-19 symptoms and went to a

16  clinic to get a COVID-19 test.  FIRST CONTINENTAL paid $65, leaving J.M. with a $185.81

17  balance; and,

18      WHEREAS, in November 2020, J.M. went to the doctor and, for unknown reasons,

19  FIRST CONTINENTAL refused to pay any portion of the bill, leaving J.M. with a balance of

20  $243.64; and,

21      WHEREAS, on March 9, 2021, EVOLVE HEALTH sent M.A. a verification letter

22  confirming that he "purchased a brand of membership in the SERVICE INDUSTRY TRADE

23  ALLIANCE called EVOLVE HEALTH with an effective date of 2/7/2020."  The letter makes

24  no mention of FIRST CONTINENTAL or insurance coverage.

25  //

26  //

27  //

28

## 5.  COMPLAINANT M.F.

WHEREAS, Respondent GETMECARE, an unlicensed entity, issued a medical plan insurance card in M.F.'s name effective August 20, 2020. The insurance card includes a confusing array of names and contact information. GETMECARE is the name at the top of the card. The policy number is FCL-GLI-001-AZ. The Medical Plan is through FIRST HEALTH NETWORK, with "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The number 855-648-6927 is for "all billing, customer service and non-claims related questions." SITA association member benefits can be accessed at www.serviceindustrytradealliance.org. Most of the other contact information appears similar to the information on the insurance card for Y.B.

 

The information was so confusing that M.F. did not know who the insurer was – on the Department's Request for Assistance form, M.F. stated that the insurers were GETMECARE and HealthFirst.

WHEREAS, according to M.F., health insurance representatives misrepresented coverage to attract policyholders. M.F. was told, and the medical plan insurance card indicates, that there was only a $10 co-pay for doctor visits. Subsequently, M.F. discovered that the insurance only paid about 10 percent of the amount of the doctor visits.

//

//

## 6. COMPLAINANT J.G.

WHEREAS, J.G. lost his job on January 8, 2021 and attempted to purchase health insurance under COBRA. The person J.G. spoke with on a recorded line assured him that he was signing him up for health insurance coverage; and,

WHEREAS, instead of issuing J.G. a health insurance policy, J.G. was issued a "SecureCare Mini" limited benefit policy and an Accidental Death and Dismemberment ("AD&D") policy for $320.40 down and $221.40 per month. The SecureCare Mini policy stated: "Insurance benefits are underwritten by FIRST CONTINENTAL LIFE AND ACCIDENT INSURANCE COMPANY for members of the ASSOCIATION FOR BETTER HEALTH"; and,

WHEREAS, Respondent NATIONAL ASSOCIATION OF PREFERRED PROVIDERS ("NAPP"), an unlicensed entity, issued a claims identification card in J.G.'s name effective February 2, 2021, which appears to be for the AD&D policy.[8]  The claims card includes the following information:

- Member eligibility: 1-866-910-6173.  Submit claims on HFCA 1500 or UB92 to: Claims, 11111 Richmond Ave., Ste. 200, Houston, TX 77082,[9] or Fax to: 713-270-1391.

- VOLUNTARY ACCIDENT INSURANCE PROGRAM, ISSUED TO NAPP ASSOCIATION.

WHEREAS, it would appear from the documents submitted by J.G. that he was required to purchase memberships in both ABH and NAPP to obtain the "SecureCare Mini" and the AD&D policies; and,

WHEREAS, when J.G. attempted to make a doctor's appointment, he was informed that the doctor did not take the insurance, even though the doctor's name was on his

---

[8] The AD&D insurer is unknown.

[9] This address belongs to Respondent ASSOCIATION HEALTH CARE MANAGEMENT, INC.

insurance card. When J.G. attempted to contact the person he initially spoke with, he stated every phone number was disconnected or out of service, so he was unable to reach anyone. Soon after, J.G. was rushed to emergency with an infected gallbladder and had to have it removed immediately.  J.G. believes that the applicable Respondents should be responsible for the costs of his surgery and recovery, due to their misinformation and fraudulent actions, which prevented J.G. from acquiring proper health insurance before he fell ill.

### 7.  COMPLAINANT V.C.

WHEREAS, V.C. had health insurance through her employer until she was laid off. According to V.C., she conducted an Internet search for "ObamaCare," which led her to EVOLVE HEALTH.  V.C. stated she told the agent, Respondent FABIAN VERGARA ("VERGARA"), that she mainly needed coverage for her new baby's visits and checkups. VERGARA assured her the plan she was getting would be the best fit. VERGARA sold V.C. "health insurance" for $567.90 down and $467.95 per month. Since 2018, VERGARA has been licensed with the Department as a non-resident Accident and Health Agent, license number 0M31165;[10] and,

WHEREAS, EVOLVE HEALTH issued a medical plan insurance card to V.C. and her baby, L.C., effective August 1, 2020, showing the Medical Plan through FIRST HEALTH NETWORK, with "[i]nsurance benefits underwritten by FIRST CONTINENTAL."  The other contact information on the insurance card is similar to the information on the insurance card for Y.B. The information was so confusing that V.C. did not know who the insurer was – on the Department's Request for Assistance form, V.C. stated that the insurer was EVOLVE HEALTH; and,

---

[10] The Department has issued an Accusation against VERGARA.

WHEREAS, after a few doctor visits, V.C. started to receive bills from Children's Health Orange County ("CHOC") showing that she owed money for her baby's wellness checkups and vaccinations because they were not covered by insurance.  V.C. attempted to call her insurance company but was transferred from one department to another with no resolution. As a result, V.C. cancelled her policy on January 20, 2021 and enrolled her baby in MediCal, but still has an outstanding balance from CHOC for three thousand, six hundred dollars ($3,600.00). V.C. does not believe she should be responsible for this amount since VERGARA assured her that the plan he sold her was a regular health plan that would cover her baby's wellness checkups. Had V.C. been told up front that she was being sold a limited policy, she stated she would never have purchased it; and,

WHEREAS, on June 2, 2021, EVOLVE HEALTH sent V.C. a verification letter confirming she "purchased a brand of membership in the SERVICE INDUSTRY TRADE ALLIANCE called EVOLVE HEALTH with an effective date of August 1, 2020."  The letter made no mention of FIRST CONTINENTAL or insurance coverage.

## 8.  COMPLAINANT A.U.

WHEREAS, in or about September 2020, Respondent CURTIS GARCEAU ("GARCEAU") sold A.U. "health insurance" for $260.90 down and $160.95 per month. According to A.U., "I signed up for FIRST HEALTH and United Business Association ["UBA"] for supplemental insurance through GETMECARE ..." A.U. was told that between FIRST HEALTH and UBA she would have full health coverage.  According to A.U., GARCEAU told her there was a $10 copay for doctor visits, $250 for ambulance, and $350 for emergency treatment, with the remaining balance covered by UBA, subject to an annual limit of two million dollars. GARCEAU never told A.U. that she had a limited plan.  Since 2019,

GARCEAU has been licensed with the Department as a non-resident Life, Accident and Health Agent, license number 4026934;[11] and

WHEREAS, GETMECARE issued a medical plan insurance card in A.U.'s name effective September 5, 2020. The Medical Plan is through FIRST HEALTH NETWORK, with "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The number 855-648-6927 is for "all billing, customer service and non-claims related questions." Association member benefits are through SITA, and all other contact information appears identical to the information on the insurance card for Y.B.

WHEREAS, A.U. learned she had a limited plan when she saw a cardiologist and had an echocardiogram, and neither FIRST HEALTH nor UBA would provide any coverage. A.U. had to pay for the cardiologist and the echocardiogram herself.

## 9. COMPLAINANT D.M.

WHEREAS, on or about March 24, 2020, Respondent SAMANTHA MABIE ("MABIE"), sold D.M. "health insurance" for $369.90 down and $269.95 per month. According to D.M., she found the insurance on www.healthcare.gov and:

> [A]gent made the policy sound like a full coverage plan. What I signed was never supplied to me, policy and cards never sent to me. Paid almost $400.00 a month for a year asked for a policy more than once never received. Finally received a portal sign in that had a confirmation clause to see policy that stated I didn't have medical coverage at all. When I called I was told that is what I signed the first day that I never received a copy of in my instant messages. I would never have paid 400 for a sub par policy I have a pneumonia background I cancelled a Blue Shield policy for this plan.

---

[11] The Department has issued an Accusation against GARCEAU.

WHEREAS, MABIE had enrolled D.M. in SITA's Membership Plan, which included limited benefit "health insurance." The health insurer is not explicitly stated on the receipt, but is believed to be FIRST CONTINENTAL. The situation was so confusing that D.M. believed her health insurer was EVOLVE HEALTH. Since 2016, MABIE has been licensed with the Department as a non-resident Accident and Health Agent, license number 0L30001.[12] D.M. is requesting a full refund.

### 10. COMPLAINANT D.W.

WHEREAS, D.W. states:

> I was sold this insurance policy after filling out an online questionnaire that I thought was with the Covered California Website. Unfortunately, it was a pop-up site belonging to a private broker. I was sold a policy that I was told was Aetna, and paid $743.95 with my debit card for a policy covering me and my family, with a PPO health and dental plan. Within 24 hours, I realized this was not through Covered California and is indeed not an Aetna plan, and called back to cancel. I also called Covered California, and signed up with a new policy with them. I have made numerous phone calls to the previous insurer and have followed the exact protocol told to me: to send an email, along with proof of my existing insurance, requesting immediate cancellation. I sent this email on Monday, July 19, 2021. I have yet to hear from them, have not been refunded, and am unable to reach them by phone.

WHEREAS, D.W. received a temporary medical plan insurance card. SecureCare Preferred Starter is the name at the top of the card. No policy number is listed. Other information on the card includes the following: MDLIVE Doctor Visit Fee: $0; Unlimited # of Visits; 866-976-0802; www.mdlive.com/myewellness. The Medical Plan is through FIRST HEALTH, with "[i]nsurance benefits underwritten by FIRST CONTINENTAL." The number 866-910-6173 or benefitsportal.net is for "member services." ABH association member

---

[12] The Department has issued an Accusation against MABIE.

benefits can be accessed at www.associationforbetterhealth.org. Claims submission: ACI, 994 Old Eagle School Road, Ste. 1005, Wayne, PA 19087. www.visit-aci.com or 800-565-6053.  To confirm eligibility and obtain benefit determinations, please call 800-565-6053.'At some point, D.W. apparently dealt with Prosperity Health Group.  The information was so' confusing that D.W. believed her insurer was Prosperity Health Group.

## 11. COMPLAINANT M.S.

WHEREAS, on or about June 10, 2021, M.S. purchased what she believed to be full coverage health insurance through FIRST CONTINENTAL, policy number FCL-GLI-001-AZ. M.S. was never informed that the coverage was a limited benefit plan. M.S. states:

> When purchasing this health insurance I was told there was a $10 copay for doctor visits. After visiting the doctor in July [2021] I received a bill for $857.25 instead of the $10 copay as initially outlined in my call with the company. I have since cancelled my insurance with them however at the time I called to cancel it was again confirmed I [sic] this insurance had a $10 copay. This isn't really insurance as I paid almost $800 per month for a $10 copay. It would have been less expensive to forgo the insurance and pay the doctor directly for the appointment.

WHEREAS, M.S.'s bank statement shows that Respondent FAMILY CARE of Texas, 800-323-4057, took the initial payment of $848.45 and the first installment of $738.45 from her bank account.  FAMILY CARE is the DBA of Respondent ASSOCIATION HEALTH CARE MANAGEMENT, INC.

## 12. COMPLAINANTS E.P. AND N.P.

WHEREAS, on or about December 4, 2020, E.P. and N.P. received a call from insurance agent and Respondent SCOTT RUSSELL ("RUSSELL"), who told them he could give them better health coverage with lower premiums than E.P. had through his previous insurer, Blue Cross; and,

WHEREAS, from June 18, 2019 until his license expired for failure to renew on June 30, 2021, RUSSELL was licensed with the Department as a non-resident Accident and Health Agent, license number 0N03621;[13] and,

WHEREAS, E.P. and N.P. talked extensively about the coverage with RUSSELL, and it sounded good, so they purchased the "health insurance" through FIRST CONTINENTAL, with ACI as the administrator. The medical plan was called "SecureCare Enterprise," and policy documents indicate that E.P. and N.P. were enrolled as members of ABH to obtain the coverage for $593.40 down and $468.40 per month; and,

WHEREAS, RUSSELL told E.P. and N.P. they would be receiving medical identification cards and a booklet with all the information about medical and dental coverage within a few weeks.  Although the medical cards arrived, the booklet never came.  E.P. and N.P. forgot about the booklet until March 2021, and when they called member services, they were informed that the insurer does not have medical coverage booklets but there is a website. When N.P. accessed the website, she discovered that RUSSELL had included a life insurance policy at $105.45 per month, which they had not requested. At N.P.'s request, the life insurance was removed; and,

WHEREAS, on or about March 27, 2021, E.P. had to go to the emergency room for about two hours. On or about April 29, 2021, ACI sent E.P. an explanation of benefits form stating that the coverage was a limited benefit plan and did not provide any emergency room coverage, contrary to what they had been told by RUSSELL. E.P. and N.P. were understandably upset, as RUSSELL told them they had the best policy. The emergency room bill was $8,287.49, and FIRST CONTINENTAL refused to pay any portion of it; and,

WHEREAS, N.P. tried diligently to obtain a refund by contacting the various numbers provided, but was constantly put on hold for excessive amounts of time, transferred,

---

[13] The Department has issued an Accusation against RUSSELL.

disconnected, and told she needed to call a different number. When N.P. tried to go to the

website to see if there was a refund, it showed the following message:

**Access Request**

This account cannot be accessed due to an unresolved issue. Please contact a
services leader to assist in resolving this matter

Member Services  |  (866) 910-6173  |  memberservices@ahcminc.com

AHCM Inc. is Respondent ASSOCIATION HEALTH CARE MANAGEMENT INC., DBA

FAMILY CARE; and,

The phone game is a common theme among complainants, and appears to be a

scheme by which FIRST CONTINENTAL, ACI and possibly other Respondents attempt to

evade policyholder requests for refunds and payments, probably hoping the policyholders

will just go away - and many probably do - leaving Respondents with a handsome profit.

## ILLEGAL INSURANCE

WHEREAS, the fixed-benefit policies at issue in this case work in the opposite

manner of standard health insurance policies.  Typical health policies often require the

policyholder to pay a deductible or co-pay, then the insurer pays the remainder of the

charges.  But with the fixed-benefit policies, the <u>insurer</u> pays fixed amounts (analogous to a

deductible or co-pay), and the <u>policyholder</u> pays the remainder of the charges.  The

policyholder is essentially self-insured, since the fixed amounts paid by the insurer are fairly

low and only cover a small fraction of the actual costs. This type of supplementary insurance

might be acceptable to fill in the gaps for someone who has existing health insurance with

high deductibles, but it is not intended to be a primary health insurance policy, although

Respondents sold it as such. As stated above, this type of coverage is illegal in California

when sold as a primary health insurance policy, notwithstanding the fact that it was backed

by a nonadmitted, illegal insurer, and sold by misrepresentation.

## VIOLATIONS

### *Unlawful Activities*

WHEREAS, FIRST CONTINENTAL has acted in a capacity for which a certificate of authority is required but not possessed, in violation of California Insurance Code section 700; has misrepresented fixed-benefit indemnity insurance as "health insurance," in violation of sections 106(b)(2), 780(a), 781, and 790.03(b); has issued fixed-benefit indemnity insurance to Californians who did not have comprehensive health insurance, in violation of section 10198.61(b); and failed to comply with sections 10198.61(a) and 10198.8, which require insurers to certify annually to the Commissioner that they do not market their indemnity insurance as a substitute for Affordable Care Act health insurance, "regardless of the situs of the contract or group master policyholder."

WHEREAS, ADMINISTRATIVE CONCEPTS, INC. ("ACI") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, the ASSOCIATION FOR BETTER HEALTH ("ABH") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, ASSOCIATION HEALTH CARE MANAGEMENT, INC., DBA FAMILY CARE ("AHCM") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, MATTHEW DEPREY has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, EVOLVE HEALTH has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, FIRST HEALTH NETWORK has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, CURTIS GARCEAU has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, GET ME CARE, AKA GETMECARE, has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, SAMANTHA MABIE has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, the NATIONAL ASSOCIATION OF PREFERRED PROVIDERS ("NAPP") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, SCOTT RUSSELL has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, the SERVICE INDUSTRY TRADE ALLIANCE ("SITA") has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance

in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

WHEREAS, FABIAN VERGARA has aided and abetted FIRST CONTINENTAL, an entity not licensed to transact the business of insurance in California, to transact insurance with California residents, in violation of California Insurance Code section 703; and,

### *Dates of Unlawful Activities*

WHEREAS, FIRST CONTINENTAL is not licensed by the Commissioner to transact insurance business as an insurer, and began engaging in the unlawful activity set forth herein on or before October 15, 2019.

WHEREAS, ACI, ABH, EVOLVE HEALTH, and FIRST HEALTH NETWORK began engaging in the unlawful activity set forth herein on or before October 15, 2019; and,

WHEREAS, AHCM and NAPP began engaging in the unlawful activity set forth herein on or before February 2, 2021; and,

WHEREAS, MATTHEW DEPREY and SITA began engaging in the unlawful activity set forth herein on or before February 19, 2020; and,

WHEREAS, GET ME CARE began engaging in the unlawful activity set forth herein on or before August 20, 2020; and,

WHEREAS, CURTIS GARCEAU began engaging in the unlawful activity set forth herein on or before September 5, 2020; and,

WHEREAS, SAMANTHA MABIE began engaging in the unlawful activity set forth herein on or before March 24, 2020; and,

WHEREAS, SCOTT RUSSELL began engaging in the unlawful activity set forth herein on or before December 4, 2020; and,

WHEREAS, FABIAN VERGARA began engaging in the unlawful activity set forth herein on or before August 1, 2020; and,

# SUPERIOR COURT OF CALIFORNIA
# COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:
**Stanley Mosk Courthouse**
**111 North Hill Street, Los Angeles, CA 90012**

PLAINTIFF:
**UNIVERSITY OF SOUTHERN CALIFORNIA**

DEFENDANT:
**COVENTRY HEALTH CARE NATIONAL NETWORK, INC., et al.**

## NOTICE OF CASE MANAGEMENT CONFERENCE

Reserved for Clerk's File Stamp

**FILED**
Superior Court of California
County of Los Angeles

**03/04/2025**

David W. Slayton, Executive Officer / Clerk of Court

By: _____ S. Shumate _____ Deputy

CASE NUMBER:
**25STCV05606**

TO THE PLAINTIFF(S)/ATTORNEY(S) FOR PLAINTIFF(S) OF RECORD:

You are ordered to serve this notice of hearing on all parties/attorneys of record forthwith, and meet and confer with all parties/attorneys of record about the matters to be discussed no later than 30 days before the Case Management Conference.

Your Case Management Conference has been scheduled at the courthouse address shown above on:

| Date: 08/25/2025 | Time: 10:00 AM | Dept.: 50 |

NOTICE TO DEFENDANT:    THE SETTING OF THE CASE MANAGEMENT CONFERENCE DOES NOT EXEMPT THE DEFENDANT FROM FILING A RESPONSIVE PLEADING AS REQUIRED BY LAW.

Pursuant to California Rules of Court, rules 3.720-3.730, a completed Case Management Statement (Judicial Council form # CM-110) must be filed at least 15 calendar days prior to the Case Management Conference. The Case Management Statement may be filed jointly by all parties/attorneys of record or individually by each party/attorney of record. You must be familiar with the case and be fully prepared to participate effectively in the Case Management Conference.

At the Case Management Conference, the Court may make pretrial orders including the following, but not limited to, an order establishing a discovery schedule; an order referring the case to Alternative Dispute Resolution (ADR); an order reclassifying the case; an order setting subsequent conference and the trial date; or other orders to achieve the goals of the Trial Court Delay Reduction Act (Gov. Code, § 68600 et seq.)

Notice is hereby given that if you do not file the Case Management Statement or appear and effectively participate at the Case Management Conference, the Court may impose sanctions, pursuant to LASC Local Rule 3.37, Code of Civil Procedure sections 177.5, 575.2, 583.150, 583.360 and 583.410, Government Code section 68608, subdivision (b), and California Rules of Court, rule 2.2 et seq.

Dated: __03/04/2025__

_Teresa A. Beaudet_
Judicial Officer

---

**CERTIFICATE OF SERVICE**    Teresa A. Beaudet / Judge

I, the below named Executive Officer/Clerk of Court of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below:

☑ by depositing in the United States mail at the courthouse in __Los Angeles__, California, one copy of the original filed herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid.

☐ by personally giving the party notice upon filing of the complaint.

Mikaela G. Cox
1590 Corporate Drive
Costa Mesa, CA 92626

David W. Slayton, Executive Officer / Clerk of Court

Dated: __03/04/2025__

By __S. Shumate__
Deputy Clerk

# NOTICE OF
# CASE MANAGEMENT CONFERENCE

LASC LACIV 132 Rev. 01/23
For Optional Use

Cal. Rules of Court, rules 3.720-3.730
LASC Local Rules, Chapter 7KUHH

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>03/04/2025<br>David W. Slayton, Executive Officer / Clerk of Court<br>By: _____ S. Shumate _____ Deputy |
| PLAINTIFF/PETITIONER:<br>UNIVERSITY OF SOUTHERN CALIFORNIA | |
| DEFENDANT/RESPONDENT:<br>COVENTRY HEALTH CARE NATIONAL NETWORK, INC., et al. | |

| CERTIFICATE OF MAILING | CASE NUMBER:<br>25STCV05606 |
|---|---|

**I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that on this date I served the Notice of Case Management Conference upon each party or counsel named below by placing the document for collection and mailing so as to cause it to be deposited in the United States mail at the courthouse in Los Angeles, California, one copy of the original filed/entered herein in a separate sealed envelope to each address as shown below with the postage thereon fully prepaid, in accordance with standard court practices.**

Mikaela G. Cox
HELTON LAW GROUP, APC
1590 Corporate Drive
Costa Mesa, CA 92626

David W. Slayton, Executive Officer / Clerk of Court

Dated: <u>03/4/2025</u>

By: <u>S. Shumate</u>
      Deputy Clerk

**CERTIFICATE OF MAILING**

# DEPARTMENT 50

## Judge Teresa A. Beaudet

111 N. Hill Street, Room 508
Los Angeles, CA 90012
(213) 633-0650

# MANDATORY COURTESY COPIES REQUIRED FOR *ALL FILINGS*

# FAILURE TO PROVIDE COURTESY COPIES MAY NEGATIVELY IMPACT THE COURT'S ABILITY TO CONSIDER YOUR FILING

Courtesy Copies of **all filings** are to be lodged directly with Department 50 within one court day after any electronic filing. A failure to timely provide courtesy copies may impact the calendaring of your motion or the Court's review of your papers.

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**02/27/2025**<br>David W. Slaybn, Execitive Officer / Clerk of Court<br>By: _____ S. Ruiz _____ Deputy |
| NOTICE OF CASE ASSIGNMENT<br><br>UNLIMITED CIVIL CASE | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>25STCV05606 |

<u>THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT</u>

| | ASSIGNED JUDGE | DEPT | ROOM | | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|---|
| ✔ | Teresa A. Beaudet | 50 | | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 02/28/2025 _____
    (Date)

David W. Slayton, Executive Officer / Clerk of Court

By S. Ruiz _____, Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION

The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES

The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE

A challenge under Code of Civil Procedure Section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS

Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS

All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS

Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE

A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE

The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS

The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions

Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases

Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**



*Superior Court of California, County of Los Angeles*
**ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION PACKAGE**

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS MUST SERVE THIS ADR INFORMATION PACKAGE ON ANY NEW PARTIES NAMED TO THE ACTION WITH THE CROSS-COMPLAINT.**

**WHAT IS ADR?**

Alternative Dispute Resolution (ADR) helps people find solutions to their legal disputes without going to trial. The Court offers a variety of ADR resources and programs for various case types.

**TYPES OF ADR**

- **Negotiation.** Parties may talk with each other about resolving their case at any time. If the parties have attorneys, they will negotiate for their clients.

- **Mediation.** Mediation may be appropriate for parties who want to work out a solution but need help from a neutral third party. A mediator can help the parties reach a mutually acceptable resolution. Mediation may be appropriate when the parties have communication problems and/or strong emotions that interfere with resolution. Mediation may not be appropriate when the parties want a public trial, lack equal bargaining power, or have a history of physical or emotional abuse.

- **Arbitration.** Less formal than a trial, parties present evidence and arguments to an arbitrator who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision.

- **Settlement Conferences.** A judge or qualified settlement officer assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. Mandatory settlement conferences may be ordered by a judicial officer. In some cases, voluntary settlement conferences may be requested by the parties.

**ADVANTAGES OF ADR**

- **Save time and money.** Utilizing ADR methods is often faster than going to trial and parties can save on court costs, attorney's fees, and other charges.
- **Reduce stress and protect privacy.** ADR is conducted outside of a courtroom setting and does not involve a public trial.
- **Help parties maintain control.** For many types of ADR, parties may choose their ADR process and provider.

**DISADVANTAGES OF ADR**

- **Costs.** If the parties do not resolve their dispute, they may have to pay for ADR, litigation, and trial.
- **No Public Trial.** ADR does not provide a public trial or decision by a judge or jury.

**WEBSITE RESOURCES FOR ADR**

- **Los Angeles Superior Court ADR website:** www.lacourt.org/ADR
- **California Courts ADR website:** www.courts.ca.gov/programs-adr.htm

**Los Angeles Superior Court ADR Programs for Unlimited Civil (cases valued over $35,000)**

Litigants should closely review the requirements for each program and the types of cases served.

- **Civil Mediation Vendor Resource List.** Litigants in unlimited civil cases may use the Civil Mediation Vendor Resource List to arrange voluntary mediations without Court referral or involvement. The Resource List includes organizations that have been selected through a formal process that have agreed to provide a limited number of low-cost or no-cost mediation sessions with attorney mediators or retired judges. Organizations may accept or decline cases at their discretion. Mediations are scheduled directly with these organizations and are most often conducted through videoconferencing. The organizations on the Resource List target active civil cases valued between $50,000-$250,000, though cases outside this range may be considered. *For more information and to view the list of vendors and their contact information, download the Resource List Flyer and FAQ Sheet at www.lacourt.org/ADR/programs.html.*
  **RESOURCE LIST DISCLAIMER:** The Court provides this list as a public service. The Court does not endorse, recommend, or make any warranty as to the qualifications or competency of any provider on this list. Inclusion on this list is based on the representations of the provider. The Court assumes no responsibility or liability of any kind for any act or omission of any provider on this list.

- **Mediation Volunteer Panel (MVP).** Unlimited civil cases referred by judicial officers to the Court's Mediation Volunteer Panel (MVP) are eligible for three hours of virtual mediation at no cost with a qualified mediator from the MVP. Through this program, mediators volunteer preparation time and three hours of mediation at no charge. If the parties agree to continue the mediation after three hours, the mediator may charge their market hourly rate. When a case is referred to the MVP, the Court's ADR Office will provide information and instructions to the parties. The Notice directs parties to meet and confer to select a mediator from the MVP or they may request that the ADR Office assign them a mediator. The assigned MVP mediator will coordinate the mediation with the parties. *For more information or to view MVP mediator profiles, visit the Court's ADR webpage at www.lacourt.org/ADR or email ADRCivil@lacourt.org.*

- **Mediation Center of Los Angeles (MCLA) Referral Program.** The Court may refer unlimited civil cases to mediation through a formal contract with the Mediation Center of Los Angeles (MCLA), a nonprofit organization that manages a panel of highly qualified mediators. Cases must be referred by a judicial officer or the Court's ADR Office. The Court's ADR Office will provide the parties with information for submitting the case intake form for this program. MCLA will assign a mediator based on the type of case presented and the availability of the mediator to complete the mediation in an appropriate time frame. MCLA has a designated fee schedule for this program. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

- **Resolve Law LA (RLLA) Virtual Mandatory Settlement Conferences (MSC).** Resolve Law LA provides three-hour virtual Mandatory Settlement Conferences at no cost for personal injury and non-complex employment cases. Cases must be ordered into the program by a judge pursuant to applicable Standing Orders issued by the Court and must complete the program's online registration process. The program leverages the talent of attorney mediators with at least 10 years of litigation experience who volunteer as settlement officers. Each MSC includes two settlement officers, one each from the plaintiff and defense bars. Resolve Law LA is a joint effort of the Court, Consumer Attorneys Association of Los Angeles County (CAALA), Association of Southern California Defense Counsel (ASCDC), Los Angeles Chapter of the American Board of Trial Advocates (LA-ABOTA), Beverly Hills Bar Foundation (BHBF), California Employment Lawyers Association (CELA), and Los Angeles County Bar Association (LACBA). *For more information, visit https://resolvelawla.com.*

- **Judicial Mandatory Settlement Conferences (MSCs).** Judicial MSCs are ordered by the Court for unlimited civil cases and may be held close to the trial date or on the day of trial. The parties and their attorneys meet with a judicial officer who does not make a decision, but who instead assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For more information, visit https://www.lacourt.org/division/civil/CI0047.aspx.

**Los Angeles Superior Court ADR Programs for Limited Civil (cases valued below $35,000)**
Litigants should closely review the requirements for each program and the types of cases served.

- **Online Dispute Resolution (ODR).** Online Dispute Resolution (ODR) is a free online service provided by the Court to help small claims and unlawful detainer litigants explore settlement options before the hearing date without having to come to court. ODR guides parties through a step-by-step program. After both sides register for ODR, they may request assistance from trained mediators to help them reach a customized agreement. The program creates settlement agreements in the proper form and sends them to the Court for processing. Parties in small claims and unlawful detainer cases must carefully review the notices and other information they receive about ODR requirements that may apply to their case. *For more information, visit https://my.lacourt.org/odr.*

- **Dispute Resolution Program Act (DRPA) Day-of-Hearing Mediation.** Through the Dispute Resolution Program Act (DRPA), the Court works with county-funded agencies, including the Los Angeles County Department of Consumer & Business Affairs (DCBA) and the Center for Conflict Resolution (CCR), to provide voluntary day-of-hearing mediation services for small claims, unlawful detainer, limited civil, and civil harassment matters. DCBA and CCR staff and trained volunteers serve as mediators, primarily for self-represented litigants. There is no charge to litigants. *For more information, visit https://dcba.lacounty.gov/countywidedrp.*

- **Temporary Judge Unlawful Detainer Mandatory Settlement Conference Pilot Program.** Temporary judges who have been trained as settlement officers are deployed by the Court to designated unlawful detainer court locations one day each week to facilitate settlement of unlawful detainer cases on the day of trial. For this program, cases may be ordered to participate in a Mandatory Settlement Conference (MSC) by judicial officers at Stanley Mosk, Long Beach, Compton, or Santa Monica. Settlement rooms and forms are available for use on the designated day at each courthouse location. There is no charge to litigants for the MSC. *For more information, contact the Court's ADR Office at ADRCivil@lacourt.org.*

## <u>PROOF OF SERVICE</u>

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 633 West Fifth Street, 52nd Floor, Los Angeles, California 90071. On **April 16, 2025**, I served a copy of the within document(s):

**DECLARATION OF SHANNON L. ERNSTER IN SUPPORT OF DEFENDANTS' NOTICE OF REMOVAL**

☐    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, the United States mail at Los Angeles, California addressed as set forth below.

☒    by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

Carrie McLain
Mikaela Cox
Thomas Yau
HELTON LAW GROUP
1590 Corporate Drive
Costa Mesa, CA 92626
Tel: 562.901.4499
Fax: 562.901.4488
cmclain@helton.law
mcox@helton.law
tyau@helton.law

**Attorneys for Plaintiff**
*UNIVERISTY OF SOUTHERN CALIFORNIA*
*on behalf of it KECK HOSPITAL OF USC and*
*on behalf of its USC VERDUGO HILLS*
*HOSPITAL*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

GORDON REES SCULLY MANSUKHANI, LLP
633 West Fifth Street, 52nd Floor, Los Angeles, CA 90071

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on **April 16, 2025**, at Los Angeles, California.

Bonnie Perlman